**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SHARON L. PERKINS, et al., | : | |
|     Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 3:07-cv-967 (JCH) |
| v. | : | |
| | : | |
| SOUTHERN NEW ENGLAND | : | |
| TELEPHONE CO., | : | NOVEMBER 4, 2009 |
|     Defendant. | : | |

**RULING RE: MOTION FOR FLSA COLLECTIVE ACTION AND**
**RULE 23 CLASS CERTIFICATION (Doc. No. 119) AND MOTION TO STRIKE**
**APPENDICES AND EXHIBITS RE: PLAINTIFF'S REPLY (Doc. No. 181)**

## I.   INTRODUCTION

Plaintiff, Sharon Perkins, originally brought this action against defendant,

Southern New England Telephone Company ("SNET"), on behalf of herself and a class

of similarly situated employees alleging that she had not been paid for overtime work in

violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207 and Connecticut

General Statutes §§ 31-60(a) and 31-76(c).  See Amended Complaint (Doc. No. 51).

On March 2, 2009, Perkins amended her complaint, adding Michael Blasko, Joseph

Kiely, Michael McDermott, and Kelly Werbinski as named plaintiffs.  See Second

Amended Complaint (Doc. No. 118).

Plaintiffs now move the court to certify a FLSA collective action under 29 U.S.C.

§ 216(b) and a class action under Federal Rule of Procedure 23(b)(3).  See Pl.'s Mot.

for FLSA Collective Action and Rule 23 Class Certification (Doc. No. 119).  For the

reasons that follow, the court grants the Motion.

SNET moves the court to strike certain of plaintiffs' appendices and exhibits to

1

their Reply.  See Def.'s Mot. to Strike Appendices and Exhibits (Doc. No. 181). For the reasons stated below, that Motion is granted in part and denied in part.

## II.    BACKGROUND

Plaintiffs Sharon Perkins, Michael Blasko, Joseph Kiely, Michael McDermott, and Kelly Werbinski are current and former First-Level Managers at SNET.  Perkins filed this action over two years ago, alleging overtime violations of FLSA and Connecticut state law.  See Second Am. Compl. at ¶¶ 13-17.  In June 2008, SNET moved this court to dismiss the case because the opt-in procedure of FLSA collective actions was incompatible with the opt-out procedure of Rule 23 class actions.  See Def.'s Mot. to Dismiss (Doc. No. 61).  In February of 2009, this court denied the Motion to Dismiss, allowing the action to go forward.  See Ruling Denying SNET's Motion to Dismiss (Doc. No. 111).  At that time, the court also allowed Perkins to amend her complaint to include Blasko, Kiely, McDermott, and Werbinski as named plaintiffs, and directed her to brief the issue of relation back on the FLSA claims.  See Minute Entry for Proceedings Held on March 25, 2009 (Doc. No. 134).  Extensive discovery has taken place in this case.  Over 60 plaintiffs have opted in to the FLSA action, and SNET has taken depositions of over 20 of these plaintiffs, including the named plaintiffs.  Both parties have exchanged thousands of documents.  See Def.'s Opp. at 14.

Plaintiffs claim that SNET has a company-wide policy that misclassifies a class of First Level Managers as exempt from overtime compensation.  See Second Am. Compl. at ¶ 2.  Plaintiffs claim that they frequently worked more than 40 hours per week (sometimes up to 70 hours), but did not receive overtime compensation for that work. See id. at ¶ 5.  Additionally, plaintiffs claim that First-Level Managers are required to be

2

"on-duty" on a rotating basis, which means they must be available to go into the field 24 hours per day.  On weeks when they are on-duty, plaintiffs say they work anywhere between 20 hours to 70 hours per week more than their average schedule.  See, e.g., Declaration of Kelly Werbinski, Ex. F to Pl.'s Mot. ("Werbinski Decl.") at ¶ 7; Declaration of Michael McDermott, Ex. D to Pl.'s Mot. ("McDermott Decl.") at ¶ 8.

Plaintiffs describe their work as "extremely clerical," "very regimented" or "pre-determined by [their] superiors."  See Declaration of Joseph Kiely, Ex. E to Pl.'s Mot. ("Kiely Decl.") at ¶ 15; Declaration of Michael Blasko, Ex. C. to Pl.'s Mot. ("Blasko Decl.") at ¶ 11; Werbinski Decl. at ¶ 11.  Plaintiffs claim that they have little discretion in their work.  For example, they have no control over assigning their technicians to work particular jobs: the job assignments are handed down to them by a dispatch center. See, e.g., McDermott Decl. at ¶ 17; Blasko Decl. at ¶ 18; Kiely Decl. at ¶¶ 21-22. Plaintiffs claim they do not have the authority to discipline their technicians without the approval of their own supervisor.  See, e.g., Werbinski Decl. at ¶ 28; McDermott Decl. at ¶ 21.  Plaintiffs claim that they have no control over assigning overtime hours to their technicians, and that they have no authority to hire, fire, or promote any technicians. See, e.g., Kiely Decl. at ¶ 31; Werbinski Decl. at ¶ 27; Blasko Decl. at ¶ 33-34. Plaintiffs state that, although they perform safety and quality inspections in the field, they are not allowed to use their discretion in doing so; instead they must follow a detailed computer checklist, which requires them to answer yes-or-no questions.  See, e.g., Blasko Decl. at ¶ 30; Kiely Decl. at ¶ 26-27.  Finally, plaintiffs claim that they must receive authorization from their supervisors for the most minor of decisions, such as ordering supplies or emptying the dumpster.  See Kiely Decl. at ¶ 33; Werbinski Decl. at

3

¶ 38.  The heart of plaintiffs' claim is that their work is mostly clerical and lacking in discretionary decisions, and that they therefore should not be classified as exempt employees.

## III.   DISCUSSION

### A.   Class Definition

Plaintiffs seek a collective action on behalf of:

> All First Level (or Level One) Managers employed by SNET in the State of Connecticut from June 2004 and thereafter, (1) to whom SNET assigned technicians; and (2) who worked as First Level Managers in departments and areas including, but not limited to, Network Services, Installation and Maintenance, Installation, Maintenance, IM, I/M, DSL, Cable Maintenance, Cable Repair, Installation and Repair (I&R), Consumer, Business, Splicing, Cable Splicing, Loop Electronics (LERT), Digital Electronics Group (DEG), Outside Plant, Network Operations, Construction, Engineering, Construction and Engineering, Local Field Organization (LFO), U-verse, and U-verse Operations.[1]

See Second Am. Compl. at ¶ 7.  SNET argues that Plaintiff's Motion for Collective Action and Class Certification must fail because this definition is "ambiguous."  See Def.'s Opp. at 59-70.  SNET makes the somewhat incredible claim that it can neither understand "technician" nor "assigned," and thus it cannot determine which of its employees would fall into the class defined by the plaintiffs.  See Def.'s Opp. at 62.

Plaintiffs have defined "technicians" as "bargaining unit employees who perform the physical and technical aspects of the job on the inside or outside plant or at a customer's premises."  See Pl.'s Reply at 4.  SNET argues that "one cannot determine who is a 'technician' at SNET simply by job title," because it is not limited to "all those with the word 'technician' in their company job titles."  Def.'s Opp. at 63.  The court is

---

[1] The Rule 23 class definition is the same except for time period; because of the different statutes of limitations, the claims only go back to June 2005.

4

skeptical that an employer needs to rely on job titles to determine which of its employees are technicians.  Although SNET attempts to use deposition testimony from various plaintiffs to demonstrate that the term "technician" is ambiguous, the court expects an employer to be better able to define one of its own groups of employees than can employees who do not hold that position (i.e., the First-Level Managers).  At oral argument, plaintiffs' counsel stated that they could determine, based on the job titles listed in the collective bargaining agreement, which SNET employees were "technicians," i.e., "bargaining unit employees who perform the physical and technical aspects of the job on the inside or outside plant or at a customer's premises."

Additionally, plaintiffs produced for the court numerous documents they received from SNET during discovery, which documents make it clear that SNET is capable of defining "technician."  See Ex. A to Declaration of Andrew Melzer ("Melzer Decl.")(Doc. No. 168).  These documents include SNET records, such as phone trees and organizational charts, which demonstrate that SNET can readily identify its "technicians."  For example, some records, clearly obtained from SNET's internal records system, include a column labeled "Tech" or "Technician," which is filled with either an identification number or a name.  See id.  Other organizational charts include a column titled "Tech Code," which is filled with an identification number.  See id.  As "technician" is clearly a term that SNET uses internally, it is disingenuous for it to now argue to the court that it cannot determine which employees are "technicians."  Therefore, based on the evidence before it the court finds "technician" to be an ascertainable term.

Next, SNET argues that "its organizational charts do not indicate which

5

employees are assigned technicians."  Def.'s Opp. at 64.  However, SNET does admit

that these organizational charts do "indicate who [sic] individuals report to."  Id.  Thus,

SNET's argument here relies on its earlier argument that it cannot define "technician."

This court has already determined that "technician" is ascertainable.  Additionally,

plaintiffs introduced numerous organizational charts which make it clear that SNET's

internal reporting system keeps track of which technicians report to which First-Level

Managers.  See Ex. A to Melzer Decl.  For example, plaintiffs provided "Organizational

Listings" for several named and opt-in plaintiffs, which list the technicians that directly

report to each First-Level Manager.  See id.  These lists appear to be computer

printouts, which demonstrates that it should be fairly simple for SNET to determine

which First-Level Managers had technicians assigned to them.

Finally, SNET argues that it would be burdensome to "locate[], investigate[], and

interrogate[] every employee and former employee who held a first-level manager

position at any time since June 2004 about whether they were assigned technician."

Def.'s Opp. at 68-69.  This argument is without basis, especially because SNET has

already admitted that its organization charts indicate to whom each employee reports,

and plaintiffs have produced examples of such charts.

With the addition of the definition of "technicians" as "bargaining unit employees

who perform the physical and technical aspects of the job on the inside or outside plant

or at a customer's premises," and the evidence of SNET's own internal organizational

charts which demonstrate to whom technicians are assigned, the court concludes that

plaintiffs' class definition is ascertainable and not ambiguous.

B.    FLSA Collective Action

The FLSA permits employees to file an action on behalf of themselves, as well as on behalf of "other employees similarly situated," for violations of minimum wage and overtime provisions of the FLSA.  29 U.S.C. § 216 (b).  "[S]uch a joint, or collective, action requires potential plaintiffs to opt in to the suit in order to benefit from any judgment."  Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 618 (D. Conn. 2007)(citing 29 U.S.C § 216(b)).

"It is well settled that district courts have the discretionary power to authorize the sending of notice to potential class members in a collective action brought pursuant to [section] 216(b) of the FLSA."  Holbrook v. Smith and Hawken, Ltd., 246 F.R.D. 103, 105 (D. Conn. 2007)(quoting Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).  However, the Second Circuit has not articulated a test for certification of an FLSA collective action.  See, e.g., Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216, 220 n.6 (D. Conn. 2003).

District courts in this circuit have undertaken a two-stage inquiry.  See, e.g., Neary, 517 F.Supp.2d at 618.  The first step in determining whether a suit pursuant to the FLSA may proceed as a collective action is for the court to determine whether the proposed class members are similarly situated.  Id.  If the court concludes the proposed members are similarly situated, then the collective action will be conditionally certified. Id.  The second step of the analysis "occurs upon completion of discovery."  Id.  "A court, often prompted by a motion for decertification by the defendant, will examine all the evidence then in the record to determine whether there is a sufficient basis to conclude that the proposed class members are similarly situated."  Cuzco v. Orion

7

Builders, Inc., 477 F.Supp.2d 628, 632 (S.D.N.Y. 2007); see also Holbrook, 246 F.R.D at 106.  The court's findings on the motion for decertification constitutes the second step in the two-part inquiry.

Several district courts, including one in this district, and the Tenth Circuit, have adopted an ad hoc review of certain factors at the second stage, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."  See, e.g., Torres v. Gristede's Operating Corp., 2006 U.S. Dist. LEXIS 74039, at *30 (S.D.N.Y. Sept. 28, 2006); see also Thiessen v. GE Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001); Wilson v. Guardian Angel Nursing, Inc., 2009 U.S. Dist. LEXIS 26126, at *14 (M.D. Tenn. Mar. 24, 2009).

SNET argues that, because of extensive discovery that has already taken place in this case, the court should assess Plaintiffs' Motion as if it were at the second step. See Def.'s Opp. at 14-16.  The court agrees that it should determine whether to certify this collective action based on the full evidence before it, rather than merely examining the "pleadings and affidavits" as courts do at the first step.  See, e.g., Scott v. Aetna Servs., Inc., 210 F.RD. 261, 264 (D. Conn. 2002).  Although this second step involves a "higher standard" in analysis of the "similarly situated" question, it is still "considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate.'"  See, e.g., Ayers v. SGS Control Servs., 2007 U.S. Dist. LEXIS 19634, at *16-*17 (S.D.N.Y. Feb. 26, 2007).

8

1.    Disparate Factual and Employment Settings of Plaintiffs

Throughout its Opposition, SNET argues that FLSA misclassification cases are "inherently fact-specific" and, thus, are not appropriate for trial as a collective action. See Def.'s Opp. at 8-11, 35, 38.  However, section 216(b) clearly applies to misclassification claims as well as other FLSA claims.  Had Congress intended to exclude misclassification claims from collective actions, it would have done so. Additionally, a number of courts in this district have certified collective actions for FLSA overtime claims.  See, e.g., Marcus v. Am. Contract Bridge League, 254 F.R.D. 44 (D.Conn. 2008); Neary, 517 F. Supp. 2d 606.  Therefore, the court refuses to deny certification categorically, but it will instead examine the full record before it.

SNET relies heavily on Mike v. Safeco Ins. Co. of Am., 274 F.Supp.2d 216 (D.Conn. 2003), in making its argument that proceeding with a collective action would require individual inquiry which would be too cumbersome for the court, and therefore, inappropriate.  In Mike, Judge Squatrito denied a Motion to Proceed as a Collective Action because it required determining whether the FLSA administrative exception applied to the plaintiff, and this inquiry would be fact-intensive because the representative plaintiff "disavowed" his job description, and thus the court would have to "engage in an ad hoc inquiry for each proposed plaintiff to determine whether his or her job responsibilities were similar to Mike's."  Id. at 221.  As this court has already determined that plaintiff's class definition is ascertainable, Mike is thus distinguishable.

SNET further argues that the deposition testimony of the named and opt-in plaintiffs "establish that significant differences exist among the named plaintiffs themselves, and between the named plaintiffs and the individuals they seek to

represent."[2]  Def.'s Opp. at 17.  However, for a collective action, even at the second

stage, "plaintiffs need show only that their positions are similar, not identical, to the

positions held by the putative class members."  Ayers v. SGS Control Servs., 2007 U.S.

Dist. LEXIS 19634, at *16 (S.D.N.Y. Feb. 26, 2007)(quoting Grayson v. K Mart Corp.,

79 F.3d 1086, 1096 (11th Cir. 1996).  A collective action should be certified if, "on

balance, the differences among the plaintiffs do not outweigh the similarities in the

practices to which they claim to have been subjected."  See id. at *18.  The court notes

that, in highlighting specific sections of deposition testimony dealing with evaluation,

investigation, discipline, and training of other employees, SNET appears to be couching

arguments about the merits of the misclassification case in arguments about the

similarity of the potential class.  See Def.'s Opp. at 18-28.  At the certification stage, a

court need not judge the merits of the plaintiffs' claims because they are irrelevant to

the collective action inquiry, as long as plaintiffs assert a plausible basis for their claim.

See Holbrook, 246 F.R.D. at 105-06; Hoffmann, 982 F. Supp. at 262; Cuzco v. Orion

Builders, Inc., 477 F. Supp. 2d 628, 633 (S.D.N.Y. 2007).

     Although there are some distinctions between class members, SNET frequently

exaggerates the scope and extent of these differences in its memorandum.[3]  For

---

[2] The court notes that SNET refers to several "potential opt-in plaintiffs" by name in this section of
its brief, undermining its own argument that the class definition is "ambiguous" and that it cannot
determine which of its first-level managers were "assigned technicians."  However, since these "potential
opt-in plaintiffs" have yet to join the action, the court will disregard any arguments made by SNET on their
behalf.

[3] SNET also relies on language from plaintiffs' resumes to argue that certain plaintiffs had more
discretion or a larger leadership role than that to which they testified.  See, e.g., Def.'s Opp. at 24, 29.  The
court does not find this argument persuasive.  The Sixth Circuit has noted that, "The key to determination
of whether an employee is covered by an exemption to the FLSA overtime requirements does not depend
on an employee's general characterization of his or her job in a resume designed to enhance the
employee's duties and responsibilities to obtain a job . . . .  What is important is what an employee actually

example, SNET stated that opt-in plaintiff Curtis Langner testified that he "probably could" recommend a pay raise.  However, Langner continued, "Ultimately, I don't make the decisions. . . .  I can recommend, but it's not my decision."  <u>See</u> Dep. of Curtis Langner, App. to Def.'s Opp., at 117:2-7.  SNET stated that opt-in plaintiff Scott Hunt "has sent employees home when they arrive in inappropriate clothing, and has had input into whether to terminate a probationary employee."  Def.'s Opp. at 18-19.  However, Hunt testified that, if an employee showed up in inappropriate clothes, he would "go to his manager" and ask him "how would you like to proceed."  <u>See</u> Dep. of Scott Hunt, App. to Def.'s Opp. at 212:1-12.  Hunt also stated that he didn't have "the final say" in whether to terminate a probationary employee, but that "I guess you could say I have input."  Hunt Dep. at 174:22-175:2.  SNET also argues that Hunt testified to his "significant role in an OSHA investigation."  Def.'s Opp. at 28.  However, while Hunt did testify that he investigated whether "procedures were followed correctly, incorrectly," Hunt also testified that he "didn't have a hand in what was going to happen to the individual when he did come back."  Hunt Dep. at 52:12:17.

SNET states that opt-in plaintiff Tammy Keith "was heavily involved in the progressive discipline of a technician, making the initial recommendation to coach him on her own without telling her manager beforehand, and then administering the discipline . . . without her second-level manager being present.  Def.'s Opp. at 19.  However, Keith also testified that "coaching is not discipline," and that her "supervisor recommended" that she issue a verbal warning.  <u>See</u> Dep. of Tammy Keith, App. to

---

does on a day-to-day basis."  <u>Ale v. TVA</u>, 269 F.3d 680, 688 (6th Cir. 2001).

Def.'s Opp., at 21:11-24.  SNET stated that opt-in plaintiff Jerry Nuzzo "issued a one-

step wage reduction" to an employee, see Def.'s Opp. at 22, while failing to note that

Nuzzo stated in his Declaration that he "was not involved in the decision to issue the

wage reduction," Declaration of Jerry Nuzzo, Ex. O to App. of Opt-in's Declarations, at ¶

8.  On the whole, the court determines that SNET's arguments about the distinctions

between the plaintiffs are overstated and unpersuasive.

        Other arguments that SNET makes (such as those regarding time spent in the

field, contact with customers, and implementation of MSOC) are not persuasive.

Plaintiffs are not arguing that they are identically situated, nor do they need to do so: for

a collective action, plaintiffs need only to be "similarly" situated.  Merely because some

class members "spends his or her time on somewhat different specific assignments"

does not mean that these employees are not "similarly situated" under FLSA.  See

Scott, 210 F.R.D. at 265.

        To the contrary, after examining the evidence before it, the court concludes that

the named and opt-in plaintiffs are similarly situated in the areas of their jobs which are

relevant to the FLSA misclassification inquiry.  Plaintiffs testified to their lack of

discretion in assigning work, in disciplining technicians, in hiring, firing, or promotions,

and even in menial tasks such as purchasing supplies.[4]  Although there are some

_____

        [4] The named plaintiffs swore to these similarities in their Declarations.  See supra at 3.
Deposition testimony by both named and opt-in plaintiffs provides further support for the similarities
between potential class members.  For example, Michael Blasko, Scott Hunt, Tammy Keith, Michael
McDermott, Bruce Ollayos, Sharon Perkins, and Jeffrey Schena testified that they were required to
contact their supervisor prior to disciplining a technician.  See Dep. of Michael Blasko, Ex. I to Pl.'s Mot.,
at 152:7-18; Deposition of Scott Hunt, App. to Def.'s Opp., at 53:14-19; Deposition of Tammy Keith, App.
to Def.'s Opp., at 21:11-22:8; Dep. of Michael McDermott, Ex. H to Pl.'s Mot., at 16:11-25, 27:4-18; Dep.
of Bruce Ollayos, Ex. S to Pl.'s Mot., at 34:23-25; Dep. of Sharon Perkins, Ex. L to Pl.'s Mot., at 324:21-24;
Deposition of Jeffrey Schena, Ex. T to Pl.'s Mot., at 154:7-155:12.   Michael Blasko, Frank Baranowsky,
Joseph Kiely, Richard Lavery, Michael McDermott, and Sharon Perkins testified that they had no

distinctions,[5] the court concludes that, on balance, the similarities outweigh the

differences, see Ayers, 2007 U.S. Dist. LEXIS 19634, at *18, and thus this factor

weighs heavily in favor of certification of the collective action.

       2.    Potential Defenses

Although SNET does not explicitly address this factor, it is clear from its lengthy

summary of alleged distinctions between class members that it will argue that some

members of the class are exempt while others are not.  However, these arguments go

to the merits of the plaintiffs' claims, which is not proper for the court to consider at the

collective action stage.[6]  Additionally, even though SNET has highlighted a few

_____

discretion in choosing which technicians were assigned which work.  See Blasko Dep. at 84:7-19; Dep. of
Frank Baranowsky, Ex. P to Pl.'s Mot., at 81:15-16, 99:17-100:12; Dep. of Joseph Kiely, Ex. J to Pl.'s Mot.,
at 26:22-29:8; Dep. of Richard Lavery, Ex. M to Pl.'s Mot., at 77:12-21; McDermott Dep. at 90:1-10;
Perkins Dep. at 292:18-293:3.  Michael Blasko, Thomas Carey, Peter Dean, and Joseph Kiely testified
that their safety inspections were limited to a computerized checklist which allowed for only limited
responses.  See Blasko Dep., at 104:9-13; Dep. of Thomas Carey, Ex. Q to Pl.'s Mot., at 126:20-127:22;
Deposition of Peter Dean, Ex. U to Pl.'s Mot., at 100:12-101:10; Dep. of Joseph Kiely, Ex. J to Pl.'s Mot.,
at 43:1-20.  Bruce Ollayos, Jeffrey Schena, and Kelly Werbinski testified that they lacked the discretion to
choose which technicians to call to assign overtime work.  See Ollayos Dep. at 21:5-22:5; Schena Dep. at
52:1-53:14; Werbinski Dep., Ex. K to Pl.'s Mot., at 83:17-22.

    [5] Even these exceptions are often not as dramatic as SNET makes them out to be.  SNET rightly
points out that, unlike the other named plaintiffs, Werbinski testified that he decides which of his
technicians are going to handle which work orders.  See Dep. of Kelly Werbinski, App. to Def.'s Opp, at
38:17-39:10.  However, in his Declaration, which was signed after his deposition, Werbinski explained that
there were two members of his team that "drive a truck capable of pole setting.  If any job requires pole
setting, I have no choice but to send those technicians to handle the job."  Werbinski Decl. at ¶ 22.
Werbinski also stated that no other technicians have special skills, and he does not "match up jobs with
specific technicians."  This is supported by Werbinski's deposition testimony, in which he stated that he
sent two specific technicians on jobs that requires setting poles, but there was "no other type of work
orders that come in that certain people are better suited for than others," and that he does "not match up
jobs with specific technicians."  See Werbinski Dep. at 44:11-25.
    SNET also highlights testimony by opt-in plaintiff Maureen Anderson, in which she stated that she
"regularly reshuffles or reassigns work" for her technicians.  Def.'s Opp. at 22.  However, just before that
testimony, Anderson testified that she only spends 10 percent of her day "directing the daily activities of
the technicians."  See Dep. of Maureen Anderson, App. to Def.'s Opp., at 269:6-8.

    [6] See, e.g., Nerland v. Caribou Coffee Co., 564 F. Supp. 2d 1010, 1021 (D. Minn. 2007)("On a
pending motion for decertification, the Court does not consider whether the named plaintiffs and opt-in
plaintiffs would properly be classified as exempt employees.")

examples of potential class members exercising managerial discretion, a non-exempt employee may spend some of his or her time performing managerial functions. The regulations governing the executive exemption, for example, state that "employees who spend more than 50 percent of their time performing exempt work will in general satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). Therefore, it is possible for an employee to spend a portion of their time performing executive or administrative work but still be misclassified as exempt.

### 3.      Fairness and Procedural Considerations

FLSA is a remedial statute and thus, federal courts should give it a liberal construction. See, e.g., Braunstein v. E. Photographic Labs, 600 F.2d 335 (2d Cir. 1979). The Supreme Court has held that a FLSA collective action allows plaintiffs to take "advantage of lower individual costs to vindicate rights by the pooling of resources," and allows the judicial system to benefit by "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." Hoffmann-La Roche v. Sperling, 493 U.S. 165, 170 (1989). Over 60 plaintiffs have already opted in to this action, making a denial of certification difficult on both non-named plaintiffs and SNET, which would have to defend against a large number of individual claims, rather than one collective action. Both fairness and procedural considerations weigh heavily in favor of certifying the class.

### 4.      Summary and Notice.

The court concludes that, on balance, the similarities between the plaintiffs clearly outweigh their differences. Procedural and fairness considerations also weigh heavily in favor of certifying the class. Finally, although SNET is sure to raise some

14

individualized defenses regarding the discretion some plaintiffs may have exercised, those questions are more properly raised in a full discussion of the merits, not at the certification stage, and thus that factor does not heavily weigh one way or the other. Therefore, after evaluating the record before it, the court determines that the named plaintiffs are "similarly situated" to the class of SNET employees they seek to represent and certifies the FLSA collective action.

Finally, SNET argues that the court should not send notice to potential class members because "Perkins and her counsel have been communicating with SNET employees and inviting them to join this action." Def.'s Opp. at 40. However, federal courts have frequently allowed for court-authorized notice even if plaintiffs have been in contact with potential class members. The Supreme Court has upheld the issuance of notice by a district court, even after hundreds of class members had already opted in, finding that court-authorized notice is preferable because it "serves the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." Hoffmann-La Roche v. Sperling, 493 U.S. 165, 172 (1989). Therefore, the court does not find the fact that plaintiffs have reached out to such a number of other potential class members to justify not sending out notice to the full class.

B.     Rule 23 Class Certification

Plaintiffs bear the burden of showing that the class they have proposed meets the requirements for class certification. See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999); Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 484 (2d Cir. 1995). "[T]he preponderance of the evidence standard applies to

evidence proffered to establish Rule 23's requirements."  Teamsters Local 445 Freight

Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008).  A court must

"receive enough evidence, by affidavits, documents, or testimony, to be satisfied that

each Rule 23 requirement has been met.  In Re Initial Pub. Offerings Secs. Litig., 471

F.3d 24, 41 (2d Cir. 2006) [hereinafter "In Re IPO"].

The Second Circuit has defined the standard that district courts are to use in

deciding whether a plaintiff has met his burden under Rule 23.  In Re IPO, 471 F.3d at

41.  A "district court may not grant class certification without making a determination

that all of the Rule 23 requirements are met."  Id. at 40.  These determinations "can be

made only if the judge resolves factual disputes relevant to each Rule 23 requirement

and finds that whatever underlying facts are relevant to a particular Rule 23 requirement

have been established and is persuaded to rule, based on the relevant facts and the

applicable legal standard, that the requirement is met."  Id. at 41.  "The obligation to

make such determinations is not lessened by overlap between a Rule 23 requirement

and a merits issue, even a merits issue that is identical with a Rule 23 requirement."  Id.

          1.     Rule 23(a) requirements

Rule 23(a) of the Federal Rules of Civil Procedure sets forth the following

prerequisites to class certification:

> One or more members of a class may sue or be sued as representative parties
> on behalf of all only if (1) the class is so numerous that joinder of all members is
> impracticable, (2) there are questions of law or fact common to the class, (3) the
> claims or defenses of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will fairly an adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are commonly referred to as "numerosity,"

16

commonality," "typicality," and "adequacy."  See, e.g., Cruz v. Coach Stores, Inc., 202 F.3d 560 (2d. Cir. 2000).  SNET does not contest that plaintiffs are adequate representatives of the class, but argues that they have failed to meet their burden of showing numerosity, commonality, and typicality.

   a. Numerosity

   The standard for numerosity under Rule 23(a) is not tied to a minimum number, but rather inquires whether the class is so numerous that joinder of all members is impracticable.  Comer v. Cisneros, 37 F.3d 775, 796 (2d Cir. 1994); Jones v. CCH-LIS Legal Info. Servs., 1998 WL 671446, at * 1 (S.D.N.Y. Sept. 28, 1998) ("There is no magic minimum number that breathes life into a class.").  Generally, however, courts will find a class sufficiently numerous when it comprises 40 or more members. Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)(stating "numerosity is presumed at a level of 40 members"); Ansari v. New York Univ., 179 F.R.D. 112, 114 (S.D.N.Y. 1998) (citing Moore's Fed. Prac. § 23.22[2]).  Over 80 First Level Managers have already opted in to the FLSA action, and defendants have admitted that there are 100 to 140 First-Level Managers in Connecticut.  See Pl.'s Mot. at 7.  Therefore, the requirement of numerosity is met.[7]

   b. Commonality

   The commonality requirement is met if the plaintiffs' grievances share a common question of law or fact with potential class members.  Marisol A. v. Guiliani, 126 F.3d

---

[7] SNET argues that a class action is inappropriate because the joinder of the opt-in plaintiffs to the FLSA action demonstrate that "joinder is not impracticable," and thus the numerosity factor cannot be satisfied.  See Def.'s Opp. at 46-47.  This argument appears to be a continuation of the argument SNET made in its Motion to Dismiss, that a FLSA collective action and a Rule 23 class certification cannot coexist.  As this court has already decided that question, see Ruling on Def.'s Mot. to Dismiss (Doc. No 111), it will not revisit it.

372, 376 (2d Cir. 1997). "However, there is no requirement that the claims of all the potential class members share . . . every issue of law and fact in common." Scott, 210 F.R.D. at 267. Rather, Rule 23(a)(2) requires only that common questions exist "at the core of the cause of action alleged." Reese v. Arrow Fin. Servs., LLC, 202 F.R.D. 83, 91 (D. Conn. 2001).

Although SNET has argued that each plaintiff is distinct, the evidence before the court demonstrates that the plaintiffs are similarly situated in job duties and in the way they are classified as exempt under FLSA by SNET, which is at the "core of the cause of action alleged." Id. Therefore, they share a common question of law, and the requirement of commonality is fulfilled.

c.    Typicality

Typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." Marisol A., 126 F.3d at 376. In that case, the Second Circuit affirmed the certification of a class in which each named plaintiff challenged a different aspect of New York City's child welfare system, despite each claim "implicat[ing] different statutory, constitutional and regulatory schemes." Id. at 376-77.

Here, the distinctions are much less dramatic. SNET argues that the named plaintiffs' claims are not typical because of "stark differences in the duties they and other potential class members performed, . . . the extent that they performed managerial and non-managerial tasks, and the amount of discretion and judgment they exercised." See Def.'s Opp. at 49. However, the "stark differences" raised by SNET are not so stark. See supra at 10-11, 12 n.5. Although each named plaintiff may have

18

performed some exempt duties, the evidence before the court demonstrates that the majority of both the named plaintiffs' and other opt-in plaintiffs' time is spent on non-discretionary, clerical work, and that they have little to no authority to make decisions on their own.  See supra at 2-4, 12 n.4.  Therefore, the claims of the named plaintiffs are typical of the First-Level Managers at SNET who have technicians assigned to them. This is sufficient to fulfill the typicality requirement.

        2.      Rule 23(b) requirements

A class must not only meet all Rule 23(a) requirements, but further qualify under one of the three part (b) subdivisions in order to be certified as a class action.  Rule 23(b) delineates three types of class actions.  The first two subsections of the Rule outline two types of cases in which class certification is especially appropriate: first, in Rule 23(b)(1), where the rights of either potential class members or the party opposing the class would be harmed by piecemeal adjudication, and second, in (b)(2), where the class seeks injunctive or declaratory relief against a party who has itself treated the class as a group in the context of its own acts or admissions.  Subsection (b)(3) addresses the residual situation where class adjudication would "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results," but where the circumstances of (b)(1) or (b)(2) are not met.  Rules Advisory Comm. Notes, 39 F.R.D. 69, 102-03 (1966).

Plaintiffs seek class certification under Rule 23(b)(3).  Rule 23(b)(3) contains two prerequisites for certification not imposed on the other two types of classes: first, that questions of law or fact common to the members of the class must "predominate" over

any questions affecting only individual members, and second, that a class action is

"superior" to other available methods for the fair and efficient adjudication of the

controversy, to test whether the proposed class is sufficiently cohesive to warrant

adjudication by representation.   See Amchem Prod. Inc. v. Windsor, 521 U.S. 591, 623

(1997)(quoting Advisory Comm. Notes).

          a.     Predominance

In order to certify a Rule 23(b)(3) class, the court must find "that questions of law

or fact common to the members of the class predominate over any questions affecting

only individual members, and that a class action is superior to other available methods

for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  The

inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication

by representation."  Amchem, 521 U.S. at 623.  While the commonality inquiry requires

only that common questions exist, the predominance inquiry is more difficult to satisfy.

See Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).  Predominance

is satisfied only if "resolution of some of the legal or factual questions that qualify each

class member's case as a genuine controversy can be achieved through generalized

proof, and if these particular issues are more substantial than the issues subject only to

individualized proof."  Id.  If common issues predominate as to liability, the court should

ordinarily find predominance, even if some "individualized damage issues" exist.  See In

re Visa Check/Mastermoney Antitrust Litig., 280 F.3d 124, 139-40 (2d Cir. 2001).

Together with the superiority requirement, the predominance requirement helps ensure

that class certification serves the "economies of time, effort, and expense, . . . [and]

uniformity" for which class actions are designed, and avoids "sacrificing procedural

fairness or bringing about undesirable results." Amchem, 521 U.S. at 615.

In determining whether the plaintiffs have demonstrated predominance, the court must take into account any rebuttal evidence offered by defendants at the class certification stage. In Re Salomon Analyst Metromedia Litig., 544 F.3d 474, 486 (2d Cir. 2008). SNET argues that common questions of law do not predominate because it plans to "present a defense that relies on facts that vary from employee to employee." See Def.'s Opp at 56. However, upon reviewing the record, the court is persuaded by a preponderance of the evidence that, despite some dissimilarities, the potential class members performed similar non-exempt duties, and exercised similar amounts of discretion in their day-to-day work, and thus, faced a common policy of misclassification by SNET.

Therefore, the court concludes that the "proposed class[] [is] sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. The court is persuaded that the "genuine controversy" of FLSA misclassification facing all potential class members outweighs any individualized defenses that SNET will raise – therefore, the common claims predominate. Additionally, while class members will certainly claim different damage amounts (because they will have been members of the class for different periods of time and worked different hours), this does not hamper the court's finding of predominance.

b.    Superiority

A court must find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The class action is the superior method of resolving this conflict. Factors that are relevant to

an analysis of the superiority of the class action device include: "the interest of members of the class in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; the difficulties likely to be encountered in the management of a class action." In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 304 (S.D.N.Y. 2003)(citing Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 625 (1997)).

The cost of individual litigation on an overtime exemption claim may be prohibitive for the members of the potential class, which indicates that the interests of the class would be best served by certification.  Additionally, based on the large number of plaintiffs who have already opted in to the FLSA action, it will be far more efficient for the judicial system to adjudicate these claims at one time rather than face a large number of individual actions.  The parties have not advised the court of any other significant litigation concerning this controversy.  Finally, while there may be some difficulties encountered in managing the class action based on the fact-intensive nature of the plaintiffs' claims, those difficulties are outweighed by the inefficiency of potentially litigating the same claims multiple times in multiple individual litigations.  Therefore, because the court concludes that common issues predominate and that a class action is superior to any alternative method of adjudication, class certification is appropriate under Rule 23(b)(3).

C.    Motion to Strike

On August 3, 2009, SNET moved this court to strike certain appendices and

22

exhibits to plaintiffs' Reply.  See Def.'s Mot. to Strike Appendices and Exhibits ("Mot. to Strike") (Doc. No. 181).  SNET requested that the court strike Plaintiffs' Appendix titled "Similarly-Situated Job Charts" (Doc. No. 170), Plaintiffs' Appendix titled "Mischaracterization Charts" (Doc. No. 171), the attorney affidavits submitted along with plaintiffs' appendices and exhibits (Doc Nos. 167 pp. 3-6, 168 pp. 1-2, 170 pp. 4-7, and 171 pp. 3-6), and certain paragraphs included in the Declarations of 17 opt-in plaintiffs (Doc. No. 167).

SNET argues that the two charts (Doc. Nos. 170 and 171) are "improper exhibits consisting of arguments of counsel" which exceed the 30-page limit permitted by the court for the plaintiffs' Reply.[8]  See Mot. to Strike at 1-2, 4-5; see also Order Denying Motion for Leave to File Excess Pages (Doc. No. 162).  The court notes that it did not use or rely on either of the charts in coming to its conclusion about the Motions addressed in this Ruling.  However, the disputed charts are not arguments by counsel, but instead include excerpts of deposition testimony or declarations, both of which are proper exhibits before the court.  In fact, each "chart" is accompanied by the respective pages of the deposition testimony or declaration.  As this court has stated in the past, Rule 1006 of the Federal Rules of Evidence provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed. R. Evid. 1006; see also SEC v. Competitive Techs., Inc., 2006 U.S. Dist. LEXIS 85983, at *9 (D. Conn.

---

[8]  The court notes the irony of SNET, which filed a 70-page Opposition (with the permission of the court) that included numerous exhibits, filing a Motion to Strike based on the length of the plaintiffs' submissions.  Additionally, the court notes that SNET uses four pages of its Reply to the Motion to Strike to argue the merits of the collective action/class certification Motion – rather than the questions at issue in the Motion to Strike.  See Def.'s Reply to Opp. to Mot. to Strike (Doc. No. 185), at 7-11.  Thus, SNET is using additional pages, outside of those allowed by the court, to address the merits of the case, which is exactly what it is accusing the plaintiff of doing in its Reply.

Nov. 6, 2006).  Plaintiffs' charts are merely a summary to provide the court with a roadmap to voluminous deposition testimony and declarations from a large group of opt-in plaintiffs.

Additionally, SNET argues that the "Similarly Situated Job Duties Charts" do not "reply to the facts argued by SNET in its opposition."  See Mot. to Strike at 3.  However, SNET argued extensively in its Opposition that plaintiffs and other potential class members were not "similarly situated", see Def.'s Opp. at 16-42.  Thus, an appendix demonstrating the ways in which members of the potential class are "similarly situated" directly responds to SNET's Opposition.  Therefore, the court will not strike these appendices.

SNET also challenges the attorney affidavits because they contain "improper argument . . .  over and above the page limitation," and because they were not made "under penalty of perjury" as is required by 28 U.S.C. § 1746.  See Mot. to Strike at 6-7.  The court agrees with SNET that the declarations go beyond merely stating what documents are included in the various appendices and stray into legal argument about the merits of the case.  Therefore, these declarations are struck.

Finally, SNET challenges certain paragraphs in the declarations of 17 opt-in plaintiffs.  SNET argues that these declarations do not "reply" to its Opposition.  See Mot. to Strike at 8.  However, as stated above with regard to the "Similarly Situated Job Charts," information that refutes SNET's arguments about whether named plaintiffs and other potential class members are "similarly situated" is directly responsive to SNET's Opposition.  SNET also argues that these declarations should be struck because many of the opt-in plaintiffs were not named in either plaintiffs' or SNET's briefs.  See Mot. to

24

Strike at 8.  However, in a motion for class certification and collective action, in which this court must evaluate the possible similarities of numerous class members, it is clearly unnecessary to refer to each opt-in plaintiff by name.  The declarations merely provide further support for plaintiffs' core argument: that the members of this group of First-Level Managers are similarly situated in respect to their status as misclassified exempt workers for SNET.  Therefore, the court will not strike these Declarations

## IV.    CONCLUSION

For the reasons discussed above, plaintiffs' Motion for FLSA Collective Action (Doc. No. 119), is GRANTED, and plaintiffs' Motion for Rule 23(b)(3) Class Certification (Doc. No. 119) is GRANTED.  The class granted for the FLSA collective action is:

> All First Level (or Level One) Managers employed by SNET in the State of Connecticut from June 2004 and thereafter, (1) to whom SNET assigned technicians; and (2) who worked as First Level Managers in departments and areas including, but not limited to, Network Services, Installation and Maintenance, Installation, Maintenance, IM, I/M, DSL, Cable Maintenance, Cable Repair, Installation and Repair (I&R), Consumer, Business, Splicing, Cable Splicing, Loop Electronics (LERT), Digital Electronics Group (DEG), Outside Plant, Network Operations, Construction, Engineering, Construction and Engineering, Local Field Organization (LFO), U-verse, and U-verse Operations,

with the understanding that "technicians" is defined as "bargaining unit employees who perform the physical and technical aspects of the job on the inside or outside plant or at a customer's premises."  The Rule 23 class is the same, but the claims date back to June 2005.

Plaintiffs are permitted to send a notice and consent documents to members of this class.  The parties shall confer regarding the proper form of the notice to be sent to the potential plaintiffs, in light of this Ruling, and shall submit to the court their agreed-upon notice, or if no agreement their respective proposed forms of notice,  by

November 20, 2009.

Defendant's Motion to Strike (Doc. No. 181) is GRANTED with regard to the attorney declarations (Doc Nos. 167 pp. 3-6, 168 pp. 1-2, 170 pp. 4-7, and 171 pp. 3-6) and DENIED with regard to the other documents addressed.

**SO ORDERED**.

Dated this 4th day of November, 2009, at Bridgeport, Connecticut.


 /s/ Janet C. Hall_____
Janet C.  Hall
United States District Judge