1                    UNITED STATES DISTRICT COURT.

2                        DISTRICT OF CONNECTICUT

3     _____
      SHARON L. PERKINS            )
4                    Plaintiff.   )  NO: 3:07cv967(JCH)
                                  )
5     vs.                         )  May 19, 2010
      SOUTHERN NEW ENGLAND        )
6     TELEPHONE COMPANY           )  3:30 p.m.
                     Defendant    )
7     _____)
                                        915 Lafayette Boulevard
8                                       Bridgeport, Connecticut

9                         MOTION HEARING

10    B E F O R E:
                     THE HONORABLE JANET C. HALL, U.S.D.J.

11

12    A P P E A R A N C E S:

13    For the Plaintiff   :

14                                    ANDREW MELZER
                                      Sanford, Wittels & Heisler,
                                      LLP-NY
15                                    1350 Avenue of the Americas
                                      31st Floor
16                                    New York, NY 10019

17                                    EDMOND CLARK
                                      83 Scotland Avenue
18                                    P.O. Box 133
                                      Madison, CT 06443-2501

19

20    For the Defendant   :         PATRICK W. SHEA
                                     LESLIE A. DENT
21                                    Paul, Hastings, Janofsky &
                                     Walker
22                                    75 East 55th Street
                                      New York, NY 10022

23

24

25    Proceedings recorded by mechanical stenography,
      transcript produced by computer.

1          MR. SHEA:  I believe they are in the hallway,

2     your Honor.  May I go?

3          THE COURT:  Yes, I appreciate that.  Good

4     afternoon to everyone.  We're here this afternoon in the

5     matter of Perkins versus SNET 307CV967.  If I can have

6     appearances please.

7          MR. MELZER:  Andrew Melzer for the plaintiff.

8          MR. CLARK:  Edmond Clark, your Honor, for the

9     plaintiffs.

10          MR. SHEA:  Good afternoon, Patrick Shea, Paul

11     Hastings for the defendants SNET.

12          MS. DENT:  Leslie Dent also with Paul Hastings

13     for SNET.

14          THE COURT:  All right.  Thank you.  We're here

15     because I think there are two motions: The Plaintiff's

16     Motion to Compel Production of Documents and the

17     Plaintiff's Motion for Protective Order.  Those are

18     numbers 254 and 255 in that order.  I will take up first

19     the Motion to Compel Production of Documents.  My first

20     question to plaintiff's counsel is remind me what the

21     deadline is for discovery in this case.

22          MR. MELZER:  Well, your Honor, we had had a

23     deadline.  I think it was around April 12 to serve

24     additional written discovery requests and a deadline of I

25     believe it was April 19 to compel on the six settlement

1   demand.  This was from your Honor's previous order.  I'm

2   sure defense counsel will correct me if my dates are

3   slightly wrong.  After that, we'll be going into

4   depositions.

5           THE COURT:  Did you serve additional discovery

6   on the 12th?

7           MR. MELZER:  Yes, we did.

8           THE COURT:  Has it been complied with?

9           MR. MELZER:  We are continuing to confer with

10  defense counsel and they have produced a number of items

11  and are in the process of completing the rest.  We

12  believe unless there are issues that we'll bring to your

13  Honor's attention, it shouldn't be a problem.

14          THE COURT:  Attorney Shea, I'm assuming but I

15  don't want to assume anything, that SNET did not maintain

16  payroll records of hours worked by the people who had

17  opted into this class.

18          MR. SHEA:  Yes, we deemed them exempt

19  employees.

20          THE COURT:  I understand that.  I want to be

21  certain that what I was assuming --

22          MR. SHEA:  By payroll records, you mean hours

23  worked?

24          THE COURT:  I meant the hours that they worked.

25          Attorney Melzer, in the current opt-in class,

1     the FSLA class, how many different job titles are there?

2               MR. MELZER:  Under the clarified definition

3     that the court has approved, there are only two titles

4     and the two titles are basically in a single job category

5     commonly referred to as a field manager which would be a

6     manager who has technicians working in the field.

7               THE COURT:  What are titles?

8               MR. MELZER:  The two titles are manager network

9     services and manager construction and engineering.

10              THE COURT:  How many of the opt-in plaintiffs

11    are in each of those two titles?

12              MR. MELZER:  I believe it's approximately

13    two-thirds network services.

14              THE COURT:  If I can turn to Attorney Shea to

15    ask some questions about his company's systems I guess.

16    Has SNET changed their computer systems from '04 to now?

17              MR. SHEA:  Your Honor, I'm sure there must have

18    been some changes in it but none that have been

19    specifically called to my attention.

20              THE COURT:  I'm sure there's been different

21    versions of Word say but it is still basically Word.

22    That's your sense?

23              MR. SHEA:  That's my sense, your Honor.  I have

24    not had a chance to probe that in depth.

25              THE COURT:  Obviously in the field of electronic

1    discovery, the word accessible is a key word, generally

2    speaking of the documents that are being sought that you

3    object to.  Is this data that's accessible?  Are they on

4    backup tapes or tapes that are on systems that no longer

5    run?

6           MR. SHEA:  No.  We're not making an

7    accessibility argument.  The burden argument goes to the

8    processing and the review associated with it.

9           THE COURT:  I understand.  Now I can't make you

10   do this but I can suggest it to you.  Rule 502 has been

11   amended recently.  It provides clearly for claw back of

12   privilege documents after production.  Is this anything

13   that you have discussed with your client and considered

14   as a way to -- I would think there would be large

15   categories of documents sought that really are unlikely

16   to have privilege material in them.

17          MR. SHEA:  I want to carefully in terms of

18   accessibility, I'm talking about the vast majority of the

19   e-mails we have.  I can't swear there's not backup tapes

20   somewhere but in general, the e-mails that are described

21   to answer your question about claw back, I have thought

22   about claw back.  The problem is I think claw back poses

23   a number of risks that I think I find unsatisfactory that

24   I could.  Such that I couldn't turn over masses of

25   e-mails of individuals.  These are people who on the

1    first line deal with our technicians so they handle

2    issues related to discrimination claims.  They handle

3    issues that may relate to grievances.  They handle a host

4    of sensitive personnel issues.  They are involved in

5    privileged communication in that regard.  If you get

6    charged, for example, by a tech, there's going to be an

7    e-mail exchange with the company's lawyer and the person

8    supervising and that tech.

9            THE COURT:  I understand that but these

10   plaintiffs are not -- their lawyers certainly aren't

11   interested in those documents to the extent it reveals

12   attorney thought process or advice.

13           MR. SHEA:  I can't say that for sure.  I'm

14   dealing with one of the best known plaintiff law firms in

15   the country.  One who today won a huge verdict in a

16   different case.  I think it would be irresponsible if I

17   were to give them wholesale access to privileged

18   information protected only by the potential of the claw

19   back.  That's my definitive concern about a claw back,

20   your Honor.

21           THE COURT:  All right.  You can be seated.  I

22   will just go through the plaintiff's motion -- well,

23   actually his memorandum in support of his motion to

24   compel.

25           MR. SHEA:  Your Honor.

1           MR. MELZER:  The parties may have been able to

2   reach an agreement on some of the items, particularly on

3   the motion for the protective order.

4           THE COURT:  I would like to do that later if I

5   could.  Are there any agreements on the motion to compel?

6   There was one agreement reported.

7           MR. SHEA:  There was an agreement reported on

8   14, your Honor.  And as I had proposed at the outset,

9   Mr. Melzer was conferring with Mr. Wittels by phone.  I

10  think there's at least two or three other possible areas

11  of agreement.

12          THE COURT:  I will go through them then one at a

13  time.

14          MR. MELZER:  There is a potential agreement

15  here.  And on behalf of Mr. Wittels, I would like to

16  sincerely apologize to the court.  As Attorney Shea

17  referred to, Mr. Wittels was in court this morning on

18  another class action matter and a verdict came in, and he

19  was forced to attend to matters surrounding that and he

20  sincerely apologizes for inconveniencing the court and

21  defense counsel and --

22          THE COURT:  I don't have all night.  I need to

23  get through what you are moving to compel which is 10 or

24  12 particular items, then your protective order.

25          MR. MELZER:  With regard to the potential

1    compromise, Attorney Shea has represented to us that the

2    company has produced all of the extended efforts

3    documents and day in the life documents that it is able

4    to access either through level 2 managers or otherwise

5    and if it made that representation on the record, we

6    would be satisfied with that, that all such matters were

7    produced.

8            THE COURT:  So that's number 12.

9            MR. MELZER:  12 and 24.

10           THE COURT:  What's the nature of the

11   representation?

12           MR. SHEA:  What I told Mr. Melzer with respect

13   to 12, we had asked the second level managers for any

14   extended effort forms that they had retained and have

15   been and will complete production with respect to that.

16   We, of course, have also produced the database where the

17   information taken from that form was produced.  We cannot

18   do is go to first levels themselves and ask them to give

19   us the extended effort forms.  They are members of class

20   who are represented by Mr. Melzer and his law firm.  With

21   respect to the day in the life documents, we have told

22   him that we have produced -- that our understanding of

23   day in the life, it was a survey that was conducted with

24   respect to certain SNET first-level supervisors.  We have

25   or have agreed to produce or already produced the

1  training materials that went with that, the actual survey

2  documents and the responses we received from SNET first

3  level supervisors and that what we understand being

4  encompassed within their request.

5          There was some discussion about whether there

6  was a description of what a first-level supervisor day in

7  the life should be.  That's not the way we understand the

8  term day in the life.  About material how a first level

9  should be going about organizing his or her duty under

10  the MSOC system, those materials have also been

11  produced.

12          MR. MELZER:  As part of that, it is our

13  understanding if there are descriptions of a typical day

14  in the life or what a day in the life of a first-level

15  manager in these positions should be or should reflect,

16  that those would be produced to us and we would confer

17  further regarding what the content of those documents

18  would be and where they might be located.

19          THE COURT:  Is that your understanding?

20          MR. SHEA:  It is.  If there's anything else.

21  It's a big company.  Any other leads, we'll follow them

22  up.

23          THE COURT:  Attorney Melzer, is the

24  representation made by Attorney Shea does that satisfy 14

25  and 24 as far as your motion to compel?

1          MR. MELZER:  Yes, it does.

2          MR. SHEA:  12 and 24.

3          THE COURT:  Yes.  Thank you.  Then the first one

4     that I have is number 6 and the defendant did not respond

5     to that in your memorandum.

6          MR. SHEA:  I thought 6 was one of those we had

7     agreement on, your Honor.

8          THE COURT:  Was that indicated in the reply and

9     I overlooked it because.  You are right.  In the reply

10    they reference 12, 19, 20, 24, 26 and 33 through 36.

11    Well, I guess I will ask Attorney Melzer in your original

12    motion on page 3, you move to compel as to number 6.

13    Defendant didn't respond which would suggest he thought

14    it had been resolved.  You don't number it in your reply.

15    Does that mean that's resolved?

16         MR. MELZER:  That means there wasn't anything in

17    their opposition for us to reply to.

18         THE COURT:  At the top of page 2 of your memo,

19    after reporting that 14 has been an acceptable response.

20    You say consequently the plaintiffs request the court

21    order defendants to produce documents responsive to all

22    outstanding requests.  Numbers 12, 19, 20, 24, 26, and 33

23    through 36.  So there's an inconsistency.

24         MR. SHEA:  In the first paragraph of the

25    introduction of our response, we item those areas where

1     the parties had reached agreement.  They are with respect

2     to 6, 8, 15.  16, 22 and 27.

3          MR. SHEA:  The plaintiff didn't reply to those

4     indicating we have agreement on all of those, therefore,

5     they are off the table.

6          THE COURT:  Let me double check that you are

7     right about that.  That seems to be the case, Attorney

8     Melzer, those numbers line up with the ones that are

9     dropped out of your reply.

10         MR. MELZER:  I will agree with that.

11         THE COURT:  I'm going to treat 6, 8, 16, 15,

12    wasn't in the motion, 22, and 27 as moot.  Along with 12,

13    14 and 24.

14         So the first one I believe, therefore, that I

15    need to address is number 19.  There seems -- it's

16    unclear to me between the different briefs, it appears as

17    if the plaintiff was at sometime suggesting that if they

18    could just get the time stamp information from these

19    e-mails and e-mails for 20 of the plaintiffs, they would

20    be satisfied and it then appears that the defendants

21    opposition indicates that they would be willing to offer

22    the time stamp information but doesn't respond I guess to

23    the 20 persons versus the 200 sampling.  I believe the

24    numbers that the defendant provides at page 3 for costs

25    which, of course, the plaintiffs contest but taking the

1    numbers at page 3, those would be to do a search and

2    review of e-mails for 200 people, is that correct?

3         MR. SHEA:  That's correct, your Honor.  I think

4    if you look at underlying methodology, you can scale that

5    to a subset.  For example, if you are doing about 20 in

6    that regard, if you assume an average of three gigabytes

7    per person which is what our estimate was based on that

8    would come to 60 gigabytes.  A gigabyte is equal to

9    40,000 and 50,000 pages.  Therefore, 60 gigabytes would

10   translate to anywhere between 2.4 and 3 million pages of

11   documents.  Our vendor quote for doing the privilege

12   review is 20 cents a page.  That comes to a neighborhood

13   of half a million, $600,000 for review process.  As you

14   know, there's dispute between the parties about the

15   separate part of processing.  Their reply declaration

16   suggests the use of a slimmed down native review which

17   among other things would make it very difficult to redact

18   privileged material and frankly something you could use

19   if you were going to look at stuff.  If you were dumping

20   it on them.  Something that I don't think AT&T can afford

21   to do.  Depending on which of the two processes you look

22   at, there there's probably an additional cost in the

23   neighborhood of 40 or 50,000 if you are using our

24   approach.  Less if you are using their approach.  So the

25   reason that we have opposed to doing the 20 person sample

1    is twofold.  There's still a pretty significant cost

2    associated with the review component.  Second, we don't

3    think it is likely to be very informative.  If you are

4    taking 20 people randomly and looking at all of their

5    e-mails, you may learn something about the duties for a

6    small group of these people but it is really not likely

7    to be informative.  It is not going to match up with the

8    people who are likely going to be witnesses in this case.

9    Those are people being deposed who are going to be on the

10   witness list, might be some coincidental overlap but not

11   much in that regard.  As all discovery, it is a benefit

12   versus burden analysis.  We believe the benefit is

13   relatively modest and exceeded by the pretty substantial

14   burden.

15         THE COURT:  Attorney Melzer, were you proposing

16   to pick the 20 at random?  Have your expert pick the 20

17   at random?

18         MR. MELZER:  Yes, we were.  Our expert says it

19   is very important to get these e-mails corroborating data

20   back and forth in terms of liability, that class member

21   duties, their communication they are having on a regular

22   basis as well as to damages, what kind of hours they are

23   doing.  That's the relevance of the time stamp data in

24   part because I think it is undisputed that the members of

25   the class are getting and responding to e-mails at all

1    hours of the day on the weekend.  We also need the

2    content that we have seen e-mails in the initial

3    discovery process.  We get e-mails in every case that we

4    do.  In the Navaris case that we talked about, there were

5    millions of e-mails produced.  A lot of evidence relied

6    upon at trial were e-mails, hundreds of exhibits.  This

7    is always crucial data.  It directly relates to the

8    communication that level ones have with their techs, with

9    their level twos, with their management regarding duties,

10   expectations, hours, everything.  Our expert says that it

11   is valid to do this as a sample because with a sampling

12   of 20 people, you would be able to derive some

13   conclusions from that and use it to as supporting

14   evidence for the rest of the matter in the case.  We

15   think that because --

16           THE COURT:  In all the cases that this is always

17   done, has the cost ever been shifted to the plaintiff?

18           MR. MELZER:  Not that I'm aware of.  We think

19   that the cost is a lot less than their estimating.

20           THE COURT:  I know that.  Why don't you respond

21   to counsel's argument today about the fact that the type

22   of dumping of the documents under the method your expert

23   proposes is not usable as the method their experts

24   propose that's more costly.

25           MR. MELZER:  The company such as their vendors,

1    would still be able to analyze the raw data in a way

2    that's useful.  Also we have proposed a lot of

3    suggestions to try to eliminate the burden in addition to

4    samples, in addition going from 200 to 20.  We proposed

5    using search terms.  Confer with the party.  We would

6    confer with SNET on the search terms to be applied and we

7    would consider other methods to reduce the burden in

8    terms of review.  One thing I can think of off the top of

9    my head for each of the 20 instead of giving everything

10   for six years, maybe you could sample randomly for each

11   person one week out of every month.  I don't know if that

12   would work but maybe it would.  And a lot of people may

13   be getting the same e-mail.  If it is a different week

14   for month for every person, you might be able to get

15   everything.  So we think there's still ground for us to

16   agree on that.  And this is highly relevant information

17   and we have done everything we can to try to work out a

18   solution.

19        THE COURT:  Attorney Shea, your offer to produce

20   the time stamp aspect of the e-mail, what is the cost

21   involved in doing that?

22        MR. SHEA:  That's a modest cost, your Honor,

23   because I don't have to look at it.  As you can see, most

24   of the cost in the review process, I'm told the

25   processing cost is also minimal.  If I can respond to the

1    point of search terms.  Part of the problem this case is

2    different than Navaris.  If you are looking at a case

3    involving promotion or pay, it's easy to get your arms

4    around a series of search terms that will work.  Here

5    some have said they want this about the duties of a first

6    level supervisor.

7            THE COURT:  I understand.  What about the

8    suggestion that you sample, if you take 20 employees, you

9    take five of them and get their e-mails from the first

10   week of the month.  You take the next five, do the second

11   week and maybe the second month, you shift everybody by a

12   week so you got the second week people, you get their

13   first week e-mail in the second month.  So you are not

14   always picking the second week for the same group of

15   people.  That would cut the number of e-mails down 25

16   percent.  That would make your cost closer to $125,000

17   total opposed to we were up 6 million at one point there.

18   That's using your method that you prefer as opposed to,

19   you know, perhaps finding a different method to approach

20   it.  But even using your method for a case this size, I

21   know it is a lot of money.  I would love to have that

22   money but it is also for a case this size with a number

23   of people involved.  If we were doing paper discovery,

24   you would be spending that much money.

25           MR. SHEA:  That's the first time I heard that.

1    I haven't had a chance to consult with my tech people to

2    make sure the cost is scalable.  The other suggestion I

3    would make seems to be logical.  If we were going to go

4    down that road, we ought to be focusing on the e-mails of

5    the people who are being deposed.  In other words, it

6    doesn't make a lot of sense to sample the e-mail of

7    somebody who is never going to take the witness stand,

8    never have the deposition taken.

9         THE COURT:  The problem with that, though, I

10    think the plaintiff's approach is going to prove through

11    statistical evidence that the testimony they have heard

12    from live people really is evidence that can be extended

13    on statistically proper methods such that the jury can

14    infer that about the rest of the class they won't hear

15    from and if you only limit all the discovery to the 50

16    people you are already doing the depositions on, that

17    means the plaintiff will never have evidence which could

18    be used.  It wouldn't be statistically valid sample.  You

19    picked the 50.  They didn't.  Their expert didn't say

20    those 50 are good.  Therefore, the expert couldn't

21    qualify the evidence that way and, therefore, the

22    plaintiff is left with no evidence unless you have got a

23    network manager level one who can get up and say I work

24    in a bull pen with these 47 other level managers.  I know

25    they are all there until 8:00.  I don't think that's

1  going to happen.  That's one case where farm workers.

2  They are all in the field the same hours.  That's not

3  hard for the farmer to say my wife and kids and Joe is my

4  friend and family are out there.  That's not going to be

5  the way it is working here.  It sounds to me what the

6  plaintiff thinks the evidence is going to show that these

7  folks are on call.  They might get a call at 9:00 at

8  home.  Nobody else would know that.  Unless they march

9  the 50 people on the stand, it seems they have to go on a

10  statistical basis.

11          MR. SHEA:  I think we have to divide up hours

12  worked versus duties.  Clearly with respect to hours

13  worked, they get all that information with time stamps

14  that we're willing to produce.  There's no expert

15  testimony in this case.  You won't find it in Dr.

16  Drogan's original affidavit reply that says from a

17  sampling of 20 people, I can review the e-mail and come

18  up with an expert opinion about their duties without

19  hearing any testimony from them.  So it is not going to

20  solve the duties question.  The focus of the duties

21  question for the people who take the witness stand.  We

22  don't know who those will be.  We had a long debate the

23  last time you were here.  We have to decide that at some

24  point in time.  Discovery keeps the options open in terms

25  of what people can do in that regard.  From that

1    perspective, your Honor, I think that given the time

2    stamp that tells about everybody that's working at 8:00

3    or 9:00.  If we're going to do economically reasonable

4    production of e-mails, it should be from people who are

5    going to testify.

6          Now, if plaintiff's want to indicate there are

7    people they're calling, being their witness to testify

8    and let us know about that.  We want to have a grouping

9    of both, that's something we can consider.  A bare e-mail

10   from no one that's going to take the witness stand, I

11   don't think it is going to be informative of issues that

12   you are ultimately going to try.

13         THE COURT:  The problem I have is I can't tell

14   the plaintiff how to try the case.  I'm here to get the

15   case to trial.  I'm not in a position to tell you how to

16   defend or them how to try it.  If they think they are

17   going to prove their case through a random sample on the

18   issue of duties, I will not tell them they can't.  I want

19   to make it clear.  I wrote a note to myself to say this.

20   If I allow sampling, I'm not saying that I think that's

21   going to be a valid method of proof in this case, number

22   one, assuming your expert is competent.  Number two, that

23   his opinion is within the scope of his expertise.  Number

24   three, it is an opinion upon which he can give the

25   opinion to the jury.  Number four, that the jury could

1  reasonably infer what you want them to infer from the

2  opinion.  I don't know those answers.  I haven't heard

3  the evidence yet.  Probably during the trial is when I

4  will decide it or after the evidence has been heard and

5  there's a directed verdict motion or motion to set aside

6  is the time that I will know that answer.  I have to

7  leave it to the parties to decide what they want to.  If

8  plaintiff say they want 20 random people, they are not

9  going to come back to me next month, now could we have

10 the 50 depositions to take, we want those e-mails.  My

11 answer would be when do you want to write the check to

12 the defendant so I'm assuming the plaintiffs have thought

13 hard who they want or that they want it random, how they

14 wanted it selected randomly.  I presume they can get

15 those instructions.  We want you to take every fifth

16 person alphabetically or every fifth by seniority.  I

17 don't know.  They will come up with some formula.  That's

18 what you will give them of what I order.  What you are

19 saying makes sense to me but I'm not a plaintiff's lawyer

20 in the field.  I don't know why they want it random.

21 They seem to want it random.  I think what I will do

22 today especially in light of the absence of lead counsel

23 for the plaintiff, I'm going to order that you comply as

24 far as the time stamps which you agreed to do which I

25 think is a reasonable thing, and I didn't think would be

1    very expensive.  I think it is a very powerful piece of

2    evidence for the plaintiff or not for the plaintiff, may

3    not help them.  May be the time stamps aren't good.  They

4    are early in the day.  Either way, they are clearly very

5    probative one way or the other and I didn't think it

6    would be expensive.  I think that the proposal of the

7    plaintiff to do 20 is very reasonable.  I also think the

8    further proposal today to in effect take one quarter of

9    each of those 20.  In other words, one week in the month

10   makes it extremely reasonable.  I will leave it to the

11   plaintiff to direct to the defendant reasonable

12   instructions on who those 20 people are.

13        Now I would suggest the plaintiff confer with

14   the defendant.  Maybe the best think is maybe to agree on

15   who those 20 are going to be.  If the plaintiff wants it

16   random, then you will provide defense counsel with

17   instructions on how to make that random selection.  In

18   other words, by alphabetical, every fifth or by some

19   other method that you are going to pick but I leave that

20   issue open other than I'm ordering that at some point,

21   once the plaintiff has given you directions, the

22   defendant is going to produce the e-mails of 20 of what

23   is a 200 member class, 150 something FSLA opt-in class

24   and that what will be produced for those 20 people is the

25   e-mails in the time period in question for one week out

1    of each month and you would roll that unless the

2    plaintiff doesn't want to do that.  If they always want

3    the same week, that's fine with me.  I think the rolling

4    might be a good idea.  I'm assuming it doesn't make it

5    incredibly more expensive.  I'm assuming that the program

6    can be written that it wouldn't be difficult.  Might take

7    a few more minutes, hours of the programer's time.

8    That's not very much in relation to the overall cost.

9    The cost is reviewing primarily.  We have cut it down

10   from 200 to the relevant equivalence of five because you

11   are taking one quarter of each of 20 so I think that is

12   reasonable.  The expense while significant is not out of

13   line with the size of the case so that remains, Attorney

14   Melzer, an open issue for you to either discuss with the

15   defendant or to direct the defendant what 20 people you

16   want and how you want the quarter of their e-mails a

17   month to be produced.

18            MR. MELZER:  Thank you, your Honor.

19            THE COURT:  In other words, you may decide you

20   want everybody's e-mail for one week out of the month.  I

21   don't know that.  I leave that to you.  What I'm

22   ordering is the parameters of what the burden is on the

23   defendant.  All right.  The next one I think, is it 20?

24            MR. SHEA:  Yes.

25            THE COURT:  20.  I have a very distinct

1    recollection of Attorney Clark and I are the only two

2    people in the courtroom on the day in question when the

3    question was had.  I can recall George O'Brien sitting in

4    your seat.  You bear some resemblance to him.

5           MR. SHEA:  Make sure Attorney O'Brien never

6    hears that.

7           THE COURT:  It could be you that could be

8    offended.  He was very concerned about preservation of

9    documents.  This is one with ediscovery.  There are a lot

10   of cases.  In fact, myself had issued an opinion on

11   spoliation and adverse inferences so I'm well aware that

12   he undertook to put out orders to have to files

13   preserved.  I don't know the exact details but I'm well

14   aware of That.  Am I correct in assuming that what the

15   plaintiff seeks in this request is, in fact, a copy of

16   what the defendant determined to preserve in connection

17   with their document obligations under the federal rules?

18          MR. SHEA:  That's correct.

19          THE COURT:  Then why does the plaintiff talk

20   about selective preserving?  Do you know anything about

21   that?

22          MR. SHEA:  All I can tell you --

23          THE COURT:  He said some of the computers' hard

24   drives.

25          MR. SHEA:  The only thing I can tell you about

1    that is that altogether we believe there were 280

2    different computers that SNET sought to and successfully

3    did do the preservation on.  Whether that's every single

4    member of the class, I'm not certain.

5            THE COURT:  Because the class was a mess back

6    then.  That was Mr. O'Brien's concern is that he didn't

7    know who the class was and it looked like it was going to

8    change and he was very concerned about that.

9            Attorney Melzer, I don't understand why you

10   should get this.  Just because a company chooses to

11   preserve documents under its burden under the federal

12   rules, why does it make everything discoverable?

13           MR. MELZER:  Your Honor, let me explain our

14   perspective a little bit.  We had been receiving --

15   without disclosing confidential communications, we have

16   been receiving reports that people were being told that

17   their computers needed to be copied because they had

18   opted into the lawsuit and not from everybody but from

19   selective individuals we were concerned that would have a

20   chilling or intimidating effect.  We want to know what

21   the company has been doing, whose computer they have

22   copied, what their rationale was and what they have been

23   doing, what material they have been getting.

24           THE COURT:  My understanding what they have been

25   doing is attempting to fulfill their obligation under

1    Rule 26 of the Federal Rules.  Are you doing anything

2    other than that?

3         MR. SHEA:  No, your Honor.

4         THE COURT:  My second thing they have, however,

5    preserved if they preserved 280 people's computer

6    records.  Therefore a blanket request for all of what

7    they preserved can't possibly be discoverable in this

8    case.  And my last response I guess would be as to your

9    comment of what are they doing with it.  I presume they

10   are searching it.  When you ask them for production of

11   documents because that's the purpose they preserve them

12   for, am I mistaken in that respect?

13        MR. SHEA:  We have not done that for be every

14   single request.  It was preserved so we would have that

15   ability.  In responding to the plaintiff's discovery, I

16   think it would be extremely burdensome to go ahead and

17   search and image all 280 computers in that regard.

18   Therefore, I don't want to mislead the court on that

19   point.  We have restricted most of our request because

20   they have been typically directed to the managers of

21   these individuals to talk to those folks to pull up

22   documents so the real answer is we haven't been doing

23   anything.  They have been sitting there in case we need

24   to do something with them.

25        THE COURT:  I don't know whether Southern New

1   England is intimidating anyone or not.  I believe there's

2   a lawsuit pending in front of Judge Eginton alleging

3   that.  If that's the case, I guess that decision will

4   come out in that case.  This case isn't about

5   intimidation.  So I really do not see any purpose.  I

6   don't think it is within the scope of discovery to compel

7   the defendant to produce copies of the images that they

8   made, given counsel's representation to the court that

9   those images were made in order to preserve records in

10  the event some aspect of their database was destroyed or

11  otherwise changed, and this would be the only source of

12  obtaining the records going forward in response to

13  discovery requests.

14       Based on that representation, it seems to me

15  that it's probably -- it could be in some respects work

16  product what they chose to preserve but secondly, see

17  that it's within the scope of discovery.  In other words,

18  there might be many things in there that aren't properly

19  discoverable.  You asked for many of them already but the

20  mere fact that what you are asking for is what was

21  copied, I don't think what was copied is a matter that's

22  discoverable in this case.

23       MR. MELZER:  Your Honor, I would agree with that

24  based upon counsel's representations.  I would express my

25  concern about the communications that are being made to

1   the class members that things are being done because they

2   are part of this lawsuit and anything that might create

3   an impression that the company is looking for things,

4   evidence of potential misconduct which they might use

5   against them.

6        THE COURT:  My understanding this was done some

7   time ago.  It is not continuing to be done, correct?

8        MR. SHEA:  That's correct.

9        THE COURT:  Number two, I have heard defense

10  counsel tell me they can't produce something because it

11  would require them to communicate with their client.

12  They don't feel they can do that on the subject of the

13  lawsuit.  I think counsel appreciates the fact.  I'm sure

14  he's communicated that to his client that while it is a

15  difficult situation, the topic of this lawsuit is not a

16  topic for discussion between his client or himself and

17  these clients of yours.

18       MR. SHEA:  If I can explain, no one was told

19  their computer was being copied because they were in the

20  lawsuit.  We do have people who work remotely with

21  laptops.  I believe to copy them, they have to be hooked

22  up to the network for an extended period of time.  The

23  people asked why was my computer being copied.  They were

24  told because of the lawsuit.

25       THE COURT:  It is always in the eyes of the

1    beholder.  Someone might have felt intimidated.  I'm sure

2    you felt it was done in a way that's entirely innocent.

3    The fact of the matter is it's been done.  It's over

4    with.  There's no more requests as I understand. The mere

5    fact that the company preserved documents makes

6    everything it preserved discoverable, the court will deny

7    the motion to compel with respect to 20.

8             The next is 26 I believe.  They are inventory

9    reports that the plaintiff has sought because of time

10   stamps on them.  Is this a time stamp a manual or

11   computer time stamp?

12            MR. SHEA:  It is a computer time stamp.  It's

13   different from the e-mail time stamps only in the sense

14   that it does not identify what the first-level manager is

15   doing.  It doesn't identify duration.  You will know from

16   the time stamp at a particular point a first level

17   manager uploaded the inventory report.  You just won't

18   know who.

19            THE COURT:  How much effort is it to get the

20   time stamp?

21            MR. SHEA:  I don't think it's an extraordinary

22   effort.

23            THE COURT:  Why don't we start with the time

24   stamp that an inventory was uploaded by a manager at 8:00

25   at night.

1          MR. MELZER:  We agree the time stamp is

2    relevant.  We always want the actual reports themselves

3    because there are reports being filled out by first

4    levels and reflect potentially their duties.

5          THE COURT:  But we have to turn over every

6    inventory report for the last six, seven years in order

7    to get a sense of the duties?  Your clients are the best

8    evidence of the duties they have.

9          MR. MELZER:  We would accept a sample of what

10   the elements of the report are and what a first level

11   fills out.

12         THE COURT:  Do you follow that and what's your

13   reaction?

14         MR. SHEA:  My recollection is I will give him

15   the time stamps, and I will give him 20 sample reports

16   that he can see.  That doesn't strike me particularly

17   burdensome.  After that, we can agree it is not relevant.

18         THE COURT:  The 20 will be spread out over the

19   time period.

20         MR. SHEA:  Certainly.

21         MR. MELZER:  We agree to that proposal and will

22   confer with defense counsel after the production.

23         THE COURT:  All right.  That takes care of 26.

24   The defendant will produce the time stamp, the computer

25   report, the time the document is uploaded as well as 20

1    sample reports over the time period in question.

2           The last one is actually a group of numbers 33

3    through 36.  If I understand, Attorney Melzer, you are

4    asking for in effect every document that this defendant

5    has for 20 years that relates to the change in status

6    from exempt to nonexempt of vice versa of any position at

7    their company.  Is that fair?  Have I read that

8    correctly?

9           MR. MELZER:  Your Honor, it is not my position

10   it is only first level positions.

11          THE COURT:  Okay.  Why 20 years?

12          MR. MELZER:  Well, because we allege that the

13   people in the class and the two titles themselves were

14   reclassified in the early 1990s.

15          THE COURT:  But didn't limit your request to

16   these first level positions in the case, though, right?

17          MR. MELZER:  That's correct.  We also are

18   interested in the company's rationale for and criteria

19   for determining whether someone is exempt or not exempt.

20   Right now we have a very narrow class within two titles

21   but many other positions among first levels are pretty

22   similar and we're interested in finding out what the

23   thought process is for comparison purposes why certain --

24   we're aware of two positions that were reclassified.  One

25   being the outside planning engineers that were

1    reclassified during this lawsuit.  We request number six

2    was related to the construction supervisors, the foreman

3    who -- and that position has since been I believe

4    eliminated and incorporated into the construction

5    engineering managers which are part of the lawsuit.

6              THE COURT:  But you got number six.

7              MR. MELZER:  Right.  We're seeking documents

8    relating to changing status to understand the thought

9    process, the criteria and how it might lead to

10   discoverable evidence under Rule 26 how that might carry

11   over to our class.

12             THE COURT:  Back in 1992?

13             MR. MELZER:  We think that our people were

14   reclassified around that time.

15             THE COURT:  We're not talking about your first

16   level people.  I'm talking about anybody other than.

17             MR. MELZER:  Because our people are reclassified

18   around that time.  Other decisions made around that time

19   would be reflective of probative value.

20             THE COURT:  Which decision was the change in the

21   '90s as to the two at issue in this case went from

22   nonexempt to exempt?

23             MR. MELZER:  We believe that's correct.  I

24   believe there was testimony in this case from at least

25   one of the deponents that he used to be paid over time

1    back until 1992, 1993.

2            THE COURT:  Okay.  Attorney Shea, I believe the

3    first position you took in your memorandum was that you

4    agreed to produce any nonprivileged documents.  Obviously

5    that's responsive to the request as it relates to the

6    first level positions in the case.  Is that still your

7    position?

8            MR. SHEA:  That's still my position, your

9    Honor.

10           THE COURT:  You would go back and look for

11   whatever documents you have that aren't privileged that

12   occur in the 1990's period if there was a change as this

13   gentleman made that.

14           MR. SHEA:  I made the inquiry.  I have been told

15   by my client no such documents exist.  No such change

16   occurred.  One can be certain when you are going back

17   that far in time that's my best belief as I said here

18   today.  I do not have responsive documents that concerns

19   these two positions.

20           THE COURT:  Why shouldn't you be required to

21   produce documents that would contain or be or reflect

22   what I will call for lack of a better word, criteria that

23   the company has been using say from '04 to now in

24   deciding whether to reclassify some position one way or

25   another back and forth?

1          MR. SHEA:  One, because positions have no

2     relevance or bearing on this case.  Let's take the two.

3     One is straw bosses.  A straw boss is a construction

4     foreman which have always been a nonexempt position

5     because they are actually out there splicing the lines

6     and actually doing the techs work in a lead basis.

7          THE COURT:  They have never been changed?

8          MR. SHEA:  The only change SNET made was a few

9     years ago it eliminated that position.  Most of the straw

10    bosses went back to the tech job, left the company to an

11    outsource situation or a couple were promoted to the

12    position of being a first level.  Were they ceased being

13    a straw boss?  They were no longer running the wire and

14    doing the job.  They were supervising techs.

15         THE COURT:  From '04 to now, how many changes

16    have been made in the exempt/nonexempt status at the

17    company?

18         MR. SHEA:  I don't know.  I know that companies

19    are always constantly reviewing and making sure they are

20    properly classified.  Particularly after 2004 when the

21    new regulations came.

22         THE COURT:  I have got to believe that a company

23    like SNET has criteria or a manual or a human resources

24    file or something that tells people what do these regs

25    say.  What are we looking at when we decide the job as

1    janitor somehow is exempt or nonexempt?

2            MR. SHEA:  Almost everything that SNET would do,

3    the criteria are spelled out in law and the criteria were

4    spelled out by the lawyers who direct the

5    reclassification issues.  You walk yours into huge

6    privilege claims when you go down that road.  The other

7    possibility it has no relevance.  Ultimately what's going

8    to matter in this case is not what SNET thought the legal

9    criteria were for exception.  If SNET set that bar too

10   low because they misunderstood the legal requirements,

11   ultimately it is not going to be relevant.  If it sets

12   the bar too high that will not be relevant.  There's only

13   one person in this courtroom that's going to set that bar

14   in terms of criteria and I'm speaking to her right now.

15   So what SNET thought has really no bearing, particularly

16   in taking into account it is not with respect to these

17   positions.

18           The other one he mentioned is the outside plant

19   engineer.  That person doesn't supervise techs.  That

20   person is in charge of designing the wiring diagrams

21   around wiring centers to figure out how your telephone is

22   going to best interconnect with SNET's network and for

23   plaintiff to delve into and raise all of these privilege

24   issues we have with positions that are not an issue in

25   this lawsuit, I think does not satisfy any of the

1     criteria of relevance and frankly gives rise to the

2     concern that I articulated in my papers.  This is not

3     about finding out about matters that actually aren't

4     going to have any bearing on this lawsuit.  It is about

5     finding where else has this company done reclassification

6     because maybe that's an area of vulnerability that we can

7     explore for our next lawsuit.  I think that's a very

8     valid concern in this situation.

9         THE COURT:  Have you inquired of your client

10     searched to see if these two positions have been the

11     subject of review as to whether to reclassify or not?

12         MR. SHEA:  Yes, your Honor.

13         THE COURT:  Have they reviewed them?

14         MR. SHEA:  They have not, your Honor.

15         THE COURT:  Despite all of this constant

16     rethinking of classification, these two happen to be one

17     they never thought about.

18         MR. SHEA:  I should take that back.  In terms of

19     SNET, I'm not aware of any review.  If there was, I would

20     have listed that on my privilege log.  I think when most

21     people look at this situation, where you have somebody

22     who is a supervisor, who is supervising 10 to 15

23     employees.  That doesn't tend to fall within the gray

24     area that you worry about.  Companies worry about that in

25     the administration exemption.  People look at that and

1    say that looks like a classification technical exemption.

2    I know I made the request and asked if there was any

3    privilege documents, I would have to log those.  I was

4    told there was none.  From that, I surmised there was not

5    a sufficient level.  Obviously in conjunction with the

6    lawsuit, people were looking at it as part of the process

7    of the defense here but as far as actually sitting down

8    to review this, no, I do not believe it took place.

9         THE COURT:  Attorney Melzer, I think that if the

10   company ever reviewed these two positions, that's

11   extremely relevant so I will deal with that with the

12   defendant in a minute as far as what I will tell him he

13   needs to search for but it sounds like he's probably not

14   going to come up with anything.  He needs to make sure

15   that's the case in terms of looking at every other

16   reclassifications in the company.  I'm just not persuaded

17   that that's probative in this case.  Unless you can tell

18   me a position at the company that's so similar to the

19   ones at issue in the case.  I don't know why deciding

20   whether a telephone operator or I can't think of other

21   positions but should be exempt or not is going to tell me

22   anything about your folks' positions.

23        MR. MELZER:  I have two points in response to

24   what Mr. Shea said, then I will try before I lose them

25   then I will try to address your argument so Attorney Shea

1    was explaining the difference between the two positions

2    that we have identified straw boss and outside planning

3    engineer and our class members and trying to show why our

4    people are different and how that's relevant to overtime.

5    Basically the thought process is they are different

6    because they don't have direct reports.  Well, that's

7    very relevant.  If the idea is that you're not exempt --

8    that you are exempt, if you have direct reports and these

9    positions are distinct because they don't have direct

10   reports, that thought process those criteria are highly

11   relevant.  Attorney Shea has also said that the company's

12   thought process is not relevant because the only thing

13   relevant is the low.  I would disagree with this as well.

14   The company's thought process is highly relevant to the

15   willfulness inquiry.

16           THE COURT:  Can you identify for me any position

17   at SNET that has a characteristic the same as your two

18   positions such as supervising somebody or not

19   supervising, I don't know, but has a characteristic

20   that's akin to your characteristics and the outcome of

21   the company is opposite of these two positions?

22           MR. MELZER:  Your Honor, there are a lot of

23   positions that are similar to our people, as you know the

24   class has been narrowed considerably since the beginning

25   of the case.  It is our position that people in other

```
1    positions do have a lot of characteristics of --
2              THE COURT:  Are they exempt or not exempt?
3              MR. MELZER:  We believe that they are also
4    exempt but we're not entirely certain given the company
5    may have reclassified some of them.
6              THE COURT:  This is what the court is going to
7    do.  First of all, the court is going to order the
8    defendant to inquire/search for any documents related to
9    the classification of the two positions in this case.
10   Including the review of that status, the consideration of
11   the classification, anything that would relate to these
12   two positions and the fact they are classified as exempt
13   but related to these two positions.  I'm going to permit
14   the plaintiff a week to identify if they can, another
15   position or positions at the company that you believe
16   have similar criteria, similar characteristics to your
17   folks' positions that are classified or have been
18   classified as nonexempt and to identify those to the
19   defendant.  If, in fact, you are correct, in other words,
20   the defendant I suppose can come back and say you are
21   mistaken.  That's always been exempt.  Never been
22   unexempt for the last twenty years.  If you are correct,
23   there's a change or different category than your client,
24   then I would expect counsel to confer and discuss the
25   production of documents as to that position or positions
```

1    of the same that I just ordered the defendant to do for

2    the two in this case.  In other words, if there's ever

3    been a review of it or a consideration of why they are

4    this way or not the other, those documents nonprivileged

5    would be produced and the privilege log would be

6    produced.  I'm not going to just say to the company

7    produce every piece of paper that you ever had any

8    classification on when many of the employees at the

9    company bear no resemblance to the plaintiffs in this

10   case.  I understand there may be some who do bear

11   resemblance but to the extent, they are classified the

12   same as the plaintiffs are, I don't think you are going

13   to get anything from them.  If they used to be classified

14   another way or now classified another way, then I do

15   think you get up the scale of relevance and

16   discoverability.  That's why I will order the defendant

17   to give you that discovery assuming your assumption is

18   correct.

19              MR. MELZER:  Thank you.  I have a couple of

20   clarifications to ask of you.  One would be that with

21   regard to the two positions we would expect that that

22   information even if the analysis not being applied to

23   this particular title but in some other way such as field

24   managers, IM managers, anything else that might encompass

25   people in these positions even if it is not by this

1      title.  The second thing I would ask if any of this

2      analysis or criteria were applied not at the SNET level

3      but by AT&T, we would want to get that as well.

4              THE COURT:  How would could you get that?

5              MR. MELZER:  AT&T maybe making some these

6      classification decisions nationwide for people in similar

7      positions.

8              THE COURT:  I presume they will communicate that

9      to SNET and SNET would produce that communication.  You

10     would learn about AT&T's decision.  You could decide to

11     run down a non-party witness.  AT&T is not a party to

12     this case.  You can't make SNET produce AT&T documents.

13     You can brief it if you want.  I don't think you will win

14     that battle.

15             MR. MELZER:  We would be entitled to that.

16             THE COURT:  If it is within the scope of what I

17     just described.  I don't care where he gets it from.  He

18     can have a letter from the Department of Labor that's

19     related to the classification of a position.  He should

20     turn that over.  You said something else.  How long have

21     these people had the title network service whatever and

22     construction and engineer manager.  How long have they

23     had those titles?

24             MR. MELZER:  It is my understanding not going

25     back to 1990 at least for the class period but it is more

1    understanding also that classification decisions may not

2    have been made down to the specific title level.

3              THE COURT:  I don't know what -- does the

4    defendant know what the plaintiff is asking for?

5              MR. SHEA:  I don't.  I'm about to rise and say I

6    don't understand that.  If he's saying the following, if

7    I can cut to the chase, if he's saying that he wants us

8    to go back and examine these two titles or predecessor

9    titles of people who flowed into, that's a reasonable

10   parameter and one I can understand and implement.

11             THE COURT:  Is that what you are saying?

12             MR. MELZER:  I am with this clarification.  We

13   want classification decisions that would apply to

14   managers within these titles or predecessor titles held

15   by the same people that float into these titles but even

16   if the classification decisions weren't being made

17   specifically in reference to the title but with regard to

18   another category that these people are within.  If you

19   follow that.

20             THE COURT:  I followed everything until the end.

21   I think what defense counsel said which is I think what

22   you said at the beginning effectively if somebody's

23   called a network manager now but we know that five years

24   ago they were called a computer manager but it is the

25   same person.  Maybe the same person but it is the same

1    job then, I heard the defendant say he can understand

2    that.  That he would, therefore, make the search not only

3    of the names we have now but the predecessor names.  You

4    said something at the end.  I have no idea what it means.

5         MR. MELZER:  Let me try to give you an example.

6    If there's a document discussing the classification

7    status not of network managers but of field managers

8    which that classification decision would encompass people

9    within these titles, we would be entitled to that.

10        THE COURT:  Field manager is a title that

11   includes both of these titles.

12        MR. MELZER:  It is generic term that includes

13   people who have technicians in the field and encompasses

14   people in both of these titles.  That's correct.  If

15   there's something about IM manager.  That is one of the

16   subcategories of our people.  We would want that.

17   Doesn't have to specifically say on the document

18   construction and engineering alone as it pertains to

19   people within that totally.

20        THE COURT:  I think if there's a generic way

21   that SNET refers to these types of people, not by their

22   title but these two titles together known as field

23   people, I don't know if that's true.  Just say, for

24   example, I would think you would know that and the

25   company people would know that if a document talks how

1    should we classify field managers everyone knows network

2    and construction/engineer manager I assume you will

3    produce that.

4        MR. SHEA:  That's correct.  The only

5    clarification of your order, a question that I had is how

6    we ought to proceed with respect to the second option if

7    we disagree on whether a job is similar.  I think I made

8    it very clear somebody who doesn't supervise anybody and

9    the job is design wire scepters is not in any way

10   similar, I will not agree to produce those.

11       THE COURT:  I understand that.  What has to

12   happen is the plaintiff will have to make a further

13   motion to compel which they outline the title that they

14   asked you for and the characteristics of that title that

15   they communicated to you that they believed were similar

16   to them, list the characteristics of our people, the two

17   in question.  I assume the plaintiff will report that you

18   couldn't reach agreement and you would report to me,

19   Attorney Melzer, that the defendant says no.  These

20   people don't have those characteristics or for some other

21   reason, he didn't want to do it.  I would assume that you

22   would respond to that motion in seven days.  Not going to

23   be a long motion.  We're talking about a page for each

24   mail of the categories you thought you should get,

25   documents, page and a half.  Tell me that information.  I

1    don't want argument.  I just want to know the facts.

2         I will turn now to 255 which is the memo in

3    support of the motion for protective order.  I believe at

4    the beginning there was an indication there might be some

5    agreement on some or all of this.

6         MR. MELZER:  Yes, your Honor.  We have narrowed

7    the areas of dispute.  With regard to SNET's

8    interrogatories and document demand directed at duties,

9    those would be addressed not to the entire class or not

10   to all the opt-ins, I'm sorry, but to only the deponents

11   as well as to anyone we disclosed as a potential trial

12   witness.

13        THE COURT:  All right.  When are you going to

14   disclose your potential trial witnesses?

15        MR. MELZER:  We're going to discuss that with

16   defense counsel.

17        THE COURT:  Which numbers are these that are

18   covered by this?

19        MR. SHEA:  Your Honor, it is really all of the

20   interrogatories with the exception of the one that goes

21   to hours which I believe is Interrogatory Number Nine.

22        THE COURT:  In other words all but nine have

23   some part of the question is asked about duties, is that

24   right?

25        MR. MELZER:  And, your Honor, also numbers one

1     through four and I believe 11 would be off the table.

2          MR. SHEA:  We agree to withdraw one through

3     four.  We agreed to withdraw 11 with the caveat that

4     plaintiff's will identify bankruptcy proceedings.

5          THE COURT:  For whom, all or some?

6          MR. SHEA:  Bankruptcy proceedings identified by

7     all people in the class since in our view they bounce

8     out.

9          MR. MELZER:  We disagree with that part.

10         MR. SHEA:  We don't have agreement on the

11    bankruptcy.

12         MR. MELZER:  The other one through four and 11

13    would be off the table.

14         THE COURT:  You said.

15         MR. MELZER:  One through four and 11 is still

16    partially in dispute.  Those would go to the 50 deponents

17    and to anyone who we disclose as we agree upon.

18         THE COURT:  The remaining ones would go to 50

19    plus any potential witnesses so the remaining portions of

20    five, six, seven, eight, nine and ten.

21         MR. MELZER:  10 was withdrawn.

22         MR. SHEA:  It is really a 5, 6, 7, 8, then we

23    have the disagreement on 11 and disagreement on nine.

24         THE COURT:  11 and 19 are at issue.

25         MR. SHEA:  11 is a request, not a interrogatory.

1     It's a request for documents.

2              THE COURT:  I'm looking at requests.  You are on

3     interrogatories.  Let's start again.  Any part of one

4     through four that asks for duties -- I'm sorry.  All of

5     one through four is withdrawn, is that correct?

6              MR. SHEA:  That's correct.

7              THE COURT:  The 50 deponents will answer and any

8     potential trial witnesses will answer 5 through 8.

9              MR. SHEA:  That's correct.

10             THE COURT:  Except for the duty part.

11             MR. SHEA:  Nine is still in dispute.  We're not

12    conceding on nine.

13             THE COURT:  Nine is in dispute and 10 is

14    withdrawn.

15             MR. SHEA:  That's right.

16             THE COURT:  This is of the interrogatories.

17    Let's take up nine of the interrogatories which is that's

18    the issue of and what's the dispute whether it can be

19    estimate or average or whether it has to be to the best

20    of their knowledge.

21             MR. MELZER:  That's one of the disputes. The

22    other is who it goes to the sampling.

23             THE COURT:  I see.

24             MR. SHEA:  Before we resolve this, there's a

25    couple of timing aspects with respect to the responses

1    when we left off the request for production.  The request

2    for production will be responded.

3            THE COURT:  Let's do interrogatories.

4            MR. SHEA:  Interrogatories.  We will get answers

5    seven days from those people yet to be deposed.  We will

6    get their answers seven days in advance of their

7    deposition to enable us to prepare.  We had not yet

8    agreed.  We need to meet and confer on the

9    supplementation of those people who already had been

10   deposed, the date for that and the date to produce trial

11   witnesses.  That's the part we're still working on.

12           MR. MELZER:  Your Honor, with regard to number

13   5, defense counsel indicated that they wanted to use that

14   to locate documents that might be used in the deposition.

15   We would ask that that those documents be produced in

16   advance of the depositions.

17           MR. SHEA:  I don't think I said that.  I said I

18   need to know seven days in advance of the deposition any

19   one of the clients they disciplined.

20           THE COURT:  Don't you know who has been

21   disciplined?

22           MR. SHEA:  The problem is these are first level

23   managers, your Honor.  Sometimes it flows up in a

24   situation I do know.  Sometimes they are the people who

25   the managers taking care of this for the company.  So

1   they do have the best knowledge of which techs they are

2   disciplining and when.  I think it goes to the

3   supervisory status and the reason why they are exempt.

4   This is an unusual case.  I rarely have a case where

5   people who are my managers are adverse to me.

6           THE COURT:  They don't report the information?

7   It doesn't go in a personnel file?

8           MR. SHEA:  Depending on the seriousness of it,

9   it might and it's also very difficult to capture.  I

10  don't have the central location for this so I will have

11  to get information on discipline.

12          THE COURT:  How are these people going to

13  remember who they disciplined?

14          MR. SHEA:  I think a lot of times they won't.

15  Obviously if don't, they can only give the best answers

16  they can.  I think it is useful information for me to

17  have.

18          THE COURT:  So we talked about time.  That's an

19  open issue but you will meet and confer.  One through

20  four is withdrawn.  10 is withdrawn.  We talked five

21  through eight is going to be answered by the 50 plus

22  witnesses except the question about duties.  Have I got

23  it right so far?

24          MR. SHEA:  Yes.

25          THE COURT:  Now we have to go the nine.  Let's

1    go to nine.  Attorney Shea, you yourself acknowledge in

2    your opposition that number nine is susceptible to

3    sampling so why should I make every plaintiff answer it

4    if I only have two categories of positions.  If I had 10

5    categories or if I only have two, why do I need everybody

6    to answer?

7             MR. SHEA:  Because, your Honor, we believe that,

8    one, the sampling process if we're going to get a large

9    enough sample that we were going to be confident even

10   plus or minus half an hour which I said could still be a

11   swing of almost a million dollars according to my expert.

12   In that situation, you are going to have to get responses

13   from I think 125 people assuming a certain level of

14   randomness.  If you are going to ask 125, you might as

15   well get complete information.  I think it is my view on

16   that.

17            THE COURT:  I'm sure it is your view.  The

18   question is whether it is a reasonable view.

19            MR. SHEA:  Your Honor, again that number could

20   even go higher depending stratification.  There's two

21   problems with the plaintiff's approach to sampling.

22   Something I think may manifest only in their reply brief.

23   Is that we're dealing here with both a small class and an

24   astronomical damages claim.  There's too many people in

25   this class.  In the reply brief, they say they are

1    demanding upwards of one hundred million dollars.  That's

2    half a million dollars per claimant.

3              THE COURT:  That's $100,000 a year.

4              MR. MELZER:  On top of everything else.

5              THE COURT:  What do these people make

6    ordinarily?  What's their managerial salary?

7              MR. SHEA:  75 to $85,000 range.  In context not

8    all these people were there for the entire period of

9    time.  All I'm suggesting to you if somebody is here

10   demanding in court half a million dollars, it is not a

11   significant burden to ask them to do their best to report

12   the best information they have on the hours they worked.

13   That's what we're requesting and plaintiff said that's a

14   big burden but not in contrast to what's at issue here.

15   I think that distinguishes us from a number of the cases

16   they cite.  We're dealing with humongous classes where

17   neither party is asking for any random sampling because

18   you can't go out and get 2500 responses.  We're dealing

19   with relatively a small amount of work off the clock.  If

20   you are going to ask for half a million dollars, you

21   ought to at least be going to the trouble to sit down and

22   look at your records and provide the best estimate you

23   can.  If you are asking for average, your Honor.  I have

24   seen other cases get answers and the information tends to

25   be worthless.  Everyone claims to have worked the same

 1    12, 13, 14, 15, 10 hours, whatever it is.  Everyone
 2    claims to have worked there every single week during the
 3    liability period even though we know they took vacation.
 4    They were sick, on disability.  It is easy to rattle off
 5    an average number of hours and then say oops, I made a
 6    mistake when you are caught.  So I think requiring the
 7    plaintiffs, the plaintiffs make the suggestion this
 8    should be done after they had a chance to review the
 9    written discovery related to them.  They ought to be
10    required to come up with the best estimate of hours.
11    That is particularly true when you look at the other
12    discovery that's in the case.  Nothing you haven't seen
13    for the most part because we wound up agreeing on it.
14    What the plaintiff proposes to do here is try to figure
15    out the hours people worked, look at things like cell
16    phones, computer lines, look at when an unnamed manager
17    had a time stamp with respect to inventory reports.
18    We're going to look at e-mail dates and from this,
19    experts are going to spend hundreds of thousands of hours
20    trying to come up with a estimate of hours work.  We're
21    going to do all of that and never ask the opt-in to give
22    us their best estimate of hours worked.  That makes no
23    sense whatsoever, your Honor.
24             THE COURT:  The case law suggests that when the
25    company doesn't -- remember one of my first questions to

1    you.  The company didn't keep records.  I understand why.

2    You don't think these people are nonexempt.  The fact of

3    the matter is if the jury determined they are nonexempt

4    and you should have paid them by the hour, it is not

5    their fault.  They don't have precise evidence to show

6    what hours they worked that they weren't paid for.  I'm

7    looking at -- there's a couple of case out of the Fifth

8    Circuit Bella versus McCloud, that's back '85.  Casillio

9    more recently talks about if the employee makes a

10   credible showing he's performed the work not properly

11   compensated, the employer can't be heard to complain that

12   the damages lack the exactness and precision would it be

13   possible if they had kept records.  The workers may

14   satisfy their burden with admittedly inexact evidence.

15              MR. SHEA:  That is an accurate statement of the

16   law.  I think we need to distinguish between what Mount

17   Clemons really says.  What Mount Clemons is saying is if

18   despite the employee's best efforts, they cannot come up

19   with an accurate recollection of the hours they worked,

20   that doesn't mean they forfeit their right to damages.

21   That was the employer's argument.  If you can't come up

22   with that, then you don't get any damages at all.  The

23   Supreme Court rejected that and the case law rejected

24   that.  That's different than what's going on here.  I'm

25   asking plaintiff to make their best effort.  I don't

1  think it excuses you from making your best effort to say

2  if despite my best efforts, I can't come up with the

3  right number, then you can't use that to disqualify me

4  from having damages.  You are required to make that best

5  effort so that the defendant in Mount Clemons, the burden

6  shifts to the defendant.  The benefit is the plaintiff's

7  best effort in that regard.  What the plaintiffs are

8  saying here is because despite my best efforts, you can't

9  use that as an excuse to deny me damages.  That means I

10  shouldn't have to make any effort at all or not make much

11  of it.  Don't make me sit down and try and actually track

12  when I was on vacation, when I was not working more than

13  40 hours in a week, when I know I was in a job I was

14  working more than 40 hours.  Don't make me do that

15  because that's too much work.  That's where Mount Clemons

16  does not help them.  That's to the fact that each of

17  these persons is making a half million dollars claim

18  comes into play and should not excuse them from

19  reasonably giving the defendant the discovery it is due

20  so under Mount Clemons, I can make my best showing.

21          THE COURT:  You are repeating yourself, sir.

22  Attorney Melzer, do you want to respond?

23          MR. MELZER:  I think that we are proposing that

24  everybody make their best effort.  Everybody who is among

25  the sample group responding on their hours, they do give

1   their best effort rather than arbitrarily saying the week

2   of May 1, 2003, I worked 43 and a half hours.  What they

3   should be able to do is to say from May 2007 to April

4   2008 I held this position and during that period, I

5   worked an average of 10 hours a day and then my job

6   changed a little bit so my hours changed a little bit.

7   During that period, I worked 55 hours a day that seems to

8   me to be a lot more accurate than what Attorney Shea is

9   suggesting.

10          THE COURT:  That's the best the person can do.

11   I don't know that's much different than what he's

12   suggesting.

13          MR. MELZER:  He's not suggesting they submit the

14   average hours.  He's saying recreate their hours day by

15   day, week by week over single week for six years.

16          THE COURT:  The answer is the plaintiff says

17   that a four-month period I know I held this job.  I was

18   out of Meriden.  I know these days I didn't get home

19   until 7.  I know I worked X hours four days a week.

20   That's the best information and knowledge and belief.  To

21   me that's a pretty good faith estimate.  Counsel said in

22   interrogatory nine can be an alternative answer if you

23   can't.  I suppose there might be somebody who wrote down

24   who worked -- I have been known to do that just to see

25   how many hours I'm working at this job that I'm exempt

1    from.  So maybe somebody did that.  If they did, they

2    should tell them.  If they didn't, he's saying provide a

3    good faith estimate by day or week.  I know for those

4    eight weeks that's what I worked.  To me, that's my week.

5    I don't think the person has to say May 1, it was this

6    many hours.  May 8 it was the same number.  May 16.

7              MR. MELZER:  That's exactly what he's asking.

8              THE COURT:  I don't read it that way.  If the

9    person can't do it, they can't.  I don't see if it was

10   the same number.  They know they were on assignment and

11   they know what they worked on that assignment.  They

12   didn't need to put down each week separately to make

13   Mr. Shea happy.  I'm telling you that's how the answer to

14   the interrogatory is going to come in.  It is going to

15   come from the best of knowledge of belief from the person

16   answering.

17             MR. MELZER:  Including an average hours per

18   week.

19             THE COURT:  Sir, you always want to change what

20   I say.  You are going to have to break that habit.  If I

21   say it, it is what it is.  What I'm trying to say to you

22   is a person can only answer what they can answer.  If

23   somebody asked me how many hours I worked in 2006 in the

24   month of May, the week of May 7, I could probably go back

25   and get some idea of that.  And so I would make my best

1    estimate of what it was based on, the opinions I issued

2    that week, what my calendar said I did, whether I had a

3    discovery hearing scheduled at 3:30 on a particularly

4    difficult case, I would know I would not be out of court

5    at 5:00 so I would estimate what I did.  I don't see why

6    whoever is going to answer this, why they can't do the

7    same.  They want damages.  I don't know why they can't

8    say this is how much damages I'm entitled to based on the

9    best -- I understand they don't keep records.  That's not

10   their fault.  That's the defendant's fault.  But they

11   still need to come forward with something.  They have to

12   make a prima facie showing.  I don't know why they can't

13   do that now opposed to doing it on the witness stand.

14        MR. MELZER:  Thank you.

15        THE COURT:  The second issue is how many people

16   are going to do this.  Your expert says lets sample 30

17   people.  He says I propose a random sample of 30 would be

18   adequate provided sufficient information for estimating

19   class wide damages.  The problem is he then says if the

20   court finds additional responses are necessary after

21   evaluating the margin of error, then we could add more

22   people.  I don't know how I'm going to do that.  How is

23   it going to get in front of me?  If I order you to do 30,

24   I guess I leave it to the defendant to make a further

25   motion to compel because 30 is not good enough because

1    the margin of error is too high or there's not a good

2    response.  Better be a good response rate.  I don't know

3    what else would affect it.

4         MR. MELZER:  That's correct.  Your Honor, what

5    our expert says is that the margin of error, the

6    exceptional margin of error is not just for a

7    statistician to decide.  It is for the finder of fact to

8    decide and the important thing to remember and not lose

9    site of is they are getting this information from 80

10   people, not just the 30.  They are picking deponents who

11   will also be answering about their hours.

12        THE COURT:  That is not clear yet.  That isn't

13   what you proposed.

14        MR. MELZER:  We propose that the random sampling

15   be done on the 30.  In the deposition of the 50, the ones

16   that have been done, they have talked about their hours.

17   The ones that are remaining to be done, I have no reason

18   to believe that Attorney Shea won't ask them about their

19   hours.

20        THE COURT:  Attorney Shea.

21        MR. SHEA:  I don't know that the depositions

22   that have been taken, there's some question about hours.

23   I don't think we have got the detail of hours.  In part,

24   you need some time to think and reflect to answer that.

25        THE COURT:  How many have you taken so far?

1        MR. SHEA:  I have 28 to take.  22 were taken

2    precertification where damages was less of an issue,

3    where hours were touched upon but not at this level.

4    Clearly I think at a minimum, I think Interrogatory 9

5    would have to be answered by the 50 deponents and by the

6    30 folks in random sampling and any trial witnesses.  If

7    you have that, again, the problem with the sample I think

8    is, one, it leaves open the possibility of additional

9    motion practice.  We don't about verification.  How this

10   is going to play out.  Two, at the end of the day even in

11   the best case scenario, you are going to be left with a

12   margin of error.  Meaning you could be plus or minus off

13   to close to a million dollars.  I think in a class that's

14   this small, where it is not that burdensome to ask each

15   of these people, all of who are demanding on average half

16   a million dollars in damages to respond to the one damage

17   interrogatory.

18        THE COURT:  But you weren't here but the

19   certification of this class occurred at the second stage.

20   We're sort of past the point of accepting that these

21   people are quite similarly situated, right?

22        MR. SHEA:  For one thing I think that ruling had

23   nothing to do with numbers of hours worked.

24        THE COURT:  That's true.

25        MR. SHEA:  I think at least there's always a

1    flavor when I get a plaintiff's papers that I have

2    already lost this case both on the merits and the court

3    has definitively ruled all of the people are similarly

4    situated.  I'm definitely asking the jury to decide on

5    the individual people who sit here.  The jury decides

6    them all the same, then they are similarly situated.  If

7    the jury decides some are and some aren't, I will be back

8    asking to decertify the class because the jury will have

9    so found so for all of those reasons, I think it is the

10   most logical, expeditious way is to do all of them.

11   Otherwise we're going to be here in a sort of iterative

12   sampling process.  In the long run, I think we will not

13   produce economy either for the court or the parties.

14        THE COURT:  Can your expert say that sampling 30

15   plus the 50 deponents, plus any trial witnesses which

16   means you could be as high as certainly more than half

17   the class, can he say that's going to be statistically

18   significant.

19        MR. MELZER:  Well, your Honor, he said that's a

20   very high likelihood.

21        THE COURT:  What I will order is the following:

22   With respect to number 9, to the extent certain

23   plaintiffs will answer that, they will answer it to the

24   best of their knowledge and belief, refreshing their

25   recollection by reference to whatever matters they may

1    refresh them, whether documents at work or their own

2    documents, but they will make a good faith best estimate

3    and to the extent, for example, they had a particular

4    assignment and they know when they did that assignment,

5    they were working the same hours, extra hours each week,

6    they can say for that range of time, this is the estimate

7    per week or per day.  If they did different things, one

8    week they did one thing and the next week they did

9    another, they can't say on average over those two weeks,

10    I worked X.  In other words, the fact they remember a

11    particular assignment that occupied a period of time to

12    me makes it reasonable to say over that period of time

13    and that project, I worked so many hours a week or a day.

14    If their responsibilities changed from week or month to

15    month, then I don't think they can start of try to

16    average over the whole period.  By saying on average, I

17    worked this much because the inference isn't there to be

18    reasonably drawn.  If they are doing different things, it

19    is not reasonable they were always working two extra

20    hours a day.

21            The court is going to order that the 28

22    deponents yet to be deposed, be prepared to answer, in

23    effect provide this information at their deposition.  I

24    guess the defendant can request 30 people that would be

25    sampled in effect, a sample, a 30 person sample I assume

1     they would work with the defendant to have those people

2     answer.

3          With respect to the 22 who have already given

4     the deposition, they will also answer and any potential

5     trial witnesses that the plaintiff identifies would

6     provide the information as well.

7          That's going to give the defendant as I say,

8     probably well over, that's a little more than half of the

9     class I think, the opt-in class and 40 percent of the

10    Rule 23 class depending on how many witnesses there are.

11    I would think that's sufficient but I make this order

12    without prejudice I suppose to the defendant coming in

13    and pointing out that the way the answers have come out

14    that there's no way to extrapolate or maybe the plaintiff

15    will realize that the answers are so varied that their

16    expert won't be able to make the type of testimony that

17    they would need in order to provide a basis for the jury

18    to conclude that the damages are -- can be extrapolated

19    for the nonanswering plaintiffs.

20         MR. MELZER:  Your Honor, the only thing that we

21    would take to clarify is that 30 person sample be taken

22    randomly.

23         THE COURT:  I said it should be random.  But I

24    said I think the defendant since they are the one asking

25    for the information, they in the first instance would get

1    to say to you how do they want to randomize it.  You are

2    talking about 50 people out of the group of 150 already

3    so you are going to be sampling 30 out of 100.  I would

4    expect counsel would confer about that so hopefully the

5    sample is a value to both parties.  If it takes 32 to get

6    both experts to be happy that the 30 will be a good

7    sample, then you will do 32.  That's the sort of thing I

8    expect you to work out.

9         Now we have -- that was interrogatories, right,

10   yeah so we still have that documents.  Am I right?

11   Requests to the plaintiffs.

12         MR. MELZER:  We have agreed, your Honor, to the

13   same type of division here that duties documents be

14   directed to the 50 deponents plus the trial witnesses and

15   any damages be directed to this group that you just

16   defined.

17         THE COURT:  So that's 50 plus trial plus 30

18   sample.  Does that resolve everything?

19         MR. SHEA:  I think it does.  Just to be clear --

20         THE COURT:  Are you withdrawing one through

21   four?

22         MR. SHEA:  No.  One through four are different.

23   Number two is actually what I would call the time hours

24   worked.

25         THE COURT:  That correlates to the nine

```
 1      interrogatory.

 2              MR. SHEA:  Number two correlates to nine.

 3              The rest are duties and would be answered by the

 4      subgroup.  With the exception of 11, we need to deal with

 5      bankruptcy.

 6              THE COURT:  Is 10 withdrawn?

 7              MR. MELZER:  Interrogatory 10.

 8              THE COURT:  So now we have to deal with 11.  My

 9      understanding is the defendants have compromised which

10      hasn't been accepted but to having it be only bankruptcy

11      as to everybody.

12              MR. SHEA:  That's correct.

13              THE COURT:  The plaintiff's position is they

14      like the bankruptcy limitation but you don't want it to

15      be everybody.

16              MR. MELZER:  We don't want it to be everybody.

17      We also don't agree with producing documents relating to

18      bankruptcy proceedings.

19              THE COURT:  Why don't you.

20              MR. MELZER:  Because we think it is irrelevant

21      and not likely to bear any probative value in this

22      case.

23              THE COURT:  The defendant tells me in their

24      memorandum that this would be a claim that would need to

25      be listed on a bankruptcy schedule.  Are they wrong about
```

1     that?

2              MR. MELZER:  We don't dispute that as a general

3     matter, it should be listed in bankruptcy.  We just

4     believe this would be burdensome and harassment to the

5     plaintiff and nothing more than a fishing expedition.

6              THE COURT:  Well, the court is going to order

7     that each -- you don't limit it to time, Attorney Shea.

8     Why would you ever get any answer prior to '04?

9              MR. SHEA:  I think '04 forward, correct.

10             THE COURT:  The court is going to order that

11    each member produce a document from any bankruptcy

12    proceeding they were a party to from June '04 to the

13    present which document is a listing of the assets of the

14    estate.  In other words, the document if they had listed

15    this as an asset, it would be reflected.  I presume they

16    didn't list it but that will be revealed by their asset

17    listing.  I believe that's one of the first documents a

18    filer has to file.  I don't see any reason to produce

19    anymore documents.  Obviously if somebody filed a lawsuit

20    and their original asset, they didn't claim the suit or

21    this claim, and they amended it, I presume they would be

22    smart enough to turn over the amended listing as well.

23    Assume they didn't.  They listed it on the first filing,

24    all they have to do is turn over that document.  If they

25    didn't list and never listed it, then the first filing is

1      enough to give the defendant the notice of the number of

2      the proceeding.  If they want to investigate that

3      proceeding further, the documents are available to them

4      in the courthouse, just as they are to your clients.

5              MR. MELZER:  We would also ask that this be

6      limited to the group of people who are producing duties

7      documents.

8              MR. SHEA:  I would disagree with that, your

9      Honor.  This is a straightforward, the claim gets

10     bounced.  It doesn't bear on duties.

11             THE COURT:  At this point, the court is going to

12     order that it be the 50 deponents, the 30 sample and the

13     possible trial witnesses.  In other words, the people who

14     answered the damages question, the hours question, I'm

15     going to require they answer this question.  If there's a

16     need it becomes evident from their answers of that group

17     of people that's approximately half that the defendant

18     needs all of them, you may make a further motion.

19             MR. SHEA:  If I can be heard on that, the

20     problem is that means it is randomly.  If somebody is

21     lucky enough to have filed for bankruptcy, which means

22     they would have forfeited this claim, that they are not

23     one of the duty deponents, they get a free ride.

24             THE COURT:  You are also getting the 30 samples.

25     Presumably --

1          MR. SHEA:  I don't know about the statistical

2     sample likely.  If I have one bankruptcy filing, then I

3     can ask for the rest.  It is not the sort of thing that

4     lends itself to statistical sampling.

5          THE COURT:  At this point, that's what it is

6     going to lend itself to.  If you want to come back, you

7     can come back on that issue.  They are already going to

8     these people so to me it is not a great burden to have

9     them say in the deposition say yes, I was in a bankruptcy

10    case.  This was the number and I did or didn't list it.

11    That's easy for those people.  For the 28 who have

12    already given it and the 30 that will be sampled, it can

13    be a interrogatory type answer or a piece of paper.  I

14    don't think it matters which it is.  But it is not like

15    you are going to the other people with any question so

16    we're not losing an opportunity to get the answer and

17    bothering people twice.  If it develops from those

18    answers, then you can persuade me that you need

19    everybody, I will consider that.  All right?  Anything

20    further?

21         MR. SHEA:  There was one more item.

22         THE COURT:  There is whether you can take a

23    deposition of a class member who has not opted in.

24         MR. SHEA:  I'm about to serve at the end of this

25    week my second wave of 14 deponents.  I'm proposing to

1    put on either two or three Rule 23 class members.  They

2    are a part of this case.  I think they may give some of

3    the most neutral down the road testimony as to what the

4    duties of these positions actually are.  There's no

5    burden associated with doing this with two or three

6    people.  I think that the case law that the plaintiff's

7    cite had to do with much larger Rule 23 classes where

8    there aren't opt-ins present and going out and asking for

9    a whole bunch of depositions.  The only reason not to

10   takes those two or three is the plaintiff is concerned

11   what they will say.

12           MR. MELZER:  They haven't met their burden.

13           THE COURT:  Which is.

14           MR. MELZER:  Which is to make a strong showing,

15   first of all, to get any discovery from absent class

16   members and then if you meet that, depositions are

17   extremely disfavored and they haven't given you a good

18   reason.  One is because they want to know why they didn't

19   opt-in and didn't opt-out at the same time.  That's a

20   cute theory but it doesn't really matter.  The second one

21   they think that they might give more favorable testimony

22   to the company.  I don't think that's a good

23   justification either.  I don't think it overcomes this

24   very high burden.  In every single class case, we might

25   suspect that people who haven't opted-in might give

1    favorable testimony.  This is the rare exception and you

2    don't get to do it.  It is an extraordinary kind of

3    relief that they are seeking.

4         THE COURT:  This very high burden that you refer

5    to comes from a Southern District of New York case in

6    1995.

7         MR. MELZER:  That's one of the places that it

8    comes from.

9         THE COURT:  That's the only place you referred

10    me to.

11         MR. MELZER:  It comes from just about every case

12    in this area.  It is an accepted principle nationwide in

13    every Rule 23 action.

14         THE COURT:  It helps if you site the cases to me

15    if you are going to make a case.  It is nice that you

16    think that.  No offense to you.  The fact that's your

17    point of view doesn't really inform me as to what I

18    should do by way of exercising my discretion.

19         MR. MELZER:  Your Honor, in our reply brief, it

20    is also in the cases they cite.  A Southern District case

21    from 2008 that they have to make a strong showing.  It is

22    in the Seventh Circuit cases.  It is throughout the

23    country.  This is idea this is a very rare remedy even

24    when you get, even when you get to -- if you get any

25    discovery at all from the absent class members, you don't

1    get to call them for their deposition.  It's in the cases

2    that they cite.

3              THE COURT:  I'm sorry.  I guess I didn't get

4    your reply memo on this issue.  I don't have it in my

5    pile so I obviously haven't read it.  If you cited cases

6    in it, then I will have to look at them.  When did you

7    file your reply?

8              MR. MELZER:  We re-filed our reply the same

9    time.  We filed the reply on the other motion.

10             THE COURT:  Was it a separate filing?

11             MR. MELZER:  Yes.  May 12.

12             THE COURT:  I read your other reply for sure.

13   But.

14             MR. MELZER:  It was actually filed shortly

15   before the other one.

16             THE COURT:  It is not on the docket, sir.

17             MR. MELZER:  Did defense counsel receive it?

18             THE COURT:  The clerk doesn't seem to be able to

19   find it.  We certainly didn't print it out.

20             What I will do is if you give the copy to my

21   clerk when I recess and I will look at it and enter a

22   short order on the docket either yay or nay.  I have a

23   preliminary injunction to deal with tomorrow.  I will

24   hopefully do that tomorrow.

25             MR. MELZER:  I would also ask that you take the

1      time to read it on the other points as well, if possible.

2                 THE COURT:  I have already ruled.

3                 MR. SHEA:  In that regard, I would direct your

4      Honor's attention to the Tierno case versus Rite Aid.

5      Cited in our brief.

6                 THE COURT:  At page 13.

7                 MR. SHEA:  The court says the law in discovery

8      directed absent class members is flexible.  Discovery

9      from absent class members is neither prohibited nor

10     sanctioned explicitly by the federal rules. Absent class

11     members are not formulated part to submit discovery.

12     However such discovery has been permitted where the

13     information sought is relevant.  Not readily obtainable

14     from representative parties and other sources and not

15     unduly burdensome and made in good faith.

16                In this situation, we're going to have to try

17     whether all these individuals are similar situated.  The

18     jury is going to have hear from a range of different

19     people about their duties as first level supervisors.

20     Because the jury is hearing A rule 23 class, ought out to

21     have the option of hearing from one or two Rule 23 class

22     members.

23                MR. MELZER:  I would cite to the same case.

24     Tierno which we also cited in reply brief stating absent

25     class members are not ordinarily required to submit to

1   discovery, requiring them to respond would undercut the

2   purposes of class certification and effectively create an

3   opt-in scheme for absent plaintiffs.

4           In that case, the court specifically denied

5   depositions saying that depositions would only permitted

6   of absent class members, if they were disclosed as trial

7   witnesses.

8           MR. SHEA:  I would note deponents there were

9   trying to seek 400 hours of deposition time.  I want two

10  or three.

11          THE COURT:  I understand.  I will read the cases

12  and issue a ruling.  The court will stand adjourned.

13          (Whereupon, the above proceedings adjourned at

14  5:15 p.m.)

15

16  COURT REPORTER'S TRANSCRIPT CERTIFICATE

17  I hereby certify that the within and foregoing is a true

18  and correct transcript taken from the proceedings in the

19  above-entitled matter.

20

21  /s/  Terri Fidanza

22  Terri Fidanza, RPR

23  Official Court Reporter

24

25