UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHARON L. PERKINS, et al. | : | CIVIL ACTION NO. |
| | : | 3:07CV967 (JCH) |
| *Plaintiffs*, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| SOUTHERN NEW ENGLAND | : | |
| TELEPHONE COMPANY | : | |
| | : | December 8, 2010 |
| *Defendant.* | : | |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION TO STRIKE EXPERT REPORT AND TESTIMONY OF DR. KATHLEEN LUNDQUIST AND APT*METRICS*, INC.

Despite defense counsel's open representations in Court and agreement with Plaintiffs' attorneys not to present an expert on liability, Defendant SNET has now launched a sneak attack on the final day for the production of defense expert records. SNET has submitted the expert report of an industrial psychologist/psycho-metrician -- who asserts that she has conducted an analysis of the Level One class members' jobs and opines that their duties and responsibilities conclusively satisfy each of the elements of the overtime exemptions at issue in this case. If ever there was a liability report, this is it.

This defense expert report violates counsel's representations to the Court and agreement with Plaintiffs not to introduce liability experts. The report further provides ultimate legal conclusions on the administrative and executive exemptions -- SNET's defenses to this action -- and is otherwise flawed and improper. The report and anticipated testimony from defendant's liability expert must be stricken and excluded.

1

Because Defendant SNET has dug in its heels on an unreasonable stance, Plaintiffs are forced make the present motion to strike and exclude Dr. Lundquist's report. Due to the pending conclusion of expert discovery (December 31) and deadline for the submission of dispositive motions (January 15), the motion should be briefed and heard on an expedited basis; further proceedings should be deferred until the motion is decided. (*See* Ex. E to Wittels Decl., Proposed Order) The Court's determination of this motion is critical to how Plaintiffs will proceed with the remainder of expert discovery -- including whether to retain a rebuttal expert -- and how they will oppose summary judgment.

## BACKGROUND

At a Court hearing on April 5, 2010, defense counsel Patrick W. Shea represented to the Court that Defendant SNET did not intend to use an expert on liability. When asked what expert discovery he expected on the liability phase, Mr. Shea stated:

> ***Honestly at this point, I cannot imagine that***. I would see mostly a rebuttal from the plaintiff's perspective. What the jury is going to do is hear about the individual duties from the individual themselves from the manager. They are going to be instructed on the law by your Honor. ***Expert testimony typically comes in at the damages phase***.

Mr. Shea agreed with the Court that the evidence presented on liability would consist of fact evidence regarding the Level Ones' actual duties. (Ex. A to Wittels Decl., Tr. at 49)

After this hearing, Mr. Shea repeatedly told Plaintiffs' counsel that SNET would not use a liability expert. Plaintiffs relied on these representations in deciding to forego their own expert liability report. (Wittels Decl. ¶ 6)

On September 30, Plaintiffs disclosed two expert reports on the subject of damages. SNET had not yet completed its relevant document production, so these reports were later supplemented. SNET then deposed Plaintiffs' damages experts.

Now, on Friday, December 3, 2010 -- the last day for Defendant's expert

2

disclosures -- SNET has introduced an expert liability report from an industrial psychologist/psycho-metrician, Dr. Kathleen Lundquist of APT*Metrics*, Inc.  (Wittels Decl. Exhibit C, Report).  Lundquist only spoke to a single Level One Manager (*see infra* § III(E)) – the very class members whose job duties are at the center of this lawsuit -- (she read a sample of 8 of their 49 depositions in preparing her survey questions); and she didn't bother contacting any "techs," the workers the Level One Managers supposedly manage and direct.  Instead, Dr. Lundquist's report is based upon a "job analysis" of the Level Ones' positions conducted primarily through a survey of the wrong population of SNET employees -- 3 current SNET Directors (Level Three Managers) and 11 Area Managers (Level Twos), who have a vested interest in this litigation.

Dr. Lundquist's opinions (*see* Ex. C, p. 32) consist largely of ultimate legal conclusions on the administrative and executive exemptions.  The primary opinions advanced by the report are: (1) "A SNET Level One Manager's primary duty is management" (administrative and executive exemptions); (2) "SNET Level One Managers regularly direct the work of Technicians or other employees" (executive exemption); (3) "Level One Managers exercise a key role in making or influencing personnel decisions related to Technicians and other employees" (executive exemption); and (4) "Level One Managers exercise discretion in the performance of their job" (administrative exemption). All these critical terms – "primary duty," "management," "regularly direct," "exercise discretion" – are taken verbatim from the regulations defining the Executive and Administrative Exemptions under Federal and Connecticut law. The only thing missing from Dr. Lundquist's report is the inevitable concluding sentence: "As a matter of law, the Level Ones are excluded from overtime pay under the

3

Executive and Administrative Exemptions." By reaching these conclusions on the basic requisites of the exemptions, Dr. Lundquist's report calls the Level One class members exempt by any other name.

On Monday December 6, 2010, Plaintiffs attempted in good faith to resolve this matter. Plaintiff's counsel asked that Defendant SNET withdraw Dr. Lundquist's report for several reasons, namely: (1) the report's submission breached Defendant's representation and the parties' agreement not to present experts on liability issues; (2) the report reached ultimate legal conclusions on the class members' classification status under the relevant exemptions; and (3) Dr. Lundquist's methodology was fundamentally flawed and would not withstand the Court's scrutiny as gatekeeper of expert testimony and scientific evidence. *See Daubert v. Merrell Dow Pharmas., Inc.* 509 U.S. 579 (1993); *Kumho Tire Co., Ltd. v. Carmichael* 526 U.S. 137 (1999). (*See* Ex. Wittels Dec. Ex. D, Letter from Steven L. Wittels to Patrick Shea)

On the morning of December 7, Defendant rebuffed Plaintiff's request, engaging in a hair-splitting exercise. Counsel stated that because Dr. Lundquist had not gone one step further and actually declared the Level One class members "exempt" (an empty formality following her legal conclusions on each of the elements of the exemptions), the company had not violated its agreement to refrain from using a liability expert. (*See* Wittels Dec. Ex. B, Email response from Patrick Shea to Steven Wittels) The Court should reject Defendants' picayune wordplay.[1]

---

[1] Although Lundquist is careful to avoid directly stating that the Level Ones are "Exempt," she does make clear that the propriety of their exempt status at the company is the ultimate question driving her study. She states that her methodology, "job analysis," "has been recommended as an essential tool in establishing the exempt/nonexempt status of jobs." (Ex. C, at 8) *See also id* at 9: "An I-O expert can assist in properly classifying jobs as either exempt or nonexempt..."

4

**ARGUMENT**

I. **Dr. Lundquist's Report and Testimony Should be Excluded Because it Violates SNET's Representations and Agreement Not to Present a Liability Expert, and Prejudices Plaintiffs and the Administration of Justice**

SNET affirmatively represented to the Court that it did not intend to present an expert on the subject of liability and that the issue of Level One class members' exempt versus non-exempt status would be properly tried solely on their testimony and other fact evidence. Following these representations, the parties agreed that neither of them would use a liability expert. Plaintiffs relied to their detriment.

Now, SNET has breached its representations, leaving Plaintiffs holding the bag with only three weeks remaining (including the holiday season) in expert discovery. Defense counsel's explanation that the company did not violate its agreement because its liability expert did not expressly state that the L1 class members are "exempt" is absurd and fallaciously formalistic. Performing a "job analysis" of the Field Managers' duties and concluding that they meet each of the requirements of the relevant exemptions is precisely what constitutes a liability opinion.[2]

Defendant may have breached various obligations by engaging in this subterfuge. Moreover, its actions have severely prejudiced Plaintiffs and have usurped the Court's role in managing discovery and case proceedings. The Court should strike and exclude the improper report.

---

[2] Mr. Shea has also repeatedly represented that SNET will not move to decertify the class prior to trial. (*See*, *e.g*., Wittels Dec. Ex. A, April 5 Tr. at 58-59). However, Dr. Lundquist's report also opines that there are significant differences between the class members' job duties and responsibilities. (*See* Wittels Dec. Ex. C esp. at 24-25) Given Defendants' breach of their agreement not to use liability experts, Plaintiffs fear this is being used as a back door for an imminent decertification motion.

## II.   Dr. Lundquist's Report and Testimony Should be Excluded Because it Reaches Ultimate Legal Conclusions on the Exemptions at Issue in this Case

The exemptions at issue in this case consist of both salary and duties components. It is uncontested that the salary component is met and only the class members' duties and whether they qualify as exempt are in question.

Under the FLSA's *executive* exemption, 29 C.F.R. § 541.100, in order for an employee to be" employed in a bona fide executive capacity":

(1) His or her "primary duty" must be the" management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;"

(2) He or she must "customarily and regularly direct[] the work of two or more other employees;" and

(3) He or she must have "the authority to hire or fire other employees" or make "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees" that "are given particular weight."

Under the *administrative* exemption, 29 C.F.R. § 541.200, in order for an employee to be "employed in a bona fide administrative capacity," his or her "primary duty" must:

(1) be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and

(2) "include[] the exercise of discretion and independent judgment with respect to matters of significance."

Dr. Lundquist's report reaches affirmative legal conclusions on each of these elements. She opines (*see* Wittels Dec. Ex. C p. 32; *see also id*. at 33-44):

(a) "A SNET Level One Manager's **primary duty** is **management**"

   -*Executive and administrative exemptions, duties requirement (1)*

6

    (b) "SNET Level One Managers **regularly direct the work** of Technicians or other employees"

        *-Executive exemption, duties requirement (2)*

    (c) "Level One Managers exercise a **key role in making or influencing personnel decisions** related to Technicians and other employees"

        *-Executive exemption, duties requirement (3)*

    (d) "Level One Managers **exercise discretion** in the performance of their job"

        *-Administrative exemption, duties requirement (2)*

By rendering these legal conclusions on the elements of the exemptions, Dr. Lundquist improperly trespasses on the province of the jury to weigh the evidence on the class members' duties and to apply the law to the facts as to whether the company has met its burden of proving they are exempt. *See*, *e.g*., *United States v. Stewart*, 433 F.3d 273, 312 (2d Cir. 2006) ("Generally, the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."); *Kuebel v. Black & Decker (U.S.) Inc.*, 2010 U.S. Dist. LEXIS 46533, at *50-51 (W.D.N.Y. May 12, 2010) ("Courts in this Circuit have repeatedly held that while an expert may opine on an issue of fact within the jury's province, an expert may not give testimony stating ultimate legal conclusions based on those facts.").

Under analogous circumstances, numerous courts have held that an expert's opinion intrudes on the jury's function. *See*, *e.g*., *Henry v. Quicken Loans Inc.*, 2009 U.S. Dist. LEXIS 90126, at *18-19 (E.D. Mich. Sept. 30, 2009) (upholding order granting plaintiffs' motion to exclude defense expert report that opined on similarity of the job

7

functions of plaintiff mortgage brokers to exempt loan officers: "The magistrate judge properly excluded the opinion under Fed. R. Evid. 702 because [e]xpert testimony is not admissible if it does no more than tell the finder of fact what conclusions to reach."); *Perez v. Radioshack Corp.*, 2005 U.S. Dist. LEXIS 36292, at *9-10 (N.D. Ill. Dec. 13, 2005) (excluding expert opinion that plaintiff store managers did not have management as their primary duty -- the flipside to the opposite conclusion reached by Dr. Lundquist in opinion (a) above); *Murray v. Ohio Cas. Corp.*, 2005 U.S. Dist. LEXIS 41374, at *9 (S.D. Ohio Sept. 27, 2005) (granting motion to strike plaintiffs' expert where expert opined that plaintiff does not meet the administrative exemption); *Alldread v. Gren*, 988 F.2d 1425, 1436-37 (5th Cir. 1993) (upholding exclusion of expert witness who would testify that plaintiff fire captains were not properly classified as exempt under the FLSA).

Defendant's argument that Dr. Lundquist's report and anticipated testimony does not consist of improper legal conclusions because she did not expressly say that the Level One class members are "exempt" is futile. It is a mere matter of semantics, and as in *Perez*, supra, is unavailing. By rendering ultimate opinions on each of the elements of the exemptions, Dr. Lundquist makes the Field Managers' classification status a foregone conclusion. Dr. Lundquist has wrapped the company's package in gift wrap and tied the bow. The only thing left for the jury is to call it a "present."

In fact, large portions of Dr. Lundquist's report strongly resemble a legal brief or closing argument.[3] SNET should not be able to place the imprimatur of a so-called

---

[3] For example, Dr. Lundquist disputes Plaintiffs' contention that the bulk of their work is clerical (*see* n.4, infra); she also adopts the company's assertion that class members are exercising "authority" even when their "decisions" and actions are controlled by company policies and procedures, and builds that assumption into her operative survey. (*See* infra) Dr. Lundquist catalogues the class members' job activities in bullet-point fashion and concludes that their work is primarily managerial. She argues that even though Level Ones receive "supervision and

8

impartial scientific expert behind its position in this litigation.

### III. Dr. Lundquist's Report and Testimony Should Be Excluded Because Her Methodology and Assumptions are Fundamentally Flawed and Her Analysis Lacks Probative Value

Finally on the substance, Dr. Lundquist's methodology is defective in numerous respects and her analysis lacks probative value.

Expert testimony is admissible under the following conditions: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.  Trial judges act as gatekeepers by independently evaluating the admissibility of expert opinion testimony for reliability and relevancy. *Kumho Tire Co., Ltd. v. Carmichael* 526 U.S. 137, 152 (1999).

In *Daubert v. Merrell Dow Pharmas., Inc.* 509 U.S. 579 (1993), the United States Supreme Court set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. The specific factors cited by the Court in *Daubert* are: (1) whether the expert's technique or theory can be or has been tested--that is, whether the expert's theory can be challenged in some objective sense, or whether it is

---

guidance" from their Level Ones, they are held accountable for the technicians' results. (Wittels Ex. C, p. 34, 44)  However, the evidence developed in fact discovery consistently demonstrates that technician performance as well as that of the L1s is measured by uniform company metrics, over which Field Managers have no input or control; the fact that L1s are accountable for numbers they cannot influence (except in ways carefully prescribed and standardized by the company) is not an indication of vast realms of managerial authority and discretion.

instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.  The burden for admission of the expert testimony is on the party offering the testimony and its admissibility must be shown by a preponderance of the evidence.  *Allison v. McGhan Med. Corp.* 184 F.3d 1300, 1306 (11th Cir. 1999).

In determining whether a survey was conducted in accordance with "accepted survey principles," most courts look to the Federal Judicial Center's *Reference Manual on Scientific Evidence,* which identifies several reliability factors, including: (1) the survey's purposes and design: *Was the survey designed to address relevant questions*?; (2) population definition and sampling: *Was an appropriate population identified*?; *Was the level of nonresponse sufficient to raise questions about the representativeness of the sample?  If so, what is the evidence that nonresponse did not bias the results of the survey*?; and (3) the survey questions and structure: *Were the questions framed to be clear, precise, and unbiased?  See* Dr. Shari S. Diamond, *Reference Guide on Survey Research*, in the Fed. Judicial Ctr., Reference Manual on Scientific Evidence, pp. 229-276 (2nd ed. 2000), available from the Federal Judicial Center online at http://www.fjc.gov ("Reference Manual"); *see also Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983).

Dr. Lundquist's study fails each of these tests.  Some of these inherent problems are highlighted below:

## A. The Premises Behind Dr. Lundquist's Analysis are Flawed

Dr. Lundquist primarily bases her conclusions on a survey given to 11 Area Managers (Level 2s) and 3 Directors (Level 3s) regarding the Field Managers' performance of 177 separate job activities she has identified -- 169 of which she has characterized (without explanation or analysis) as "managerial."[4] Although Dr. Lundquist reviewed some company documents and a sample of 8 out of 49 Level One depositions in this case, she did so mainly in order to formulate her survey.[5] The heart of her analysis -- the "stuff" it is made of -- is the survey.

Dr. Lundquist bases her decision to rely on the **L2s** and **L3s** for the meat of her analysis on their purported knowledge of the **Level Ones'** jobs. Yet, she did not go to the "horse's mouth" in this case -- the 49 Level One depositions and the class members' interrogatory responses. Nor did she interview or survey the technicians who report to the L1 class members, whose work she claims the L1s direct, and over whom the L1s supposedly have the authority to make key personnel decisions. Moreover, Dr. Lundquist relies on the fact that the survey respondents' knowledge of the Level Ones jobs is bolstered by their previous experience in these positions. However, the evidence

---

[4] For example, the class members' vast array of clerical work and data entry (which they have testified constitutes the bulk of their duties) is characterized as "managerial." Advancing a legal conclusion, Dr. Lundquist postulates that this paperwork may actually be managerial in nature because the Level Ones may be simultaneously "composing or drafting their recommendations or opinions." (Wittels Dec. Ex C, at 26, n.1)
  The eight "non-managerial" activities are: (1-4) "making presentations" (4 activities); (5) maintaining professional knowledge through classes, workshops, and reading, (6) communicating the functionality of systems, (7) responding appropriately to feedback from others in order to build the L1's own skills, and (8) informing technicians about overall company performance. (*See id.* Tables 2-5, Activities 28, 93, 146-149, 151, 166)

[5] Thus, Dr. Lundquist failed to compare survey responses with field manager deposition testimony to test the value of her survey. Reference Manual at 228 ("To illustrate the value of a survey, it is useful to compare the information that can be obtained from a competently done survey with the information obtained by other means.").

developed in this case consistently shows that the class members' jobs have changed dramatically over the past decade or so: the company has increasingly imposed more rigid controls on the L1s and stripped away any authority to act independently. Only one of the participants has been in his or her current job for less than two years, and 13 of 14 have been with the company for more than 20; it is unclear when they last acted as L1s.

Dr. Lundquist acknowledges she could not interview or survey Field Managers (*but see* § E, <u>*infra*</u>). This does not mean that a survey of upper management isolates the proper target population and is an appropriate exercise. *See* Reference Manual at 236: "A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant"; Banks & Aubrey, *How to Conduct A Wage and Hour Audit for Exemptions to Overtime Laws* (Ex. F) at 295-97 (focusing on **first-hand** data collection from the population of **job incumbents**). *Cf. Home Box Office v. Showtime/The Movie Channel*, 665 F. Supp.1079, 1083 (S.D.N.Y.), *aff'd in part & vacated in part*, 832 F.2d 1311 (2d Cir. 1987)("A survey assessing response to an advertisement made for presentation to persons in the trade should not be evaluated on a sample of consumers.")

Dr. Lundquist's small sample size also raises serious questions as to the selection of participants. Dr. Lundquist states that the Area Manager respondents did not need to be chosen by random sample because they were all invited to participate. Yet only 11 current L2s did so, less than half of the Area Managers supervising class members during the relevant class period. As any statistician will concur, this is a cause for concern both as to response rate bias and the representativeness of the study. Surveys with response rates of less than 50% are considered highly suspect. Reference Manual, at 245 ("…**If the response rate drops below 50%, the survey should be regarded with significant**

**caution as a basis for precise quantitative statements about the population from which the sample was drawn**").

### B. The Survey Participants Were Misinformed as to its Purpose and Conditioned to Provide the Company's Favored Responses

According to the survey appended as an exhibit to Dr. Lundquist's report (Wittels Decl. Ex. C, Attachment 4), the L2 and L3 survey respondents were not told that the survey was being used by SNET to oppose the overtime claims of the L1 class members. Instead, the participants were misinformed that the company's goal was to maintain accurate and up-to-date job descriptions for Level Ones and that their input was critical.

Prior to the survey, all 14 participants sat in on a group discussion regarding the L1s' duties, where leading questions were posed to the panel. For example, the Area Managers and Directors were asked: What types of decisions do L1s make?  How much freedom do they have to determine work assignments and work procedures?  Are there differences in the jobs between or across the areas?  Do Level Ones need to make managerial type decisions as part of their "clerical" activities?   (Ex. C, Attachment 5, Focus Group Discussion Questions) This session likely conditioned the survey respondents to give the company's favored responses and to emphasize the Level Ones' authority and discretion. *Cf.*, *e.g.*, *Pfizer Inc. v. Astra Pharmaceutical Prods.*, 858 F. Supp. 1305, 1321-2 & n. 13 (S.D.N.Y. 1994)("…by asking a screening question with respect to the drugs the doctors prescribed, the doctors were conditioned to respond with the name of a product rather than a function")   Moreover, it is reasonable to expect that the Area Managers may have taken cues from their immediate bosses, the company's directors.[6]  The pre-survey bull session may have become a groupthink echo chamber.

---

[6] To guard against this kind of improper influence, this Court has previously excluded the class

13

### C. The Survey's Framework and Questions are Biased and Fail to Produce Evidence of Probative Value to the Court and Jury

Dr. Lundquist's job analysis is premised on bullet point-like descriptions of the 177 job activities. The L2 and L3 participants are given a list of these activities and asked to provide ratings as to the Level Ones' performance of these tasks. However, the record in this case consistently demonstrates that when Plaintiffs are able to delve behind mere labels and descriptors to portray how they actually perform their tasks, their lack of actual managerial authority becomes apparent.[7]

Moreover, numerous survey questions are framed in misleading fashion and are designed to elicit a favorable response on behalf of the company. For example, Dr. Lundquist's survey considers a Level One to have "authority" over an activity when: "The Level One Manager has the authority or power to determine how and/or when this activity is completed as long as s/he does not go against Company policies and procedures." *See* Wittels Decl. Ex. C at 16, 29. This construct goes against the record in this case and stacks the deck in favor of the company. Plaintiffs' position in this lawsuit is that the limited areas where Level Ones purportedly have "authority" are so closely controlled by company policy and procedure as to remove any vestige of actual decision-making or discretion. So, the fact that L1s can nominally make certain determinations

---

members' immediate supervisors from attending their depositions.

[7] *See* Doc. 204, Class and Collective Action Certification Order, at n.3 (discussing resumes), citing *Ale v. TVA*, 269 F.3d 680, 688 (6th Cir. 2001). As emphasized in *Ale* and numerous similar cases, it is the employee's actual day-to-day duties which are relevant to an exemption analysis, not the general labels contained in job descriptions, applications, resumes, and performance evaluations. *See also*, *e.g.*, *Schaefer v. Indiana Michigan Power Co.,* 358 F.3d 394, 400-401 (6th Cir. 2004); *Shiner v. Select Comfort Corp.*, 2009 U.S. Dist. LEXIS 116209, at *9 (N.D. Ill. Dec. 9, 2009); *Jarvis v. Griffin*, 2009 U.S. Dist. LEXIS 86484, at *23 (M.D. Fla. Sept. 23, 2009); *Alba v. Papa John's USA*, 2007 U.S. Dist. LEXIS 28079, at *36 (C.D. Cal. Feb. 7, 2007) (job description "cannot replace what the [employee] **actually** does").

but must follow company rules dictating exactly what will be done is of no probative value. Dr. Lundquist's question and the upper managers' responses are meaningless.

### D. Because Fact Discovery is Closed, Dr. Lundquist's Conclusions Are Untestable

Of the 14 survey participants, only four were deposed during fact discovery. They were obviously not questioned on their survey responses. The remaining 10 respondents have not provided fact evidence in this case and, to Plaintiffs' knowledge, have not been disclosed by the company as trial witnesses. The late stage of proceedings makes it impossible for Plaintiffs to cross-examine the respondents and challenge the report's conclusions. This is particularly important for the reasons highlighted above: when the evidence in this case goes beyond mere labels and bullet points to a breakdown of how a task is actually performed by the Level One, the illusion of authority and discretion evaporates. Furthermore, some of the participants' responses -- such as those attesting to the Level Ones' role in hiring -- go against all of the evidence developed in this case and the positions taken by the parties and have come as a complete surprise to Plaintiffs. Plaintiffs should not be denied an opportunity to test these responses in court.

Dr. Lundquist did not conduct a survey of hundreds or thousands of people; her panel of supposed "Subject Matter Experts" is comprised of a rarefied fourteen. Instead of having Dr. Lundquist take the stand as an "expert" filter, the company should just put up its witnesses and allow them to be cross-examined -- in fact the very position taken by SNET as to why the parties did not need liability experts.

### E. In Conducting its Analysis, the Company Engaged in Improper *Ex Parte* Contacts With Represented Parties

Finally, Dr. Lundquist conducted an interview with a single Level One class

15

member and observed him performing his job activities.[8] Dr. Lundquist's report claims that this exercise was appropriate because he was neither an opt-in plaintiff nor Rule 23 class member. This representation is untrue. Joseph Piccolo, the Field Manager subjected to this procedure, is a class member because he meets the certified class definition as a Manager Construction and Engineering with Outside Plant Technicians assigned to him by the company. The fact that SNET's employment data provided to Plaintiffs was inaccurate and failed to indicate that Mr. Piccolo had direct reports (thus Mr. Piccolo was not included on the class member list provided by Plaintiffs to defense counsel) is of no moment; he meets the operative class definition and the company was obligated to supplement its data production.[9] Significantly, were Mr. Piccolo not a class member covered by this certified class action litigation, there would be no conceivable reason for Defendant to seek to analyze his job duties as part of its defense of this case.[10]

Defendant's and counsel's actions are open to question. By engaging an expert to interview and tail a Rule 23 class member on the company's behalf, SNET has facilitated *ex parte* contacts with represented parties on the subject of the lawsuit. *See*, *e.g.*, *Gortat v. Capala Bros., Inc.*, 2010 U.S. Dist. LEXIS 45549, at *6-7 (E.D.N.Y. May 10, 2010), *aff'd*, 2010 U.S. Dist. LEXIS 88847 (E.D.N.Y. Aug. 27, 2010). *See also* Hazard & Hodes, *Law of Lawyering*, 3d Ed., Vol. 2, at 38-7, discussing contacts with unnamed

---

[8] SNET also "inadvertently" conducted these interviews and observations with a second Level One who is an opt-in party plaintiff and one of the deponents in this case. Because of the improper *ex parte* contacts with a party clearly represented by counsel, Dr. Lundquist's report does not mention this individual.

[9] SNET's position on class certification, since proven false, was not that it was unable to identify company employees currently satisfying the definition (the relevant L1 and tech titles have since been clarified) but that it had no records showing who had technicians reporting to them going backwards over the class period.

[10] Mr. Piccolo was on the class mailing list and did not opt-out of the litigation.

16

class members, even before certification:

> Where there is already an ongoing relationship…such as between a group of employees and their employer, direct independent communication between the parties is inevitable...**On the other hand, the lawyer for the opponent of the class should not be allowed to take statements concerning the matter in controversy from individual class members through *ex parte* interviews, for that could impose the very disadvantages that [Model Rule 4.2] is designed to prevent**.

## CONCLUSION

For all of these reasons, Plaintiffs request that the Court entertain their motion to strike on an expedited basis.  Plaintiffs have been prejudiced by the introduction of Dr. Lundquist's report.  This question as to whether it will be allowed to stand as part of the record must be resolved prior to the close of expert discovery and the submission of summary judgment motions so that Plaintiffs can receive appropriate guidance as to how to proceed on these matters.

                                              Respectfully submitted.

Dated: December 8, 2010

                                            /S/ Steven L. Wittels
Steven L. Wittels
**SANFORD WITTELS & HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone:  (646) 723-2947
Facsimile: (646) 723-2948
Email: swittels@swhlegal.com
*Lead Counsel for Plaintiff Sharon L. Perkins
 and the Opt-In Collective Action Plaintiffs*

            /S/ Edmond Clark
Edmond Clark
Law Office of Edmond Clark
83 Scotland Avenue
Madison, CT 06443-2501
Telephone: (203) 245-4602
Fax: (203) 245-9734
eclarkmadisonlaw@aol.com