UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **SHARON L. PERKINS, et al.,** | |
| **Individually and on Behalf of Others Similarly Situated,** | **CIVIL ACTION NO. 3:07CV967 (JCH)** |
| **PLAINTIFFS,** | |
| **v.** | |
| **SOUTHERN NEW ENGLAND TELEPHONE COMPANY,** | |
| **DEFENDANT.** | |

### DEFENDANT SNET'S OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION TO STRIKE EXPERT REPORT AND TESTIMONY OF DR. KATHLEEN LUNDQUIST AND APT*METRICS*, INC.

I.      **INTRODUCTION**

Defendant Southern New England Telephone Company's ("SNET" or "Defendant") expert Dr. Kathleen Lundquist of APT*Metrics*, Inc. is a highly-respected and well-qualified industrial/organizational psychologist with more than 30 years of experience in her field.  See Expert Report of Dr. Kathleen Lundquist ("Lundquist Report"), Attachment 1.  Dr. Lundquist has authored numerous papers, reports, articles and other published items and given more than 50 presentations in her professional field.  Id.  Dr. Lundquist has testified as an expert in over 50 employment litigation matters, for both plaintiffs and defendants.  Id.  Dr. Lundquist conducted a job analysis of at-issue SNET Level One Manager job positions in accordance with acceptable methods and principles in the field of industrial/organizational psychology.  Plaintiffs disagree with Dr. Lundquist's properly-reasoned and amply-supported conclusions regarding the importance and frequency of certain duties of at-issue Level One Managers' jobs, because these

conclusions do not support Plaintiffs' theory of their case.  (See Plaintiff's Motion [Doc. 288] ("Pl. Mtn.") at 11-12, 14).

Unable to assail Dr. Lundquist's qualifications as an expert in the field of industrial/organizational psychology and lacking any basis to challenge the validity of Dr. Lundquist's methodology, Plaintiffs instead insist that Dr. Lundquist's opinions are either impermissible determinations of the ultimate issue in this litigation, or outright legal conclusions. Dr. Lundquist's opinions are neither, and the motion to strike her testimony should be denied.

## II.   **LEGAL STANDARD**

An expert witness is ordinarily evaluated by the court with the assistance of direct examination by the offering party and cross-examination by the opposing party.  See Borsack v. Ford Motor Co., 94 Civ. 3299, 2007 U.S. Dist. LEXIS 54201, at *11 n.5 (S.D.N.Y. July 26, 2007) ("The Second Circuit has held that, in general, Rule 104(a) pretrial evidentiary hearings are 'highly desirable' because they allow parties to present expert evidence and conduct cross-examination of the proposed expert.") (citing Borawick v. Shay, 68 F.3d 597, 608 (2d Cir. 1995)).  In a Daubert or admissibility hearing under Federal Rule of Evidence 104 at the appropriate time for resolving pre-trial evidentiary issues, Defendant would bear the burden of establishing that the expert testimony is admissible under the Federal Rules of Evidence's "liberal standard for the admissibility of expert testimony."  United States v. Dukagjini, 326 F.3d 45, 52 (2d Cir. 2002); see also Amorgianos v. AMTRAK, 303 F.3d 256, 267 (2d Cir. 2002) ("[The] liberal admissibility standards … [recognize] that our adversary system provides the necessary tools for challenging reliable, albeit debatable expert testimony."); Bernhard-Thomas Bldg Sys, LLC v. Weitz Co. LLC, No. 3:04-cv-1317(CFD), 2010 WL 4929029, at *1 (D. Conn. Nov. 30, 2010) ("So long as the expert's testimony meets the reliability and relevancy criteria, however, Rule 702 favors admissibility.") (citing Fed. R. Evid. 702 Advisory Committee Notes

(2000) (noting that under <u>Daubert</u>, "the rejection of expert testimony is the exception rather than the rule")); <u>Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.</u>, 150 F. Supp. 2d 360, 364 (D. Conn. 2001) ("[A] review of the case law after <u>Daubert</u> shows that the rejection of expert testimony is the exception rather than the rule.")

 To be admissible, the expert testimony first must be relevant pursuant to Fed. R. Evid. 401 and reliable as defined under Fed. R. Evid. 702; that is, the expert testimony must: 1) be "grounded on sufficient facts or data"; 2) be "the product of reliable principles and methods"; and 3) properly apply the principles and methodology to the facts of the case.  As this Court has held, where (1) an expert is qualified to testify in the area at issue and (2) the expert has applied long established principles within the relevant subject area when preparing his or her report, a court will have fulfilled its gate-keeping duties to keep "junk science" out of the courtroom in admitting the evidence.  <u>See</u> <u>Dunn v. Zimmer, Inc.</u>, No. 3:00CV1306 (DJS), 2005 WL 563096, at *1 (D. Conn. Mar. 4, 2005).  Dr. Lundquist's report is admissible under these standards, as Defendants would demonstrate in a Rule 104 evidentiary hearing at the proper pre-trial stage.

 But instead of opposing the admission of Dr. Lundquist's report in a pre-trial admissibility hearing and allowing the parties to present expert evidence to the Court and conduct cross-examination, Plaintiffs have peremptorily filed this motion to strike Dr. Lundquist's report on its face.  In so doing, Plaintiffs have shifted the burden of proof – much heavier on a motion to strike – to themselves.  <u>See</u> <u>McCrae Assocs., LLC v. Univ. Capital Mgmt., Inc.</u>, 554 F. Supp. 2d 249, 257 (D. Conn. 2008) (A "heavy burden … must be satisfied in order for the court to grant a motion to strike based on Fed. R. Civ. P. 12(f).") (citing <u>Lipsky v. Com. United Corp.</u>, 551 F.2d 887, 893 (1976) ("Usually the question of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be

properly decided…")).  "A motion to strike is considered an exceptional remedy and is generally disfavored, and the proponent of such a motion must shoulder a formidable burden." Hickey v. Scott, Civil Action No. 07-1866 (JDB), 1020 WL 3700783, at *5 (D.D.C. Sept. 16, 2010) (declining to strike expert report) (citing U.S. ex rel. K&R Ltd. P'ship, 456 F. Supp. 2d 53). Plaintiffs cannot sustain their burden here.

Although Plaintiffs make veiled attacks on Dr. Lundquist's methodologies and the probative value of her analysis, the thrust of their challenge is that they do not agree with her report's conclusions, which is not an appropriate subject of the Court's inquiry regarding the admissibility of an expert report.  "[T]he district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos, 303 F.3d at 266.  Moreover, there is no basis for Plaintiff's generalized challenges to the methods used in Dr. Lundquist's report.

Far from offering some novel theory or unprecedented methodology, Dr. Lundquist's report and methods comport with accepted and long-established principles in her area of expertise – industrial/organizational psychology – and indeed, incorporate methodologies advocated in the reference sources promoted by Plaintiffs as defining acceptable standards. Plaintiffs' challenges go to the weight that Plaintiffs believe the jury or the Court should give to Dr. Lundquist's analyses, not their admissibility.  See McCulloch v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [the expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight and not the admissibility, of his testimony."); Martin v. Shell Oil Co., 180 F. Supp. 2d 313, 319 (D. Conn. 2002) (relevance and reliability objections to an expert's particular

methodology "may affect the weight that the fact finder will give [an expert's] opinion, [but] they do not affect its admissibility" where the court finds the expert's opinion to be based on accepted relevant principles).  As the Supreme Court has explained, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the "traditional and appropriate means" of attacking admissible evidence that a party argues is "shaky."  Daubert v. Merrell Dow Pharms., 509 U.S. 579, 596 (1993); see also Howard v. Walker, 406 F.3d 114, 127 (2d Cir. 2005) ("On cross-examination, an attorney is free to challenge an expert's methodology, her conclusions, and the bases for her conclusions.  To the extent that the reliability of certain facts accepted by an expert is questionable, the exercise and process of cross-examination allow a [party] to bring any such factual disputes to the attention of the jury."); McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043 (2d Cir. 1995) (a party's "quibble" with an expert's shortcomings are "properly explored on cross-examination and [go] to his testimony's weight and credibility – not its admissibility").

III.   **DR. LUNDQUIST IS NOT EXPRESSING A LEGAL CONCLUSION**

   A.   **Even if the jury accepts all of Dr. Lundquist's opinions, it will still have to apply the instructions and legal definitions provided by the Court to render a decision on liability.**

   Plaintiffs erroneously claim that Dr. Lundquist "opines that [class members'] job duties and responsibilities conclusively satisfy each of the elements of the overtime exemptions at issue in this case."[1]  (Pl. Mtn. at 1).  Dr. Lundquist's report gives no such opinion.  Dr. Lundquist's conclusions are: "1) A SNET Level One Manager's primary duty is management; 2) SNET Level One Managers regularly direct the work of Technicians or other employees; 3) Level One

---

[1] The fact that Dr. Lundquist mentions that people in her field *can* assist with classification decisions does not mean she has offered an opinion on exempt status here (and in fact, she did not).  See (Pl. Mtn. at n. 1).

Managers exercise a key role in making or influencing personnel decisions related to Technicians or other employees; and 4) Level One Managers exercise discretion in the performance of their job."  Lundquist Report p. 32.  Experts have been permitted to opine on each of these issues in similar cases.  See, e.g., Goebel v. Colorado, Civil Action No. 93-K-1227, 1995 U.S. Dist. LEXIS 21472, at *39 (D. Colo. Nov. 17, 1995), (permitting expert testimony that *plaintiffs' job was management* and *plaintiffs supervised two or more employees*); Johnson v. Big Lots Stores, Inc., 561 F.Supp. 2d 567, 580-81 (E.D. La. 2008) (permitting expert's survey results regarding whether at-issue employees "*regularly hired* associate employees as part of their job duties," "*regularly terminated* others' employment," "*disciplined* employees for misconduct or for not following corporate policies," and "*made recommendations* about the employment status of other employees" where defendant maintained plaintiffs were properly classified as exempt under the executive exemption (emphasis supplied)); Barth v. Wolf Creek Nuclear Operating Corp., No. 97-4174-SAC, 2002 U.S. Dist. LEXIS 11554, at *3-4 (D. Kan. June 19, 2002) (admitting expert testimony "that *plaintiffs used discretion* in their everyday work activities" as "greatly helpful in the court's resolution of the issues" of whether plaintiffs were properly classified as exempt).

Dr. Lundquist's testimony based on her job analysis of the at-issue positions would not instruct the jury on whether Plaintiffs are or are not eligible for overtime compensation under the FLSA, but rather would provide an opinion  on an issue of fact – how class members perform their jobs – which is permissible under Federal Rule of Evidence 704(a).  As noted in the article "How to Conduct a Wage and Hour Audit for Exemptions to Overtime Laws" relied on by Plaintiffs, even after carefully acquiring and analyzing appropriate job analysis data, as Dr. Lundquist did in her report, "the exemption criteria under the 'job duties test' still contain

ambiguously defined terms which require significant interpretation and moreover, leave open the question of what evidence would be sufficient to claim a job is exempt without threat of litigation."  See 5 Bender's Labor & Employment Bulletin 296-97.  "It should be obvious… that much is still left to interpretation."  Id. at 297.  Dr. Lundquist's report properly leaves these determinations and interpretations to the appropriate fact finder, whether the jury or the Court.

For instance, Defendant argues that the at-issue jobs are properly exempt under the executive exemption.  Under the FLSA, the executive exemption applies where: 1) employees are compensated on a salary basis not less than $455 per week; 2) their "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; 3) they "customarily and regularly direct[] the work of two or more other employees"; and 4) they have "the authority to hire or fire other employees" or their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 CFR § 541.100 (2000).  Lundquist provides no opinion regarding whether Plaintiffs' management duties relate to "the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof."  29 CFR § 541.100(a)(2).  She does not opine as to whether Plaintiffs "customarily" direct the work of two or more other employees.  29 CFR § 541.100(a)(3).  She does not opine as to whether Plaintiffs' personnel recommendations "are given particular weight."[2]  29 CFR § 541.100(a)(4).  If this case proceeds to trial, the jury will make these determinations pursuant to the Court's instructions on the meaning of the legal terms encompassed in the appropriate regulations, at the conclusion of this case.

---

[2] As described more fully in Section IIIB, Dr. Lundquist could provide expert testimony or opinions on these matters based on her expertise in industrial/organizational psychology and/or based on the common meaning of these words, so long as she did not instruct the jury as to the legal definitions of legally operative terms.

Similarly, under Connecticut state law, the executive exemption applies where: 1) the employees are compensated on a salary basis not less than $475 dollars per week; and 2) their "primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein." CONN. AGENCIES REGS. § 31-60-14 (2010). This so-called Connecticut "short test" does not require proof of any additional factors, such as evidence that supervisors exercise discretion or make personnel recommendations. Dr. Lundquist has rendered no opinion regarding whether Plaintiffs manage "the enterprise in which [they are] employed" or "a customarily recognized department or subdivision thereof," nor whether Plaintiffs' direction of the work of two or more other employees is "customary." Id. Again, either the jury (if this case proceeds to trial) or the Court (on a dispositive motion) will make these determinations based on the facts that will be before them, including testimony from class members, class members' supervisors and Company representatives, Company documents, and the questionnaire administered by Dr. Lundquist. The appropriate fact finder will be able to measure Dr. Lundquist's conclusions against these other sources of evidence and determine the weight to be given to her observations and conclusions.

B.   **Experts may appropriately render opinions on the character of at-issue job duties, even where such a determination encompasses the ultimate issue to be decided by the fact finder.**

Courts have permitted non-lawyers like Dr. Lundquist to opine on the character of at-issue job duties – including whether they are managerial or supervisory quality – so long as the experts do not instruct the jury on meaning of operative legal terms. For instance, in Goebel v. Colorado, Civil Action No. 93-K-1227, 1995 U.S. Dist. LEXIS 21422, at *39 (D. Colo. Nov. 17, 1995), the court permitted expert testimony by two former non-lawyer employees of the Department of Labor "on whether [plaintiffs] performed work related to management policies

and whether they supervised two or more employees."  First, the <u>Goebel</u> court rejected the

defendant's argument that the expert testimony would impermissibly render opinions on the

ultimate issue of exemption, because under Fed. R. Evid. 704, "[e]xpert opinions are no longer

subject to objection on the ground that they embrace an ultimate issue."  <u>Id</u>.  Expert testimony

can certainly include factual conclusions, even "though they embrace an ultimate issue to be

decided by the jury," so long as they do not "encroach upon the court's duty to instruct on the

law."  <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991) (admitting expert

testimony where the expert did not give his opinion as to whether securities laws had been

violated).  The <u>Goebel</u> Court rejected the defendant's argument that the experts were not

qualified "to assess the nature and scope of the plaintiffs' employment duties," finding that the

experts "have substantial experience in investigating job functions to determine whether those

functions involve the exercise of judgment and discretion; whether they are related to

management policies; and whether they encompass supervisory duties," and that the defendant's

"objections go to the weight, rather than the admissibility of the experts' testimony."  1995 U.S.

Dist. LEXIS 21422, at *39.

    Other courts, including the Second Circuit Court of Appeals, have permitted experts to

testify regarding whether positions include "supervisory" or "managerial" job duties.  <u>See</u>, <u>e.g.</u>,

<u>AFSCME v. Nassau</u>, 96 F.3d 644, 648 (2d Cir. 1996) (permitting expert testimony from

sociologist in discriminatory pay case who analyzed two jobs with regard to the training and

experience required, and *whether the position entailed supervisory responsibility*); <u>Johnson v.</u>

<u>Big Lots Stores, Inc.</u>, 561 F.Supp. 2d 567, 580-81 (E.D. La. 2008) (admitting into evidence the

survey results of a private consultant regarding whether at-issue employees "regularly hired

associates employees as part of their job duties," "regularly terminated others' employment,"

"disciplined employees for misconduct or for not following corporate policies," and "made recommendations about the employment status of other employees" where defendant maintained plaintiffs were properly classified as exempt under the executive exemption); <u>Donovan v. Waffle House, Inc.</u>, No. C81-609A, 1983 WL 2108 (N.D. Ga. Sept. 26, 1983) (in finding that employees were properly classified as exempt under the executive exemption, the court considered expert testimony that "the usual or typical unit manager for Waffle House spends 57% of his time in *activities which are neither managerial nor closely and directly related to his management responsibilities*" (emphasis supplied) based on an "activity analysis" in which a job duties questionnaire was administered to employees and testimony from other experts – based on a Position Analysis Questionnaire – that "in their opinion, utilizing accepted industrial engineering management concepts, theories and considerations *the unit manager would be considered in charge of, and responsible for, the unit* in the sense in which that term is ordinarily understood by industrial engineering experts" (emphasis supplied)).  Courts have also permitted Dr. Lundquist and others to provide expert testimony on the nature of requirements for at-issue jobs, including whether those requirements constitute "essential functions" of those jobs.  <u>See</u>, <u>e.g.</u>, <u>Johnson v. Uncle Ben's, Inc.</u>, 965 F.2d 1363, 1367 (5th Cir. 1992) (permitting expert testimony from industrial psychologist in discrimination case concerning his analysis of 119 job titles and his opinion as to the "level of education that he believed UBI employees would need to perform different jobs successfully"); <u>EEOC v. Abercrombie & Fitch Stores, Inc.</u>, No. 4:08CV1470 JCH, 2009 WL 3517588, at *1 (E.D. Mo. Oct. 26, 2009) (permitting Dr. Lundquist to opine "that adherence to and enforcement of the Look Policy is an *essential function of the [at-issue] position*" (emphasis supplied)); <u>United States v. Garland</u>, No. Civ. A. 3:98-CV-0307-L, 2004 WL 741295, at *11 (N.D. Tex. Mar. 31, 2004) (permitting Dr. Lundquist to testify about studies

she performed "establish[ing] a link between the tasks required of an entry-level firefighter and the knowledge, skill, abilities and other (or personal) characteristics ('KSAOs') required by the job" in a case challenging entry-level hiring practices as having a discriminatory disparate impact).

The Court in Dubiel v. Columbia Hosp. Ltd. Partnership, No. 04-80283-CIV, 2005 WL 5955691 (S.D. Fla. Jan. 11, 2005) arrived at the same conclusion: that an expert "may testify as to his opinion on an ultimate issue of fact" but "may not testify to the legal implications of conduct." Id. at *4-5 (finding expert's conclusions to be impermissible legal opinions where he stated that the defendant "operated in full compliance [with the FLSA]," "no violations of the [FLSA] were found to have occurred… no willfulness under the [FLSA] was found to have occurred… [and the defendant] was found to have attempted to administer their meal period policies in good faith with all applicable regulations of the [FLSA]"); see also Valladon v. City of Oakland, No. C06-07478, 2009 WL 585804, at *2-3 (N.D. Cal. Mar. 5, 2009) (granting plaintiffs motion to strike report of expert, a former DOL lawyer, which opined that defendant's donning and doffing practices "fully comply with the FLSA," that if the court nevertheless finds FLSA violations that those violations were not willful and thus the two-year statute of limitations applies, that defendant is not liable for liquidated damages because it acted in good faith, and that a particular court reached an "incorrect" legal conclusion); Bennett v. SLT/TAG Inc., No. Civ. CV02-65-HU, 2003 WL 23531402, at *3 (D. Or. May 8, 2003) (expert opinion that defendant acted in good faith by not paying plaintiff overtime wages and that "the employer in this case does not need to assert a good faith defense because, based on the facts stated in the material I reviewed, there was no violations [sic] to begin with" is inadmissible because "his opinion on

11

good faith is not based upon the actions taken by the defendants to ascertain whether the exemption applies, but upon his legal conclusion that the exemption does not apply.").

Here, Dr. Lundquist offers no opinion on whether Defendant has or has not violated the FLSA, nor whether Defendant has or has not acted willfully, nor whether Defendant has or has not acted in good faith.  Dr. Lundquist offers no opinion as to whether Defendant has or has not properly classified the Plaintiff class as exempt from the overtime provisions of the FLSA, nor does she opine as to which exemption, if any, applies to the class.  She simply cannot be said to have "testif[ied] to the legal implications" of Defendant's conduct.  Dubiel, 2005 WL 595569, at *4-5; see also Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (expert testimony that the defendants deviated from industry standards and that such conduct *would support a finding* of bad faith did not inappropriately reach legal conclusions because the expert did not testify that he had reached a legal conclusion that the defendants *did* act in bad faith).

Expert testimony is permissible, even where the experts use terms that also appear in the legal standards the jury will ultimately apply based on the Court's instructions:

> Plaintiffs' experts are not lawyers.  There is no indication in their reports that these experts intend to offer opinions regarding the proper interpretation of either the FLSA or the regulations.  Rather, the Court views their proffered testimony as primarily factual in nature.  *Although their opinions are necessarily couched in terms of the applicable legal standards (i.e., exercise of discretion and judgment, management of the enterprise, supervisory responsibility), this does not render their testimony inadmissible.*

Goebel v. Colorado, 1995 U.S. Dist. LEXIS, at *40-41 (emphasis supplied).  For instance, the fact that Dr. Lundquist uses the term "management" – which also appears in the regulations defining the executive exemption – does not mean she has reached a legal conclusion.  See 29 CFR § 541.100(a)(2).  "Management" has a common everyday meaning and a meaning within

Dr. Lundquist's field; it is not a legal term of art like the term "exempt" – which Dr. Lundquist does not use.  See United States v. Two Eagle, 318 F.3d 785, 792 (8th Cir. 2003) ("[T]estimony is not defective merely because it utilized the words of the legal standard.  Commonly used words and their plain meaning often match their legal meaning.").  The law is clear that simply using a word or term that is part of a legal standard does not *per se* render the testimony defective.  See, e.g., Specht v. Jensen, 853 F.2d 805, 809-10 (10th Cir. 1988) (explaining that "a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms"); Valladon, 2009 WL 585804, at *3 ("Had Ms. Kramer offered opinions moored to the facts of the case, such opinions would not have been inadmissible merely because they included reference to legal terms or regulations.").

C.   **The cases in which expert opinions are excluded for rendering legal opinions involve explicit legal analysis, typically offered by a lawyer, law professor, or other legal professional.**

The cases that Plaintiffs cite in which expert testimony is excluded on the basis that it constituted an impermissible legal conclusion contain explicit legal opinions, and often involved testimony from lawyers and/or current or former Department of Labor employees.[3]  See Kuebel v. Black & Decker Inc., 08-CV-6020T, 2010 U.S. Dist. LEXIS 46533, at *46, 49 (W.D.N.Y. May 12, 2010) (declining to consider expert opinion offered at summary judgment stage that *defendant's conduct "is a willful violation of the FLSA*," (emphasis supplied) finding that

---

[3] Even in cases cited by Plaintiffs, the courts excluded only certain conclusions that they found inappropriate or inadmissible, rather than striking the entire expert report.  See Henry v. Quicken Loans Inc., Case No. 2:04-cv-40346, 2009 U.S. Dist. LEXIS 90126, at *20-21 (E.D. Mich. Sept. 30, 2009) (excluding certain expert conclusions as legal conclusions on the ultimate issue of the case, but permitting expert to describe to the jury his on-site job observations); Perez v. Radioshack Corp., No. 02 C 7884, 2005 U.S. Dist. LEXIS 36292, at *10 (N.D. Ill. Dec. 13, 2005) (prohibiting expert testimony from former DOL employee regarding his conclusion that management is not the primary duty of at-issue store managers, but permitting general testimony "regarding the DOL's *standards and practices* in assessing whether an employee is an exempt executive" (emphasis supplied) under the FLSA).

opinion was a legal conclusion and was not supported by any "dates, studies, documents, articles or other information" provided by the expert); <u>Perez v. Radioshack Corp.</u>, No. 02 C 7884, 2005 U.S. Dist. LEXIS 36292, at *5-6 (N.D. Ill. Dec. 13, 2005) (excluding testimony from expert, a former Department of Labor Wage and Hour Division employee reflecting improper "legal conclusions that will determine the outcome of the case" such as his conclusion that "[i]n *applying the four [legal] tests* contained in both the prior and current [FLSA] regulations and the guidance provided by the [DOL's] Field Operations Handbook … it is clear management is not their primary duty" (emphasis supplied)); <u>Murray v. Ohio Cas. Corp.</u>, No. 2:04 04-CR-539, 2005 U.S. Dist. LEXIS 41374, at *7-8 (S.D. Ohio Sept. 27, 2005) (rejecting expert opinion of former Department of Labor lawyer "opin[ing], after a review of the record in this case, that *Plaintiff does not meet the administrative exemption to the overtime wage requirement*" (emphasis supplied) in the course of considering a motion for summary judgment); <u>Alldread v. City of Grenada</u>, 988 F.2d 1425, 1436 (5th Cir. 1993) (excluding testimony of labor department investigator that investigated the plaintiffs' allegations against defendant; investigator's "conclusion … that *captains were not properly classified as exempt*" (emphasis supplied) was an "inadmissible *legal* conclusion" (emphasis in original)). <u>See also</u> <u>Valladon</u>, 2009 WL 585804, at *2 ("The Court's concern is not that Ms. Kramer opines on the relevant facts, but that her area of expertise is the law. She therefore purports not to 'assist the trier of fact to understand the evidence or to determine a fact in issue,' see Rule 702, but to help the jury understand the law itself. This is not permissible."); <u>Pinal Creek Group v. Newmont Mining Corp.</u>, 352 F. Supp. 2d 1037, 1043 (D. Ariz. 2005) ("Courts have held that expert testimony by lawyers, law professors, and others concerning legal issues is improper.").

IV.   **DR. LUNDQUIST EMPLOYS ACCEPTED METHODOLOGIES IN HER AREA OF EXPERTISE**

SNET disclosed the expert report of Dr. Lundquist to Plaintiffs as required under the Federal Rules of Civil Procedure.  The opinions therein are proffered by a very highly qualified industrial/organizational psychologist.[4]  Dr. Lundquist gave sworn testimony in the form of her report that she was asked to identify the importance and frequency of the job duties of certain Level One Managers at SNET.  See Lundquist Report at p. 2.  Job duties are regularly studied by industrial/organizational psychologists for important business reasons, including but not limited to the validation of selection procedures, performance appraisals, and designing human resource processes.  Id. at p. 4.  Dr. Lundquist's sworn report affirms that in performing her job analysis for SNET, she followed established methodology regularly used in her area of expertise.  Id. at p. 7-21.  Dr. Lundquist's job analysis included: 1) reviewing SNET documents related to the Level One Manager job, the deposition testimony of some opt-in Plaintiffs and charts summarizing opt-in testimony prepared by Plaintiffs' counsel for their own experts and annotated by defense counsel for defense experts; 2) development of a job analysis questionnaire, including identifying 177 distinct work activities and content regarding Level One Manager knowledge, skills, abilities and other personal characteristics (KSAOs);[5] 3) preparation of a job questionnaire; 4) meeting with individuals who currently supervise the at-issue Level One Managers to discuss the Level One Manager job and administer the job analysis survey; and

---

[4] Indeed, Plaintiffs do not challenge Dr. Lundquist's qualifications as an expert under Fed. R. Evid. 702.

[5] Plaintiffs' argument that Dr. Lundquist's job analysis consists of generic "labels and descriptors" of the work that Level One Managers perform is not well-taken in light of Dr. Lundquist's identification of 177 separate and distinct work activities performed by Level One Managers.  Lundquist Report p. 14.

5) an on-site observation of a Level One Manager's job activities.[6] Id. at p. 12-21.  Although

Plaintiffs now argue that this sort of job analysis is not appropriate, this was not always their

position.  In fact, Plaintiffs' counsel informed this Court in April that an industrial psychologist

might be an appropriate liability expert in this case:

> There are cases where experts are used and cases where they are not used on
> liability.  *I can think of an example of perhaps an industrial psychologist talking
> about the types of things that managers do*.

(April 5, 2010 Transcript [Doc. 253], p. 49-50 (emphasis supplied)).

In the usual course, Plaintiffs would have taken Dr. Lundquist's deposition to cross-

examine her on her methodology and conclusions, or would have offered evidence to challenge

Dr. Lundquist's methods as being contrary to accepted standards.  Plaintiffs do not do so here.

Instead, Plaintiffs rely solely on two articles, neither of which support a finding that Dr.

Lundquist did not use methods recognized and accepted in her industry.

### A. **Dr. Lundquist is an industrial/organizational psychologist, not a "survey expert" and her methodology complies with accepted standards in her field.**

Plaintiffs criticize Dr. Lundquist for purportedly failing to comply with the survey

methods advocated in two publications cited by Plaintiffs – the Federal Judicial Center's

---

[6] Plaintiffs accuse Dr. Lundquist of "improper ex parte contacts with represented parties" in the course of conducting her job observation.  (Pl. Mtn. at 15-16).  Dr. Lundquist was provided the name of Level One Manager Joseph Piccolo as a non-class member whom Dr. Lundquist could observe on the job without improperly contacting represented class members.  Mr. Piccolo is not an opt-in Plaintiff in this matter.  Plaintiffs' counsel prepared the list of Rule 23 class members who remained in this lawsuit following the parties' stipulation regarding a revised class definition early this year. See Declaration of E. Leonard, Exhibit A.  Mr. Piccolo's name did not appear on this list.  Defendant relied upon this representation from Plaintiffs' counsel when providing Mr. Piccolo's name to Dr. Lundquist.  Plaintiffs' further accusation that "SNET 'inadvertently' conducted these interviews and observations" with an opt-in Plaintiff is inaccurate.  As defense counsel promptly advised Plaintiffs' counsel at the time, Dr. Lundquist and her team were directed to a second Level One Manager by Mr. Piccolo to obtain security badges, and had limited interactions with him regarding Level One job duties.  Dr. Lundquist did not rely on any information obtained from the opt-in Plaintiff in preparing her report and did not disclose such information to defense counsel or Defendant.

Reference Manual on Scientific Evidence and an article titled "How to Conduct a Wage and Hour Audit for Exemptions to Overtime Laws."  (Pl. Mtn. at 10, 12).  First, Dr. Lundquist is not offered as a "survey expert."  The questionnaire administered as part of Dr. Lundquist's job analysis was created for the purpose of providing her with relevant facts to inform her opinions about the nature of Level One Manager jobs she was analyzing and to satisfy the requirement that expert opinions should be "sufficiently tied to the facts of the case that it will aid the [fact finder] in resolving a factual dispute."  Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000); see also United States v. City of Miami, 115 F.3d 870, 873 (11th Cir. 1997) ("Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion.").  The job questionnaire was not designed or represented to be a stand-alone survey.  Therefore, the examination of the "validity of the techniques employed" under Fed. R. Evid. 703 should focus not on whether Dr. Lundquist's techniques are consistent with those of survey experts, but rather whether the facts and data she used from the questionnaire are "of a type reasonably relied upon by experts in the particular field [in this case, industrial/organizational psychology] in forming opinions or inferences upon the subject."

Plaintiffs have failed to address this issue or to challenge the validity of the job analysis methods – including job questionnaires – cited in Dr. Lundquist's report as the standard and acceptable practice in the field of industrial/organizational psychology.  See, e.g., Lundquist Report 8-11; Martin, 180 F. Supp. 2d at 319 (District of Connecticut rejected a challenge to the admissibility of expert testimony, in part because the opposing party "has not cited any case law for the notion that a different analysis would be required of [the expert]").  In fact, expert opinions based on Dr. Lundquist's methodology have been admitted by many courts.  See, e.g.,

Lundquist Report, Attachment 1, <u>Abercrombie & Fitch</u>, 2009 WL 3517588, at *1 (denying motion to exclude expert testimony of Dr. Lundquist "that adherence to and enforcement of the Look Policy is an essential function of the [at-issue] position"); <u>Garland</u>, 2004 WL 741295, at *11 (permitting Dr. Lundquist to testify about studies she performed "establish[ing] a link between the tasks required of an entry-level firefighter and the knowledge, skill, abilities and other (or personal) characteristics ('KSAOs') required by the job" using a job analysis, a panel of industrial/organizational psychologists, and information obtained from SMEs).

      B.        **Plaintiffs offer no evidence that the two articles they cite regarding survey techniques represent the standard or appropriate methodology for industrial/organizational psychologists performing job analyses – or for survey experts, for that matter.**

Plaintiffs offer no evidence that the methodology outlined in the two sources they cite is more well-accepted than, or contrary to, the methodology Dr. Lundquist describes as being used in the field of industrial/organizational psychology.[7]  For instance, Plaintiffs cite only a single case for the proposition that "most courts" rely on the Federal Judicial Center's <u>Reference Manual on Scientific Evidence</u> (and, more specifically, the <u>Reference Guide on Survey Research</u>) "in determining whether a survey was conducted in accordance with 'accepted survey principles'" (Pl. Mtn. at 10), and this pre-<u>Daubert</u> case does not even mention the Manual that Plaintiffs urge is one of the seminal texts on surveys.  <u>See</u> <u>Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.</u>, 559 F. Supp. 1189, 1203-05 (E.D.N.Y. 1983) (in a trademark infringement case, an expert's survey of consumers was excluded by the court as lacking in trustworthiness, primarily because the expert overseeing the survey used more than 20 persons whom he did not directly

---

[7] Even if Plaintiffs offered such evidence, it would be outside the province of the Court to decide which methodology is correct.  <u>See</u> <u>Travelers</u>, 150 F. Supp. 2d at 366 (citing <u>Ruiz-Troche v. Pepsi Cola</u>, 161 F.3d 77, 85 (1st Cir. 1998) ("<u>Daubert</u> neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.").

employ or supervise to conduct the survey interviews, prepare punch cards of the results,

perform computer analyses, and validate the survey and could not explain or confirm exactly

what methods were used at all steps in the process).  In fact, a search of reported decisions found

only one case decided by the Second Circuit and two cases decided by this Court that reference

the Reference Guide on Survey Research, none of which relied on the Reference Guide on

Survey Research in rendering a decision on the admissibility of an expert's opinions.  See

Amorgianos, 303 F.3d at 265; In re Xerox Corp. Sec. Litig., Civil Action No. 3:99CV02374

(AWT), 2010 U.S. Dist. LEXIS 103593, at *13, n. 12 (D. Conn. Sept. 30, 2010); Applera Corp.

v. MJ Research Inc., 389 F. Supp. 2d 344, 350 (D. Conn. 2005).

The article Plaintiffs cite regarding "How to Conduct a Wage and Hour Audit for

Exemptions to Overtime Laws" is only minimally relevant given that Dr. Lundquist was not, in

fact, conducting a wage and hour audit.  In fact, Dr. Lundquist's job analysis by necessity (due to

legal and ethical rules) did not involve direct contact with the incumbent class of employees.

Notably, however, Dr. Lundquist's methods follow nearly all of the admonitions set forth

in the "How to Conduct a Wage and Hour Audit for Exemptions to Overtime Laws" article,

setting aside her inability to contact opt-in Plaintiffs themselves.  For instance, Dr. Lundquist

established job duties criteria and then "develop[ed] a strategy for collecting job duty

information."  Compare 5  Bender's Labor & Employment Bulletin 292-93 and Lundquist

Report p. 14-18.  Dr. Lundquist used job questionnaires, as suggested by the article.  Compare 5

Bender's Labor & Employment Bulletin 295 and Lundquist Report p. 14-21.   In fact, Dr.

Lundquist used many of the questions proposed in the article Plaintiffs cite.  Compare 5 Bender's

Labor & Employment Bulletin 300 and Lundquist Report, Table 2.

As noted, Dr. Lundquist could not administer job questionnaires to the incumbent class members, conduct job observations or interviews with incumbent class members, or ask the incumbent class members to keep a diary for her purposes, as suggested by Plaintiff's cited article.  See 5 Bender's Labor & Employment Bulletin 296.  However, Dr. Lundquist used the next-best method – asking class members' supervisors about class member duties.[8]  As the article explains, "data collection should be done by people who are knowledgeable about the job – either because they perform/have performed the job, or have acquired detailed knowledge of the job from a variety of sources including reviews of company materials related to the job duties and/or through observations of the job incumbents."  Compare 5 Bender's Labor & Employment Bulletin 296 and Lundquist Report p. 18-19.   Contrary to Plaintiffs' protests, the article Plaintiffs cite on survey techniques specifically recommends seeking information from the supervisors of the job incumbents being studied:

> *Supervisors and managers are also knowledgeable if they in fact monitor incumbents' job performance.  It is likely that they performed the job as well before they were promoted to a supervisory position.*  Like incumbents, their reports also can be self-serving under circumstances.  Again, with proper instructions and *given assurances that the data will not reflect on their own performance or affect them in any way, supervisors and managers can generate accurate and valuable data.*

Compare 5 Bender's Labor & Employment Bulletin 296 and Lundquist Report p. 18-19 (emphasis supplied). [9]

---

[8] Although Plaintiffs allege that Dr. Lundquist should have, instead, interviewed the technicians that report to the at-issue Level One Managers, they do not cite to anything suggesting that this is a requirement of job analyses (Pl. Mtn. at 3, 11) and the two articles Plaintiffs rely on as purportedly describing appropriate survey techniques do not suggest such an approach.

[9] Plaintiffs' complain that Area Managers and Directors "have a vested interest in this litigation" and thus should not have been used as SMEs for Dr. Lundquist's job questionnaire.  (Pl. Mtn. at 3).  First, job incumbents – in this case, opt-in Plaintiffs – clearly have an even greater self-interest in attempting to minimize the scope of their job duties, as was evident in their responses to inquiries about their own job duties in their deposition testimony, which Plaintiffs would

Dr. Lundquist also followed all of the article's advice on the use of an outside/neutral party collecting job analysis data:

> [Such outside/neutral party] needs to become familiar with the details of the job from a variety of sources including reviews of company documents related to job duties and through observations of job incumbents.  In addition, the outside party should be knowledgeable about job analysis techniques and understand the job information that needs to be collected.

<u>Compare</u> 5 Bender's Labor & Employment Bulletin 296 and Lundquist Report p. 4-21.

And although the article cited by Plaintiffs describes various ways in which samples – either random or targeted – can properly be used in conjunction with job questionnaires, Dr. Lundquist actually sought to include all Area Managers and Directors who were currently supervising the at-issue Level One Managers, thus obviating the need for sampling.  <u>Compare</u> 5 Bender's Labor & Employment Bulletin 296-97 and Lundquist Report p. 19.

In short, Plaintiffs' criticism of Dr. Lundquist's methodology fails utterly to contradict her sworn testimony that she followed proper techniques generally used by industrial/organizational psychologists in arriving at her opinions.  There is therefore no basis to reject her opinion pursuant to Rule 702 and the standards established by Daubert.  The motion to strike should therefore be denied.

---

prefer Dr. Lundquist had relied upon.  <u>See</u> 5 Bender's Labor & Employment Bulletin 296. Second, Plaintiff's assertion that Area Managers' and Directors' job questionnaire responses were skewed in favor of their interest in the litigation contradicts their later criticism that questionnaire participants were not informed of the purpose of the questionnaire, but were told that it related to an effort to revise job descriptions.  (Pl. Mtn. at 13).  Again, Plaintiffs cite no authority for the proposition that job analysis participants must be informed of any litigation purposes behind the analysis, nor do the two articles Plaintiffs cite regarding survey techniques suggest any such requirement.  In fact, the Federal Judicial Center's <u>Reference Guide on Survey Research</u> (cited by Plaintiffs) states that survey respondents should be "blind to the sponsor of the survey and its purpose," at p. 266.

**V.   THERE WAS NO AGREEMENT NOT TO USE LIABILITY EXPERTS THAT TRUMPS THE DAUBERT STANDARD**

Finally, Plaintiffs urge the Court to strike Dr. Lundquist's report on the grounds that Defendant represented to the Court that it would not use a liability expert.  First, Plaintiffs cite no legal basis for the extreme sanction of striking an expert report in its entirety on such grounds.  More importantly, Plaintiffs' assertion is untrue.  In the parties' Second Supplemental Rule 26(f) Report filed on April 5, 2010 [Doc. 248, p.4 (emphasis supplied)], the parties expressly stated that although "[n]either side *currently contemplates* calling an expert witness with respect to the liability phase of the trial," the parties reserved the right to make a final determination at a later date and "[t]he parties agree to *meet and confer* no later than the end of fact discovery *to confirm whether expert testimony will be provided*."  This proposal, which was premised on the notion that proceedings would be bifurcated, was not adopted by the Court. At the 26(f) conference, defense counsel made no definitive representation about the use of experts with respect to liability, acknowledging only that "at [that] point" in time, defense counsel did not anticipate using liability experts.  (April 5, 2010 Transcript [Doc. 253], p. 49).  Plaintiffs' counsel hypothesized that an industrial psychologist could be used by the parties to "[talk] about the types of things that managers do."  (April 5, 2010 Transcript [Doc. 253], p. 49-50).

There was no later agreement not to use any liability expert, but only – as Plaintiffs acknowledge in their briefing – an agreement that experts could not be used to opine on the ultimate issue in this case: whether class members are exempt from the overtime provisions of the Fair Labor Standards Act and Connecticut State Law.  Dr. Lundquist's report is fully consistent with this agreement.

**VI.   CONCLUSION**

For the reasons described above, Plaintiff's Motion Strike should be denied.

Dated:  New York, New York
    December 15, 2010

Respectfully submitted,

By: /s/ Erika L. Leonard    
   Patrick W. Shea (CT07071)
   Paul, Hastings, Janofsky & Walker LLP
   75 East 55th Street
   New York, NY 10022
   Telephone: (212) 318-6000
   Facsimile: (212) 319-4090
   patrickshea@paulhastings.com

   Leslie A. Dent (PHV 03877)
   John F. Wymer, III (PHV 03876)
   Erika L. Leonard (PHV 03875)
   Paul, Hastings, Janofsky & Walker LLP
   600 Peachtree Street, N.E., Suite 2400
   Atlanta, Georgia 30308
   Telephone: (404) 815-2400
   Facsimile: (404) 815-2424
   lesliedent@paulhastings.com
   johnwymer@paulhastings.com
   erikaleonard@paulhastings.com

   Counsel for Defendant
   SOUTHERN NEW ENGLAND
   TELEPHONE COMPANY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **SHARON L. PERKINS, et al.,** | |
| **Individually and on Behalf of Others Similarly Situated,** | **CIVIL ACTION NO. 3:07CV967 (JCH)** |
| **PLAINTIFFS,** | |
| **v.** | |
| **SOUTHERN NEW ENGLAND TELEPHONE COMPANY,** | |
| **DEFENDANT.** | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2010 a copy of foregoing DEFENDANT SNET'S

OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION TO STRIKE EXPERT REPORT

AND TESTIMONY OF DR. KATHLEEN LUNDQUIST AND APT*METRICS*, INC. was filed

electronically and served by U.S. mail on anyone unable to accept electronic filing.  Notice of

this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system

or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing.  Parties may access this filing through the Court's CM/ECF System.

<u>/s/ Erika L. Leonard</u>
Erika L. Leonard (PHV 03875)
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, Georgia 30308
erikaleonard@paulhastings.com

*Attorney for Defendant SNET*