# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **SHARON L. PERKINS, et al.,** | ) |
| | ) |
| | ) |
| **Individually and on Behalf of Others** | ) |
| **Similarly Situated,** | ) **No: 3:07CV967 (JCH)** |
| | ) |
| **PLAINTIFFS,** | ) **PLAINTIFFS' REPLY** |
| | ) **MEMORANDUM OF LAW** |
| **v.** | ) **IN SUPPORT OF EMERGENCY** |
| | ) **MOTION TO STRIKE EXPERT** |
| | ) **REPORT AND TESTIMONY OF** |
| **SOUTHERN NEW ENGLAND** | ) **DR. KATHLEEN LUNDQUIST AND** |
| **TELEPHONE COMPANY,** | ) **ATP***METRICS***, INC.** |
| | ) |
| **DEFENDANT.** | ) |
| | ) |

SNET's arguments in opposition to Plaintiffs' motion to strike continue to be semantic and technical, consisting mainly of linguistic sleight of hand. Dr. Lundquist's report and testimony should be stricken because it violates the parties' agreement, reaches improper legal conclusions, lacks probative value, and fails the *Daubert* test for the admissibility of scientific evidence. Plaintiffs' motion is not about simply disagreeing with the results of Dr. Lundquist's analysis, but objecting to the entire exercise and its methodology as corroded and corrupt.

### SNET Has Violated its Agreement Not to Use Liability Experts; SNET Does Not Contest Mr. Wittels' Declaration Setting Forth the Agreement

As argued in the initial motion, SNET should not be able to take breach its representations to the Court and agreement with Plaintiffs not to use liability experts.[1] Plaintiffs have relied to their detriment, by refraining from conducting their own survey or other liability analysis, and SNET should be estopped from calling Dr. Lundquist or other members of her firm at trial. See, e.g., *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231 (1959) (estoppel derived from "[d]eeply rooted" "maxim that no man may take advantage of his own wrong"). Double-dealing should not result in a litigation advantage.

Counsel asserts that the company did not breach its representations because its expert did not directly say that the class members are "exempt" and thus, SNET claims, did not render an opinion on the "ultimate issue" in this case. There is actually very little, if any, real distinction between the parties' understandings of the agreement in question: (A) no liability experts (Plaintiffs) v. (B) no experts on the issue of the Plaintiffs' and class members' classification status (Defendant). (*See* Wittels Dec. and attached Exs. B, Shea email and D, Witttels Letter; Wittels Reply Dec.)  The *only* issue at stake on *liability* is whether the L1

---

[1] The fact that Plaintiffs indicated at the April 5 hearing that they potentially envisioned using liability experts is irrelevant; based upon SNET's representations, the parties subsequently agreed that neither of them would present such experts.  In fact, the citation to this portion of the record supports Plaintiffs' claim of reliance.

litigants were properly classified as exempt under the administrative and/or executive exemptions. If the parties' positions were represented as a Venn diagram, it would appear as a single circle because they are entirely overlapping.

SNET now argues that the substance of the parties' pact was solely to preclude experts from expressly stating that class members are either "exempt" or "non-exempt," what it calls the "ultimate issue." If SNET were correct, this arrangement would hardly need to be the subject of a deal between counsel. SNET acknowledges that such an opinion would be an ultimate legal conclusion and would be barred as a matter of law.

Tellingly, SNET did not submit an admissible Declaration attesting to this strained version of the agreement. In contrast, Plaintiffs have submitted the Declarations of lead counsel Steven Wittels, setting forth the agreement and Plaintiffs' reliance thereon in foregoing liability expert(s). (*See* Wittels Dec.; Wittels Reply Dec.) In the absence of a competing declaration, Mr. Wittels' sworn statements must be credited. Cf. *Barratt v. Joie*, 2002 U.S. Dist. LEXIS 3453, at *20 n.3 (S.D.N.Y. Mar. 4, 2002) (summary judgment: statement in a legal brief "clearly insufficient to create a genuine issue of fact").

By commissioning a study into the class members' exemption status and by advancing expert opinions stating in effect that Plaintiffs meet each of the elements of the relevant exemptions, the company has plainly violated its agreement.

## Dr. Lundquist Has Rendered Impermissible Legal Conclusions

SNET's opposition to the motion to strike is based upon a hair-splitting exercise: an opinion that a group of employees essentially meets all the legal requirements of an exemption is not a conclusion that they are "exempt"; an opinion that their "primary duty is management" -- the key prerequisite for the exemptions in question -- does not state whether they are

managing "the enterprise or a customarily recognized department or subdivision thereof"; an opinion that L1s "regularly" direct the work of techs does not state they also "customarily" do so -- although it is difficult to discern the difference, especially in the eyes of a lay jury;[2] and an opinion that they "exercise a <u>key role</u> in *making or influencing* personnel decisions related to Technicians" (including with respect to discipline, promotion, and pay raises) does not state whether they have authority or whether their recommendations are given particular weight.

SNET would actually have the court believe that even though Dr. Lundquist says that the Level Ones' "*primary duty is management*" and the regulations defining the exemptions require that an employee's "*primary duty is management*," the word "management" means two different things when used by the DOL and by Dr. Lundquist. (SNET Opp. at 12-13) Clearly, Dr. Lundquist has rendered a legal opinion on the application of the core "primary duty" test. Defendants' semantic legerdemain is unavailing and does not save Dr. Lundquist's testimony.[3]

In effect, SNET argues, by slightly changing the wording of the exemption elements -- but not their import -- an expert can get away with rendering a legal opinion, even though her

---

[2] Not only does Dr. Lundquist give a legal opinion that the L1s "*direct the work* of two or more employees" (all of the class members are assigned at least two Technicians) but she asks her survey participants to do so. (*See* Wittels Ex. C, Report, Tables, Activity #7). She simply reiterates their hearsay evidence. (*See infra* at ). In the hands of the L2 and L3 Managers -- who all responded Yes -- the requirement of "directing" employees' work becomes simply having technicians assigned as direct reports. This second-hand conclusion distorts the legal test, infringes on the role of the Court, and unfairly influences the jury.

[3] See, e.g., *Perez v. Radioshack Corp.*, 2005 U.S. Dist. LEXIS 36292 (N.D. Ill. Dec. 13, 2005) (precluding expert from testifying as to conclusion that employees "do not have 'management' as their 'primary duty'": "Significantly if management is not the 'primary duty,' [the employees] cannot be exempt executive and must receive overtime pay. The mere fact that [the expert] does not expressly state as much does not preclude a finding that he has opined on that legal issue."); *Henry v. Quicken Loans, Inc*., 2008 U.S. Dist. LEXIS 107155, (E.D. Mich. Sept. 30, 2008) (issue in case was "primary duty"; expert likened employees' principal job functions to those of other employees who qualified as exempt: "While Dr. Cohen claims he was not asked for nor does he give 'an opinion as to whether QLI Mortgage Bankers are exempt'... it takes little learning in logic or mathematics to complete the syllogism... Thus, it is determined that by slightly indirection [sic] Dr. Cohen is offering a legal conclusion on the ultimate issue of this case..."); *Cowan v. Treetop Enters., Inc*., 120 F. Supp.2d 672, 684 (M.D. Tenn. 1999) (expert may not testify as to employee's "primary responsibility," a "distinct legal concept").  See also *Bouder v. v. Prudential Fin. Inc.*, 2010 U.S. Dist. LEXIS 51599, at *18-19, 30 n.7 (D.N.J. May 21, 2010) (where outside sales exemption at issue, report that employees' duties are more than making sales "borders on net opinion testimony on the ultimate issue").

3

report makes the outcome a foregone conclusion.  Dr. Lundquist cues the jury how to rule on the exemptions.  SNET's citations are distinguishable.[4]  As in cases such as *Perez* and *Henry*, the inexorable sum of her opinions is a conclusion on the class members' exemption status.

As stated in *Master-Halco Inc. v. Scillia, Dowling & Natarelli, LLC*, 2010 U.S. Dist. LEXIS 38113, at *11-12 (D. Conn. Apr. 19, 2010):

> Expert testimony is permitted to help the jury understand facts that are beyond the understanding of lay people.  *See* Fed. R. Evid. 702. But in providing this service, even paid experts are not to become proxies for their clients. *See United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (explaining that jurors were not "helped" within the meaning of Rule 701 by opinion testimony that, in addition to telling them "what was in the evidence," also told them "what inferences to draw from it")....As Judge Learned Hand wisely put it, "Argument is argument whether in the [witness] box or at the bar, and its proper place is the last."

> **Dr. Lundquist's Report and Testimony is Fundamentally Flawed, Lacks Probative Value, and is Inadmissible; She Relies on Hearsay Collected from 14 Witnesses Who Can Easily Testify Themselves and Be Properly Cross-<u>Examined by Plaintiffs</u>**

Dr. Lundquist's expert "analysis" consists of a survey of 14 current Area Managers and Directors followed by improper legal opinions on the substance of the relevant exemptions.

---

[4] In *Barth v. Wolf Creek Nuclear Operating Corp*., 2002 U.S. Dist. LEXIS 11554 (D. Kan. June 19, 2002), the plaintiff conceded that the expert's opinion might be helpful to a fact finder. *Johnson v. Big Lots Stores, Inc*., 561 F. Supp. 2d 567 (E.D. La. 2008), involved an expert who was not propounding any conclusions but simply presenting the raw data from his survey (much more relevant and reliable because of 558 responses as opposed to 14 responses here).  In *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991), the majority of the expert's testimony addressed hypotheticals and deliberately refrained from discussing the specific facts of the case; moreover, any objections were waived.  Defendant cites *AFSCME v. County of Nassau*, 96 F.3d 644 (2d Cir. 1996) for the proposition that an expert may testify regarding whether positions include "supervisory" or "managerial" job duties.  There the expert's analysis did not address the ultimate legal issue in the case, an equal pay action; moreover, the issue before the Court of Appeals was not whether the expert improperly testified to a legal conclusion, but instead  whether the prevailing party was entitled to legal fees. *Donovan v. Waffle House, Inc.*, 1983 U.S. Dist. LEXIS 13420 (N.D. Ga. Sept. 26, 1983) is distinguishable because there the expert provided a conclusion about the percentage of time that the plaintiffs spent on managerial activities not whether their "primary duty" – a term of art from the FLSA – was management.  Further, the experts in *Donovan* explicitly distinguished their conclusions from a legal analysis under the FLSA by specifically stating that the terms in their conclusions were used only "in the sense in which th[ose] term[s are] ordinarily understood by <u>industrial engineering experts.</u>" *Johnson v. Uncle Ben's*, 965 F.2d 1363 (5th Cir. 1992) is a disparate impact case; the expert testified only as to the level of education needed to perform different jobs successfully, not the ultimate issue in that case.  In *EEOC v. Abercrombie*, 2009 WL 3517588 (E.D. Mo. Oct. 26, 2009), another Title VII case, plaintiff moved to exclude solely on relevance grounds.

Dr. Lundquist assigns a numerical value to respondents' answers, averages them,[5] and proceeds to conclude (1) that the Level Ones' primary duty is management; (2) that they regularly direct the work of technicians; (3) that they exercise a key role in making or influencing personnel decisions; and (4) that they exercise discretion in performing their job duties.

Without these ultimate legal findings, Dr. Lundquist's testimony is little more than a platform for untested hearsay evidence from a small cadre of upper-level managers.  Cf. *Arista Records LLC v. Usenet.com. Inc.*, 608 F. Supp.2d 409, 424-25 (S.D.N.Y. 2009) (improper for "expert" to regurgitate hearsay evidence without applying specialized knowledge and reliable methodology), citing *U.S. v. Mejia*, 545 F.3d 179, 197-98 (2d Cir. 2008); *Master-Halco*, 2010 U.S. Dist. LEXIS 38113, at *9-10 ("an expert cannot simply serve as a conduit through which a party can transmit inadmissible evidence to the jury")    And the L2s' and L3s' hearsay input is distorted by the misleading survey framework -- breaking L1s' jobs into 177 minuscule tasks through an obscure process and arbitrarily calling 169 "managerial" -- and biased questions.

Dr. Lundquist did not conduct a simple poll asking respondents' preference between clear-cut choices (political candidates, soft drinks), and apply her expertise to show why their answers are fairly representative of the larger population.  The reliability and probative value of the underlying hearsay evidence behind her report is in question.  Her survey technique adds little with only 14 participants --  who are readily identifiable, work and reside in Connecticut, and can be questioned directly without a hired intermediary put up by the company.[6]

There is no reason why the company cannot just put up its witnesses, permit a fair

---

[5] The results are skewed by Dr. Lundquist's practice of excluding "zero" answers (responses that L1s do not perform a particular activity or that it is not an important part of their job) when computing the mean.  (*See* Wittels Dec. Ex. C, Lundquist Report at 30-31 nn. 3-5)

[6] Cf., e.g., *IGT v. Alliance Gaming Corp.*, 2008 U.S. Dist. LEXIS 111773, at *30-31 (D. Nev. Oct. 21, 2008) (striking survey consisting of interviews of 12 individuals: "the relatively small size of the population interviewed detracts from the reliability of Dr. Kassinove's methods").

opportunity for cross-examination, and allow the jury to be properly instructed and reach its own conclusions. Dr. Lundquist's testimony adds nothing to this equation -- other than to stack the deck in SNET's favor by having an "expert" place the veil of science on its upper managers' company-fed lines and insulating those managers from being challenged. Thus, any limited probative value is greatly outweighed by the inordinate prejudice to Plaintiffs.

### Defendant's Arguments as to Why Dr. Lundquist's Methodology and Testimony Are Appropriate Are Misplaced

*Legal Standards*

SNET argues that by filing their motion, "Plaintiffs have shifted the burden – much heavier on a motion to strike – to themselves." (Opp. at 3) This is inaccurate. The standard on a motion to strike an expert report is a typical analysis under Fed. R. Evid. 403 and 702. *See, e.g.*, *Bethea v. Equinox Fitness Club*, 544 F. Supp. 2d 398, 398-99 (S.D.N.Y. 2008).[7]

*SNET Admits that Dr. Lundquist is Not a "Survey Expert"*

SNET asserts that Dr. Lundquist is not a "survey expert" and that the analysis commonly used to test the reliability of survey evidence should not apply. This is all the more reason to strike an expert report that is *almost entirely based on a survey*. SNET effectively admits that Dr. Lundquist was not qualified to formulate and administer the survey that forms the basis for her "analysis."

*Dr. Lundquist is an Experienced Expert in Title VII Cases, not  Wage and Hour Litigation*

Defendant misrepresents Dr. Lundquist's qualifications. According to SNET, "Dr.

---

[7] Contrary to SNET's arguments Opp at 3-4), the heavy burden on a motion to strike under Fed. R. Civ. P. 12(f) is only applicable to pleadings. *See* Fed. R. Civ. P. 12(f). Cases relating to the higher standard for a motion to strike either address motions to strike content in the pleadings, *see Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892 (2d Cir. 1976); *McCrae Assocs., LLC v. Universal Capital Mgmt.*, 554 F. Supp. 2d 249 (D. Conn. 2008) (deciding motion to strike paragraphs of the complaint and the counterclaim), or are distinguishable on another basis. *See Hickey v. Scott*, 2010 U.S. Dist. LEXIS 96949, at *16-18 (D.D.C. Sept. 16, 2010) (denying a motion to strike an expert report where half of the movant's arguments were meritless on their face and the other half were made without a single citation to the expert's report).

Lundquist has testified as an expert in over 50 employment litigation matters, for both plaintiffs and defendants," Opp. p. 1; however, based on Plaintiffs' preliminary investigation, only a handful of these "50 employment litigation matters" involved wage and hour litigation.[8]  Dr. Lundquist typically testifies in discrimination cases, not wage and hour actions.

*Reliance on Literature*

SNET questions the Federal Judicial Center's *Reference Manual* as a definitive source on the reliability and admissibility of survey evidence.  Defendant is wrong.[9]

SNET contends that Dr. Lundquist's methods comport with the article cited by Plaintiffs on "How to Conduct a Wage and Hour Audit."  Plaintiffs do not assert that this article is the *sine qua non* of "job analysis" for the purposes of an inquiry into an employee's classification status.  Rather, Plaintiffs simply point out that Dr. Lundquist's failure to focus on the relevant population of job incumbents creates a gaping hole in her study and brings its reliability into question.[10]  Dr. Lundquist finds herself free to disregard the class members' extensive testimony that they do not manage, make personnel decisions, or exercise discretion

---

[8] Plaintiffs are aware of at least one case where the court granted a motion to strike Dr. Lundquist at trial.  (*See* Melzer Dec. Ex. A, docket excerpts from *Morgan v. Family Dollar Stores, Inc.* (N.D. Ala.))

[9] E.g. *Johnson v. Big Lots Stores, Inc.*, 2008 U.S. Dist LEXIS 35316, *16 (E.D. La. Apr 29 2008):

> In determining whether a survey was conducted in accordance with "accepted survey principles," most courts look to the Federal Judicial Center's *Reference Manual on Scientific Evidence*, which identifies several reliability factors, including: (1) the survey's purposes and design: Was it designed to address relevant questions?; (2) population definition and sampling: Was an appropriate population identified?; and (3) the survey questions and structure: Were the questions framed to be clear, precise, and unbiased? Were filter questions provided to reduce guessing? What limitations are associated with the mode of questioning? *See* Federal Judicial Center, *Reference Manual on Survey Research,* 229-76 (2d ed. 2000).

See also, e.g., *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) (relying on *Reference Manual* to exclude survey failing to follow "fundamental protocols necessary to protect the objectivity and reliability of the survey"); *IGT*, 2008 U.S. Dist. LEXIS 111773, at *25-31 (applying *Manual* to exclude interviews that operated like a survey).

[10] While the article does say that supervisors may have valuable input, the primary focus should be on first-hand information from a sufficient number of job incumbents.  *See* Wittels Dec. Ex. F esp. at 297.  Supervisors might serve as "data collectors" but the key source for reliable data as to the relevant employees' actual daily job duties are the employees themselves.  Dr. Lundquist's analysis excludes the primary source.

and instead to rely upon a questionnaire fed to a small contingent of upper management and designed to lead to the company's preferred results. Based on the company's bare representations, Dr. Lundquist (or the lawyers advising her) apparently concluded that the Field Managers' evidence is irredeemably biased.

*Choice of the Relevant Population/"Selection Bias"*

SNET now admits that Dr. Lundquist only sought to include *current* Area Managers and Directors in her survey. (Opp. at 21). The basis for the exclusion of **former** L2s and L3s who supervised class members during the relevant period is not explained. There is no attempt to assess which current managers declined to participate and why. It is certainly possible that the former managers and non-volunteers would have responded differently and would have been less favorable to the company line. The low response rate -- which SNET does not contest -- and failure to conduct a response bias analysis undermines the survey's validity.

"Questions as to Dr. [Lundquist's] choice in data sampling" (L1s v. upper managers; current v. former; etc.) "go to the heart of [her] methodology," and are thus critical not simply to weight but to admissibility. *Allgood v. GMC*, 2006 U.S. Dist. LEXIS 70764, at *33 (S.D. Ind. Sept. 18, 2006); *R&R Int'l Inc. v. Manzen*, 2010 U.S. Dist. LEXIS 94550, at *34-37 (S.D. Fla. Sept. 10, 2010); *Chavez v. IBP, Inc.*, 2004 U.S. Dist. LEXIS 28838, at *22-34 (E.D. Wash. Dec. 8, 2004) (technique for extrapolating survey results to larger population undermined and rendered inadmissible by faulty methodology that failed to ensure representative sample or evaluate non-response bias).

*Dr. Lundquist Violated the Double-Blind Paradigm*

SNET posits that it was permissible for Dr. Lundquist to misinform the survey's participants about its purpose because surveys should be double-blind -- ie., blind as to both the

8

sponsor and purpose.  Here, it is eminently clear that the survey was not double-blind: the participants knew SNET was the sponsor.  And, as Plaintiffs argue, they were conditioned to provide the responses favored by their employer.  Plaintiffs do not contend that all 14 were blind to the survey's purpose; most were likely wise to the game.  It is well-known among SNET upper management that the company is embroiled in wage and hour litigation revolving on the extent of the L1s' managerial authority and discretion.  However, any upper managers who were believed to be sympathetic to their subordinates may have been actively misled.

### Defendant Improperly Contacted a Represented Party

SNET claims that Dr. Lundquist's interview and observation of a Field Manager (Joseph Piccolo) who meets the class definition was appropriate because counsel relied on Plaintiffs' class list.  However, SNET in turn knew that the list was solely based on and derived from a review of employment data produced by the company -- including a spreadsheet showing which L1s in which titles had what types of techs reporting to them at what time.  SNET was obligated to supplement and correct this information and could not legitimately rely upon Mr. Piccolo's exclusion from a list compiled from inaccurate data.  The company had *actual knowledge* that he was part of the certified class and selected him for Dr. Lundquist's scrutiny on that basis.  (*See* Wittels Reply Dec.; Piccolo Dec., Ex. B to Melzer Dec.)[11]

Dr. Lundquist should be barred from rendering any opinions based upon *ex parte* contacts with class members, and the Court should order other relief as it deems appropriate.

### Assuming that the Court Declines to Strike Dr. Lundquist's Report and Testimony, Plaintiffs Should be Permitted a Discovery Extension in Order to: (a) Depose Her; (b) Consider Deposing the 14 Survey Participants; and (c) Disclose One or More Liability and/or Rebuttal Experts

---

[11] Defendant SNET claims to downplay its "inadvertent" contact with opt-in Jerry Nuzzo.  However, Mr. Nuzzo reports that, just like Mr. Piccolo, he was subject to a full-fledged interview and observation by Dr. Lundquist and her colleague Dr. Moomaw; as with Mr. Piccolo, the process lasted 1.5-2 hours.  (*See* Nuzzo and Piccolo Decs., Exs. B and C to Melzer Dec.)

In its opposition to the related Motion to Expedite, SNET chastises Plaintiffs for seeking an extension of expert discovery despite the Court's admonition against further scheduling changes. However, Plaintiffs had no way of anticipating the company's surprise tactic of introducing a voluminous liability report. Plaintiffs will be severely prejudiced if they are unable to adequately prepare for Dr. Lundquist's deposition and to delve behind her hearsay-based conclusions by deposing the survey respondents. Further, Plaintiffs abided by the parties' agreement and did not introduce a liability expert; they will be unfairly disadvantaged if they cannot present liability and/or rebuttal reports.

Defendant argues that because the case management order does not mention rebuttal experts, such experts are not permitted. However, SNET's few citations are all from far-flung jurisdictions and have been frequently distinguished or rejected by a run of recent case law. Moreover, they do not deal with this unique situation where a party has foregone an initial expert in reliance on its opponent's representations.

Under applicable precedent, Fed. R. Civ. P. 26(a)(2)(C) continues to apply as a default where the scheduling order does not specify a rebuttal expert deadline.[12] Even assuming that rebuttal experts are precluded by the April scheduling order, the Court is clearly permitted to modify its order for good cause shown and to avoid prejudice to Plaintiffs.

---

[12] See *Dunn v. Zimmer*, 2005 U.S. Dist LEXIS 3505, at 3 n.1 (D. Conn. Mar. 9, 2005) ("The court's scheduling order did not establish a time for the disclosure of rebuttal experts and therefore the Rule 26(a)(2)(C) applies as a default."); *SEC v. Badian*, 2009 U.S. Dist. LEXIS 120951 (S.D.N.Y. Dec. 23, 2009). See also, e.g., *Martinez-Hernandez v. Butterball, LLC*, 2010 U.S. Dist LEXIS 50246, at *38-42 (E.D.N.C. May 21, 2010); *A & J Mfg., LLC v. Kingsford Prods. Co., LLC*, 2010 U.S. Dist. LEXIS 47401 (S.D. Ga. May 13, 2010) (and cases cited); *City of Gary v. Shafer*, 2009 U.S. Dist. LEXIS 41004, at *7-8 (N.D. Ind. May 13, 2009); *Mayou v. Ferguson*, 544 F.Supp. 2d 899, 901 (D.S.D. 2008); *Aircraft Gear Corp. v. Marsh*, 2004 U.S. Dist. LEXIS 15897, at *16 (N.D. Ill. Aug. 11, 2004); *Syringe Dev. Partners L.L.C. v. New Med. Tech., Inc.*, 2001 U.S. Dist. LEXIS 2843, at *104 n.7 (S.D. Ind. Feb. 9, 2001); *Walker v. Yellow Freight Sys.*, 1999 U.S. Dist. LEXIS 15012, at *8-9 (E.D. La. Sept. 24, 1999).

The Court's April 2010 scheduling order sets the date for Defendant's expert disclosures as November 22, 2010 and the close of discovery at December 31, 2010, allowing ample time for the disclosure of rebuttal experts under Fed. R. Civ. P. 26(a)(2)(C).

Respectfully submitted,

Dated: December 16, 2010

  /S/ Steven L. Wittels
Steven L. Wittels
**SANFORD WITTELS & HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone:  (646) 723-2947
Facsimile: (646) 723-2948
Email: swittels@swhlegal.com
*Lead Counsel for Plaintiff Sharon L. Perkins*
*and the Opt-In Collective Action Plaintiffs*

   /S/ Edmond Clark
Edmond Clark
Law Office of Edmond Clark
83 Scotland Avenue
Madison, CT 06443-2501
Telephone: (203) 245-4602
Fax: (203) 245-9734
eclarkmadisonlaw@aol.com