UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHARON L. PERKINS, ET AL., | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:07-CV-967 (JCH) |
| | : | |
| v. | : | |
| | : | |
| SOUTHERN NEW ENGLAND | : | JUNE 1, 2011 |
| TELEPHONE CO., | : | |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 307) AND PLAINTIFFS' MOTION TO STRIKE (Doc. No. 338)**

**I.      INTRODUCTION**

Plaintiffs, Sharon Perkins, Michael Blasko, Joseph Kiely, Michael McDermott, and Kelly Werbinski, bring this action against defendant, Southern New England Telephone Co. ("SNET"), on behalf of themselves and a class of similarly situated employees (collectively, "class plaintiffs"), alleging that they were not paid for overtime work in violation of the Fair Labor Standards Act ("the FLSA"), 29 U.S.C. § 207 and Connecticut General Statutes §§ 31-60(a) and 31-76(c).  See Second Am. Compl. (Doc. No. 118).

On January 18, 2011, SNET filed a Motion for Partial Summary Judgment (Doc. No. 307) with respect to class plaintiffs' state law claims.  According to SNET, class plaintiffs qualify as executive employees under the relevant Connecticut statutory and regulatory provisions and are, therefore, as a matter of law, exempt from the state overtime requirements.

1

For the following reasons, the court denies defendant's Motion for Partial Summary Judgment. In light of this Ruling, the court terminates plaintiffs' Motion to Strike (Doc. No. 338) as moot.

## II.   FACTUAL BACKGROUND[1]

On November 4, 2009, this court certified a Rule 23 class action of SNET First Level Managers (or "Level Ones"). See Doc. No. 204. The parties have stipulated that this class is defined to include:

> only those Level One employees in two titles (Manager Network Services and Manager Construction and Engineering) who were assigned technicians with specific bargaining unit titles as follows: Network Delivery Technician, Network Deployment Technician, Installation and Repair Technician, Outside Plant Technician, Premises Technician, Service Delivery Technician, Service Delivery Technician-Business.

L.R. 56(a)(1) Stmt. ¶ 1 (Doc. No. 309).

Level Ones are classified as "managers" by SNET and have held that title at all times relevant to this case. L.R. 56(a)(1) Stmt. ¶ 8. According to SNET, this title appropriately accounts for the duties Level Ones engage in during their workday. In contrast, however, class plaintiffs describe their duties as clerical and wholly lacking the imprimaturs of management.

Little is agreed upon between the parties in this case. See L.R. 56(a)(2) Stmt. (class plaintiffs denying twenty-seven out of thirty-two separately identified "facts" cited

---

[1] The court would normally rely heavily on defendant's Local Rule 56(a)(1) Statement in order to articulate the factual background. The Statement will generally include a substantial number of undisputed facts. Unfortunately, this document is all but useless to the court in the present case. The vast majority of defendant's "facts" are too broad and too contentious to permit a straightforward admission or denial. See, e.g., L.R. 56(a)(1) Stmt. ¶ 13 ("Plaintiffs also arrange for their Techs to participate in informal "peer to peer" training with another Tech or provide "on the job training," and ensure that Techs have the appropriate training on new or changing technologies." (emphasis added)). Class plaintiffs cannot be expected to admit or deny such "facts." As such, the court will generally rely on the factual record.

by SNET). It is clear that Level Ones work in one of three different subdivisions of SNET, Core Installation & Maintenance ("I&M"), Construction and Engineering ("C&E"), or U-verse, and that they are assigned to work with anywhere from ten to thirty technicians ("Techs"). See L.R. 56(a)(1) Stmt. ¶¶ 2-3.[2] Level Ones report to "Area Managers," who supervise anywhere from five to twelve Level Ones and upwards of 100 Techs. Id. at ¶ 6. These Area Managers supervise Level Ones at multiple sites and are typically not on-site to oversee Levels Ones or Techs. Id. at ¶ 7.

Level Ones meet daily with their assigned Techs to review an agenda. Id. at ¶ 10; L.R. 56(a)(2) Stmt. ¶ 10 (disputing nature of meetings, but not disputing that they took place on a daily basis). At these meetings (or "huddles"), Level Ones provide to their assigned Techs safety alerts, company policies, and information on their Techs' productivity. See, e.g., Keith Dep. 46:22-47:3, Oct. 8, 2008 (safety alerts and company policies); McKeon Dep. 38:24-39:5, Aug. 11, 2010 (productivity). These meetings also appear to be opportunities to discuss jobs that were previously finished or ones that were planned for that day. See, e.g., McKeon Dep. 39:9-10 ("The technicians may bring up a roadblock or two based on the day before's work."); M. Theriault Dep. 43:16-18, June 8, 2010 ("[O]n occasion, there is [sic] jobs that I need to talk about."). Daily huddles appear to last up to twenty minutes. See, e.g., McKeon Dep. 39:21-24 ("Company policy it should last about ten minutes. It could go a little longer, 20 minutes depending on the subject that needs to be covered or the discussion that we are having.").

---

[2] Although class plaintiffs "deny" these paragraphs, they do not cite facts disputing either that Level Ones are assigned technicians or that they work in the three mentioned subdivisions of SNET. See L.R. 56(a)(2) Stmt. ¶¶ 2-3.

Outside of these meetings, Level Ones engage with their assigned Techs on a variety of levels. Level Ones inform Techs of any necessary training and sometimes facilitate such training. See, e.g., Greco Dep. 58:3-6, July 27, 2010; Troiano Dep. 173:13-19, Aug. 10, 2010 (agreeing that Level Ones would coordinate technician pairings for training). Level Ones assist in removing "roadblocks" between Techs and their projects. See, e.g., L. Albert Dep. 35:4-7, Aug. 10, 2010; Poirier Dep. 50:21-51:6, July 8, 2010. Level Ones perform site inspections, review performance metrics, and conduct "ride alongs" with their Techs from time to time. See, e.g., Barber Dep. 56:5-57:12, 60:4-61:12, Sept. 23, 2008 (site inspections); Burdon Dep. 248:10-18, July 14, 2010 ("ride alongs"); Greco Dep. 96:3-13 (review of performance metrics); see also Fermo Dep. 37:4-7, Aug. 19, 2010 (noting that, although he did not participate in ride-alongs, he planned to). Level Ones also review Techs' timesheets[3] and supply orders, occasionally separately order supplies, and conduct safety sweeps of their garages. See, e.g., L. Albert Dep. 40:12-18 (ordering supplies); Barber Dep. 35:24-37:8 (timesheets); Lavery Dep. 119:22-24, Sept. 26, 2008 (safety sweeps); Reynolds Dep. 201:8-15, July 21, 2010 (reviewing supply orders).

Class plaintiffs are quick to point out at every turn—and SNET does not appear to dispute—that Level Ones do not have very much discretion in conducting these various tasks. See, e.g., L.R. 56(a)(2) Stmt. ¶ 47; Def.'s Reply to L.R.56(a)(2) Stmt. ¶

---

[3] Class plaintiffs "deny" this fact. See L.R. 56(a)(2) Stmt. ¶ 25. However, none of the cited facts contradict the fact that "[p]laintiffs review and sign off on time sheets of the Techs assigned to them." L.R. 56(a)(1) Stmt. ¶ 25.

47.[4]  Rather, Level Ones' duties are heavily circumscribed. Everything from the daily "huddles" to site inspections to Techs' training requirements is carefully laid out with no input from Level Ones. See, e.g., L. Albert Dep. 173:24-174:4 ("I can't make a decision. . . . I have to get direction on everything that I do. I can't order a screwdriver, and I'm being told everything to do."). Level Ones are required to follow guidelines and checklists and do not have an opportunity to inject their viewpoints into any of the processes they supposedly oversee. See, e.g., Barber Dep. 165:22-166:3 ("I follow company procedure and guidelines all day long . . . . My day is spent following guidelines and passing that onto my technicians.").

## III. STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

---

[4] Class plaintiffs object to SNET's separate "Statement in Reply." See Pls.' Mot. to Strike (Doc. No. 338). While the court has never seen a statement of this nature and doubts its permissibility under the Local Rules, the court did find the statement helpful in identifying which facts cited by plaintiffs were and were not disputed by defendants. In light of the court's Ruling in favor of class plaintiffs below, the court does not need to address their objection to this pleading.

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## IV.   DISCUSSION

Class plaintiffs bring this action pursuant to both the Connecticut Minimum Wage Act ("the CMWA") and the FLSA, see Second Am. Compl. ¶¶ 148-66, and SNET asserts defenses under both statutes, see Answer at 6 (Doc. No. 139). The present Motion, however, is brought only with respect to the CMWA claims and that statutes' executive exemption. See generally Def.'s Mem. (Doc. No. 308). SNET argues that class plaintiffs are executive employees, as a matter of Connecticut law, and that summary judgment is appropriate on plaintiffs' CMWA claims.

However, upon review of the facts on the record, including the excerpts from the depositions of more than fifty class members, the court concludes that there are

6

material issues of fact such that a reasonable jury might determine that Level Ones are non-exempt employees under the CMWA. For this reason, the court denies SNET's Motion for Partial Summary Judgment.

    A.    <u>Regulatory Language</u>

The executive exemptions found in the FLSA and CMWA regulations are very closely matched. In fact, until 2004, the relevant language was essentially identical. <u>Compare</u> Conn. Agencies Regs. § 31-60-14(a), <u>with</u> 29 C.F.R. § 541.1 (2003). As of 2004, however, the federal regulations eliminated what were previously known as the "short" and "long" test versions of the executive exemption. <u>See</u> 29 C.F.R. § 541.100. In order to frame its later discussion, the court below sets out the current and former state and federal schemes.

The court rejects SNET's suggestion that it interpret the Connecticut regulations in a vacuum, without relying on federal law, given the slight differences between the provisions. <u>See</u> Def.'s Mem. 3-4, 6, 8-9. The Connecticut Supreme Court has made it clear that, when interpreting the CMWA, Connecticut courts rely on federal precedent interpreting analogous provisions of the FLSA. <u>See</u> <u>Roto-Rooter Servs. Co. v. Dep't of Labor</u>, 219 Conn. 520, 528 n.8 (1991). The federal and state regulations were virtually the same until 2004, so interpretations of the pre-2004 federal regulations are clearly relevant to this court's inquiry. Further, the language in the federal regulations has not substantially changed and, thus, even cases interpreting the post-2004 regulations are pertinent to the court's analysis.

        1.    The CMWA "Short" and "Long" Tests

Connecticut regulations currently provide that the executive exemption includes any employee:

> (1) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and
> (2) who customarily and regularly directs the work of two or more other employees therein; and
> (3) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and
> (4) who customarily and regularly exercise discretionary powers; and
> (5) who does not devote more than twenty percent . . . of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in subdivisions (1) to (4), inclusive, of this section; . . . and
> (6) who is compensated for his services on a salary basis at a rate of not less than four hundred dollars per week . . . .

Conn. Agencies Regs. § 31-60-14(a). This test is sometimes known as the "long" test. For employees who make $475 or more per week, however, the regulations provide for a truncated—or "short"—test, which renders exempt any employee "whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein." Id.

Connecticut regulations do not provide any further explication of the terms used throughout these provisions, such as "management" or "primary duty." However, the Connecticut Department of Labor has released a worksheet to assist employers in identifying whether or not an employee is exempt.[5] Included in this worksheet is a list of

---

[5] This worksheet is available on the Connecticut Department of Labor website, at www.ctdol.state.ct.us/ wgwkstnd/forms/pay001.pdf.

exempt, "managerial" duties, including:

- Interviewing, selecting, hiring and training employees.
- Setting and adjusting pay rates and work hours or recommending same.
- Directing work.
- Keeping production records of subordinates for use in supervision.
- Evaluating employees' efficiency and productivity.
- Handling employees' complaints.
- Disciplining employees including termination, or recommendation to terminate.
- Planning work.
- Determining techniques to be used at work.
- Distributing work to others.
- Deciding on types of merchandise, materials, supplies, machinery, or tools.
- Controlling flow and distribution of merchandise, materials and supplies.
- Providing for safety of employees and property.
- Establishing strategy, making financial or marketing decisions, etc.

CDOL Worksheet at 3-4 (Doc. No. 323-4). This list is quite similar to the one found in the FLSA regulations, discussed further below.

    2.  The FLSA Regulations Pre- and Post-2004

The federal regulations under the FLSA were virtually identical to Connecticut provisions until 2004. These regulations also included a short and long test. The long test exempted any employee:

> (a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department of subdivision thereof; and
> (b) Who customarily and regularly directs the work of two or more other employees therein; and
> (c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and
> (d) Who customarily and regularly exercises discretionary powers; and
> (e) Who does not devote more than 20 percent . . . of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section . . . ; and
> (f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week . . . .

29 C.F.R. § 541.1 (2003).  The pre-2004 short test exempted employees making more than $200 per week, "whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein."  Id.

As of 2004, however, the regulations changed and the distinction between the short and long tests disappeared.  Now, federal regulations exempt an employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

Federal regulations also provide further instructions with respect to the definitions of both "management" and "primary duty."  Before 2004, the regulations provided a list of duties that were generally understood to be managerial, including:

> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

10

29 C.F.R. § 541.102(b) (2003).  The 2004 regulations added three additional duties to this list, including "providing for the . . . security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures."  29 C.F.R. § 541.102.

The pre-2004 explanation of primary duty included four factors a court should consider, in addition to "[t]he amount of time spent in the performance of the managerial duties," including:

> the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

29 C.F.R. § 541.103 (2003).  The current statutes no longer mention "the frequency with which the employee exercises discretionary powers."  See 29 C.F.R. § 541.700.  However, courts understand this factor to be incorporated into an analysis of an employee's "relative freedom from supervision."  See, e.g., Morgan v. Family Dollar Stores, 551 F.3d 1233, 1270 n.57 (11th Cir. 2008) ("Having discretionary power is one aspect of freedom from supervision.").

   B.   Executive Exemption as Applied to Level Ones

Class plaintiffs stipulate that they satisfy the salary requirements of the CMWA's short test.  Therefore, SNET need only prove two things in order for Level Ones to qualify as exempt: (1) that Level Ones' primary duty is management and (2) that Level Ones direct the work of two or more other employees.  See Conn. Agencies Regs. § 31-60-14.  Further, the court will assume that, if SNET could prove the first prong of the

11

exemption—that Level Ones' primary duty is management—than it can also prove that Level Ones direct the work of two or more employees.[6]

Thus, the court need only determine whether Level Ones' "primary duty is management." For the reasons stated below, the court is of the view that there are material issues of fact[7] such that a reasonable jury could find (1) that Level Ones' work is not managerial, and (2) that, to the extent Level Ones engage in managerial work, such work is not their primary duty.

    1.    "Management"

The term "management" is not self-defining. Titles are cheaply had, and little weight, if any, can be given to the fact that SNET labels their employees "managers." See, e.g., Dep't of Labor v. City of Sapulpa, Okla., 30 F.3d 1285, 1288 (10th Cir. 1994) ("The common thread in each of these cases is that a title . . . provides no guidance . . . ."). Further, the fact that Level Ones take advantage of this title in constructing their resumes is both unsurprising and unhelpful. See Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 503 (6th Cir. 2007) ("[C]ourts cannot rely on the plaintiff's or the employer's description of the plaintiff's position or authority . . . ." (emphasis removed))

Instead, the "primary factor . . . is the nature of [the employees'] duties." Butler

---

[6] Class plaintiffs argue this point. See Pls.' Opp. 36-40. However, this argument is "closely linked" to their argument that Level Ones' primary duty is not management and is addressed in the discussion of that prong. Mullins v. City of New York, 523 F. Supp. 2d 339, 359 n.217 (S.D.N.Y. 2007). The court rejects class plaintiffs' suggestion that, to satisfy this element, Level Ones must direct their Techs more than eighty percent of the time they spend working. See Pls.' Opp. 38-40. This requirement would be completely at odds with the cases that have held that an exempt manager may spend more than fifty percent of her time doing nonexempt work. See, e.g., Donovan, 675 F.2d at 521.

[7] In the following subsection 1(a)-(e), the court sets forth evidence in the record that is contrary to defendant's position in its Motion for Summary Judgment. Thus, such evidence creates issues of material fact.

ex rel. Skidmore v. Hartford Tech. Inst., Inc., 243 Conn. 454, 467 (1997); see also Myers v. Hertz Corp., 624 F.3d 537, 548 (2d Cir. 2010) ("The exemption question, therefore, is a mixed question of law and fact, involving a number of subsidiary questions . . . . Significantly, the regulations make clear that these questions should be resolved by examining the employees' actual job characteristics and duties." (citation omitted)). In aid of its analysis, the court will consider the variety of duties that have been identified as managerial by pre-2004 federal regulations, as well as those listed in the Connecticut Department of Labor worksheet, discussed supra. See 29 C.F.R. § 541.102; CDOL Worksheet at 3-4. Unlike class plaintiffs, however, the court does not view these lists as "factors" in analyzing whether someone is exempt, see Pls.' Opp. 16-22, but rather as lists of actual duties that could qualify Level Ones as exempt, if any number of these tasks can be considered Level Ones' "primary duty."

SNET, in its Reply, argues that Level Ones perform the following duties: (1) "Directing work"; (2) "Evaluating employees' efficiency and productivity"; (3) "Handling employee's complaints"; (4) "Distributing work to others"; (5) "Controlling flow and distribution of merchandise, materials and supplies"; and (6) "Providing for safety of employees and property." Def.'s Reply at 5. However, after considering the record in a light most favorable to class plaintiffs, the court does not agree with SNET's assessment.

                    a)      Directing, Distributing, or Apportioning Work

Level Ones disseminate information to Techs about their daily assignments and any important information regarding their workday. See, e.g., Keith Dep. 46:22-47:3 (discussing the daily dispensation of information and tasks to Techs). However, Level

13

Ones do not determine the nature of the work to be conducted by a given Tech on any given day.  See, e.g., Baranosky Dep. 100:9-16.  Rather, Level Ones receive preset instructions on what each Tech is required to do.  See, e.g., Poplawski Dep. 24:15-25, July 7, 2010.  Level Ones cannot modify these assignments, nor determine whether a particular Tech is better suited for a particular task.  See, e.g., Kiely Dep. 29:2-8, Sept. 25, 2008.

Although Level Ones hold a daily meeting with Techs for up to twenty minutes, these meetings do not appear to be anything more than opportunities to convey information from the Level Ones' superiors to the Techs.  See, e.g., L. Albert Dep. 18:11-21 (discussing scripted agenda).  This transference of information might conceivably be termed "directing," "distributing," or "apportioning."  However, the simple fact is that the handing out of predetermined assignments is not a "management" task.  See, e.g., Gorman v. Cont'l Can Co., No. 76 C 908, 1985 WL 5201, at*22 (N.D. Ill. Dec. 31, 1985) (finding that the distribution of work did not constitute "directing" employees).  Rather, an employee must exercise some modicum of control over these processes in order for them to appropriately qualify as exempt duties.

                b)       Evaluating Employees' Efficiency and Productivity

Level Ones review performance metrics with their technicians and conduct site visits and "ride alongs."  See, e.g., Barber Dep. 56:5-57:12, 60:4-61:12 (site inspections); Burdon Dep. 248:10-18 ("ride alongs"); Greco Dep. 96:3-13 (review of performance metrics).  However, as with their morning huddles, these evaluations are circumscribed.  Techs' performance metrics are computer generated, see Fredsall Dep. 204:22-205:8, July 22, 2010 ("[W]e have to go on the site and go on that.  And then we

look at the results.  And if the results are okay, they meet them, and if the results are bad, then they don't meet them."), and Level Ones do not offer advice to their Techs with respect to their numbers, see, e.g., Burdon Dep. 157:19-59:23 (stating that he did not make suggestions to Techs on how to improve their numbers).  Level Ones conduct their inspections and "ride alongs" with pre-written forms, on which Level Ones are required to complete checklists and are not given an opportunity to elaborate or explain.  See, e.g., Baranowsky Dep. 89:9-21, Oct. 8, 2008; Blasko Dep. 104:12-17, Oct. 6, 2008.

Level Ones have no involvement in the creation or modification of these forms or the data used to generate them.  See, e.g., Hunt Dep. 192:16-18, Sept. 25, 2008 (stating that he had no influence over "what the goals are set as to what the number should be").  Instead, all work analyzing and reacting to these evaluations is done by Level Ones' superiors.  See, e.g., Marsella Dep. 188:14-15, June 16, 2010 ("[P]olicies [are] driven by the company—corporate.  We don't draw up policy.").

Again, although Level Ones may technically "evaluate" their assigned Techs, this cannot be appropriately considered a "management" duty.  See, e.g., Pressler v. FTS USA, LLC, No. 4:09-cv-676, 2010 WL 5105135, at *2 (E.D. Ark. Dec. 9, 2010) (finding plaintiff's "primary duties were not in management," where "he checked others' work using a standard form").  Absent some level of control over the design or method of implementation of these processes, these duties cannot be considered exempt.

     c)  Handling Employees' Complaints or Grievances

Level Ones often serve as the initial recipient of a complaint or grievance from one of their assigned Techs.  However, Level Ones are not permitted to resolve these

concerns, but must redirect them to the Area Manager.  See, e.g., Anderson Interrog. Resp. 2 (Doc. 322-2) ("I do not have the authority to resolve grievances.  It is understood that they are rarely if ever resolved at the Level One level.").  Level Ones would participate in "informationals," which appear to be the beginning of the grievance procedure.  See Marsella Dep. 117:16-23.  However, these meetings are not meant to resolve grievances, and Level Ones were not involved in the actual grievance proceedings, except to rarely respond to factual inquiries.  See, e.g., L. Albert Interrog. Resp. 2 (Doc. No. 322-1).

Level Ones cannot discipline Techs, nor do Level Ones' views appear to be given much, if any weight, during disciplinary proceedings.  See, e.g., Fermo Dep. 236:22-237:13.  Thus, contrary to SNET's characterization, Level Ones do not appear to "handle" these complaints or grievances.  Instead, they merely direct Techs to the appropriate person to be resolved.

       d)  Controlling Flow and Distribution of Supplies

Level Ones order supplies to some extent.  See, e.g., L. Albert Dep. 40:12-18.  Technicians also purchase supplies on their own, subject to Level Ones' "approval."  See, e.g., Miller Dep. 65:19-66:18, July 15, 2010.  However, as with everything else Level Ones do, the task of ordering supplies, when it is engaged in, is heavily circumscribed.  When Level Ones purchase supplies they utilize a mechanized system and must receive their supervisors' approval.  See, e.g., L. Albert Dep. 40:16-18.  Further, to the extent Level Ones "approve" their Techs' supply orders, this process appears to be only an opportunity to reject items that are not permitted by company policy.  See, e.g., Schwab Dep. 49:24-50-10, Aug. 4, 2010; see also Miller Dep. 65:19-

16

66:18.

Again, the court does not find this rubber stamping process to fall within the definition of "management." Absent some amount of control over the nature and number of products purchased, Level Ones' "purchase" of supplies does not constitute exempt activity.

          e)       Providing for Safety of Employees and Property

At their daily "huddles," Level Ones inform Techs of any safety alerts. See, e.g., Keith Dep. 46:22-47:3. Additionally, Level Ones sometimes perform site inspections for safety and safety sweeps of their garages. Barber Dep. 56:5-57:12, 60:4-61:12 (site inspections); Lavery Dep. 119:22-24 (safety sweeps). As with each of the previously discussed duties, however, Level Ones do not exercise any control with respect to the information conveyed to Techs nor over the nature of the inspections or the consequences for violations. See, e.g., L. Albert Dep. 18:11-21 (discussing scripted agenda); Carey Dep. 127:24-128:12, Sept. 30, 2008 (describing checklist for safety inspections); Burr Dep. 85:2-86:7, Nov. 11, 2008 (noting lack of discretion with respect safety-related disciplinary scheme). Absent such control, the court does not view these activities as exempt "management" duties. See, e.g., Pressler, 2010 WL 5105135, at *2.

          f)       Conclusion

In light of the little control Level Ones exercise over the nature of the various duties described in this section, the record supports a finding that Level Ones do not engage in "management" duties. See, e.g., Ale v. TVA, 269 F.3d 680, 692 (6th Cir. 2001) ("Although [plaintiffs] did spend some of their time supervising employees, this

supervision was not managerial in nature because they had no control over the people they supervised."). Instead of management, a reasonable jury could conclude that Level Ones' duties are better characterized as those of an administrative assistant to the Area Manager, lacking any real authority or power. Partial summary judgment on class plaintiffs' CMWA claims is, therefore, inappropriate.

        2.    "Primary Duty"

Even if one or more of the aforementioned duties were to constitute "management," partial summary judgment would be inappropriate in this case. The court must also consider whether any such management work can properly be considered Level Ones' "primary duty." See Conn. Agencies Regs. 31-60-14(a). Federal regulations interpret this term to mean "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Although "[t]he amount of time spent performing exempt work can be a useful guide," it is "not the sole test." Id. § 541.700(b). Instead, a court will consider a number of factors, including: "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id. § 541.700(a). This inquiry is a "fact-intensive" one. Reich v. New York, 3 F.3d 581, 586 (2d Cir. 1993), abrogated on other grounds as recognized by Close v. New York, 125 F.3d 31, 38 (2d Cir. 1997); see also Indergit v. Rite Aid Corp., No. 08 Civ. 9361, 2010 WL 1327242, at *6 (S.D.N.Y. Mar. 31, 2010) ("Many courts have held

that resolving this difficult and intensive factual inquiry is inappropriate at summary judgment.").

There is undisputed evidence on the record that Level Ones exercise very little discretion in their position, are closely monitored by their superiors, and earn less money than their "subordinate" Techs. See L.R. 56(a)(2) Stmt. ¶¶ 47-49; Def.'s Reply to L.R.56(a)(2) Stmt. ¶¶ 47-49.[8]  In light of this evidence, summary judgment is clearly inappropriate.

SNET, responding to this argument, has suggested that the federal regulations are inappropriate to apply, because consideration of an employees' discretion under the "primary duty" prong would render the inclusion of the additional "discretion" prong in the long test superfluous.  See Def.'s Reply at 2.  Notably, however, SNET failed to cite any cases in support of its position.  This is in spite of the fact that the supposed inconsistency identified by SNET was present in the FLSA regulations until their emendation in 2004.

Prior to 2004, federal regulations included a short and long test which were all but identical to the current Connecticut tests.  Compare Conn. Agencies Regs. § 31-60-14(a), with 29 C.F.R. § 541.1 (2003).  The federal long test, like the Connecticut long test, included a requirement that an employee "customarily and regularly exercise[] discretion."  Id. § 541.1(d). Despite this requirement, the federal regulation defining "primary duty" included a separate factor permitting the consideration of "the frequency with which the employee exercises discretionary power."  29 C.F.R  § 541.103 (2003).

---

[8] Defendant's Response is that the "purported fact is immaterial to the resolution of Defendant's motion."  Def's Reply to L.R.56(a)(2) Stmt. ¶ 47-49.  Under the rules, failure to admit or deny a factual statement is deemed an admission.  Fed. R. Civ. P. 56(e)(2); L.R.56(a)(3) (D.Conn).  Therefore, the court deems these paragraphs admitted.

The court does not view this as so incredible a result. It appears entirely consistent, on the one hand, to require evidence that an employee "customarily and regularly exercise discretion" under the long test, and, on the other hand, to permit a court to consider the frequency of any discretion under that test's "primary duty" requirement. See Thomas, 506 F.3d at 506 & n.7 (discussing difference between the two inquiries and referring to the long test's factor as a "heightened standard"). The discretion prong is only rendered superfluous if, in every instance where an employee does not "customarily and regularly exercise discretion," she necessarily does not have management as her primary duty. Class plaintiffs have not argued for this result, nor is it necessary for their argument.

Therefore, in light of the fact that, as SNET appears to admit, there remain material issues of fact "as to whether and to what degree Plaintiffs exercised discretion in the course of their work," Def.'s Mem. 2, it is clear that summary judgment, even under Connecticut's short test, is inappropriate.

## V.    CONCLUSION

For the foregoing reasons, the court denies defendant's Motion for Partial Summary Judgment (Doc. No. 307). In light of this Ruling, the court terminates plaintiffs' Motion to Strike (Doc. No. 338) as moot.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 1st day of June, 2011.

                                                    /s/ Janet C. Hall
                                                   Janet C. Hall
                                                   United States District Judge