# REPORT AND RECOMMENDATIONS

## OF THE PRESIDING OFFICER AT PUBLIC HEARINGS ON

## PROPOSED REVISIONS OF REGULATIONS, PART 541

Defining the Terms

"Executive" "Administrative"

"Professional"

"Local Retailing Capacity"

"Outside Salesman"

as contained in Section 13 (a)(1) of the Fair Labor Standards Act

I. "Stein Report", October 10, 1940
   (Harold Stein, Presiding Officer)

II. "Weiss Report", June 30, 1949
    (Harry Weiss, Presiding Officer)

III. "Kantor Report", March 3, 1958
     (Harry S. Kantor, Presiding Officer)

UNITED STATES DEPARTMENT OF LABOR
W. WILLARD WIRTZ, Secretary

Wage and Hour and Public Contracts Divisions.
CLARENCE T. LUNDQUIST, Administrator

WASHINGTON, D. C.

## STATEMENT OF THE ADMINISTRATOR

The construction of Regulations, Part 541, as amended, which the Wage and Hour Division will follow in enforcing the act thereunder (unless and until the regulations are set aside in whole or in part by amendment or by authoritative decisions of the courts) will be found in this Report and Recommendations.

PHILIP B. FLEMING,<br><i>Administrator.</i>

III

At these hearings all interested parties were given full opportunity to testify and to cross-examine witnesses. There was wide representation from both industry and labor;[4] many of those who testified based their statements on painstaking and prolonged study. These statements contain a mass of valuable information. In addition to the oral testimony, approximately 180 briefs, written statements and memoranda were received. The Administrator also called upon members of his staff for suggestions based on their own experiences in making decisions under the regulations during the course of actual inspection work. The following report and recommendations are based on the whole investigation which has been carried out in the manner described.

## Section II. THE ADMINISTRATOR'S AUTHORITY UNDER SECTION 13 (a) (1) OF THE ACT

### ADMINISTRATOR HAS BROAD POWERS

It was freely admitted by interested parties that the Administrator is given a large degree of discretion under section 13 (a) (1) of the Fair Labor Standards Act.[5] It is clear from the very terms of the act itself that Congress felt that the mere use of the phrase "employed in a bona fide executive capacity" etc. was adequate as a standard, but inadequate as a detailed rule to guide employers, employees, and the courts. It therefore gave the Administrator the responsibility of amplifying and describing more precisely the type of employees to whom the exemption would be applicable. Use by Congress of the word "delimited" as well as the word "defined" is a further indication of the extent of the Administrator's discretionary power under this section of the act. Therefore, the Administrator is responsible not only for determining which employees are entitled to the exemption, but also for drawing the line beyond which the exemption is not applicable.

### EXEMPTION SHOULD BE INTERPRETED NARROWLY

The general rule in a statute of this nature, that coverage should be broadly interpreted and exemptions narrowly interpreted, is so well known as to need little elaboration here. This doctrine was recently restated by the Circuit Court of Appeals for the Eighth Circuit in its opinion in the Hawkeye case,[6] in connection with the exemption in section 13 (a) (5) of the act. In this opinion, which is equally applicable to the problems of definition and delimitation under section 13 (a) (1), the court said:

> The manifest declared purpose of the statute was to eradicate from interstate commerce the evils attendant upon lower wages and long hours of service in industry. Accepting this as the declared purpose of the act, exemption would tend to defeat its purpose. The statute is remedial, with a humanitarian end in view. It is, therefore, entitled to a liberal construction.

---

[4] There were 127 appearances on behalf of employers and employers' associations; 34 on behalf of employee groups (A. F. of L., C. I. O., and independent); 2 on behalf of the American Association of Schools and Departments of Journalism; and 1 for the League of Women Shoppers, Inc.; a full list of appearances will be found in Appendix C.

[5] See, for example, statements of Elisha Hanson, American Newspaper Publishers Association, and Morris Zeitlin, International Federation of Architects, Engineers, Chemists, and Technicians, Hearing July 25–9, vol. II, p. 817 and vol. 1, p. 149, respectively.

[6] *Fleming v. Hawkeye Pearl Button Co.*, 113 F. (2d) (adv. ops.) 52 (C. C. A. 8th, 1940).

a general national minimum requirement for exemption.[18] Aside from the serious difficulties in enforcement that would be involved, these various suggestions fail to take into account the fact that the Fair Labor Standards Act itself has as an objective "a universal minimum wage of 40 cents an hour" and contemplates lower differential minima only as a temporary device in reaching the universal minimum as rapidly as possible.

Further, it should be recognized and admitted that the minimum salary qualification in the definitions of "executive," "administrative," and "professional" must be in each instance an approximation of what will best effectuate the purposes of the act. Like most laws of national application, the act itself and the regulations issued thereunder cannot pretend to be scientific in the sense of taking into account every small variation occurring over the length and breadth of the country. To make enforcement possible and to provide for equity in competition, a rate should be selected in each of the three definitions which will be reasonable in the light of average conditions for industry as a whole. In some instances the rate selected will inevitably deny exemption to a few employees who might not unreasonably be exempted, but, conversely, in other instances it will undoubtedly permit the exemption of some persons who should properly be entitled to the benefits of the act.

## Section V. THE EXEMPTION OF ALL WHITE-COLLAR WORKERS

### LEGAL ARGUMENTS

Some of the proposals, most notably perhaps the proposal of the Southern States Industrial Council (as originally presented in written form)[19] would have the effect of exempting all of that very large group of persons known loosely as "white collar workers"—generally speaking, all employees except laborers, machine operators and tenders, craftsmen, and maintenance workers. It is unnecessary herein to discuss in detail the various legal arguments that were advanced in support of the proposition that such workers are not covered by the act at all. The Administrator has on numerous occasions expressed the opinion that white collar workers as such are entitled to the benefits of the act[20] and his opinion is, of course, followed in this report. Under the contrary opinion the specific statutory exemptions for named groups of typical white collar employees would not be needed nor would there be any occasion for a reexamination of Regulations, Part 541. However, it was urged alternatively by some that, while the general coverage of the statute might be thought to include "white collar" workers, the terms "executive," "administrative," and "professional" (and presumably "outside salesman") in and of themselves should be construed and were meant by Congress to exclude from the benefits of the act all white collar workers. Surely if Congress had meant to exempt all white collar workers, it would have adopted far

---

[18] It was argued by Mary M. Manderscheid, Montgomery Ward & Co., that this involves the assumption by the Administrator of a power to fix minimum wages for "executive" and "administrative" employees for which no basis is found in the act. Record April 10-16 hearing, vol. II, p. 267.

[19] It was later stated at the hearing by the Council's general counsel, J. H. Ballew, that a salary qualification of $20 to $30 a week would not be objectionable; record June 3-5 hearing, vol. I, p. 27.

[20] See Wage and Hour Division Interpretative Bulletin No. 1, par. 5.

Case 3:07-cv-00967-JCH   Document 575-2   Filed 11/18/11   Page 5 of 8

Case 1:06-md-01794-PAC   Document 110-2   Filed 05/06/08   Page 9 of 31
*"Executive, Administrative, Professional . . . Outside Salesman" Redefined*    7

more general terms than those actually found in section 13(a)(1) of the act. The theory of general exemption is further negated by the grant of power to the Administrator to define and delimit those terms.

### OVERTIME AND "IN-SERVICE" TRAINING

In addition to the legal arguments advanced, it was stated as a reason for exempting "white collar" workers that the overtime penalty interferes with the efforts of ambitious young men to improve their status by studying their employer's business after working hours.[21] An employer may frequently consider such after-hours work of inadequate educational value to justify overtime payments. However, the normal practice throughout industry for both factory and clerical workers is to give training on the job and during working hours, and the act in no way discourages such training. While a hardship with respect to training may be produced in occasional exceptional instances, this hardship must be weighed against the general widespread improvement of working conditions which results from application of the act.

It was also stated that the overtime requirements force some employers to place their clerical employees on staggered shifts which are inconvenient to both employer and employee.[22] No doubt this has occurred in some instances, although much of the testimony on this point referred to staggered shifts as a future possibility rather than a present actuality. These inconvenient staggered shifts may or may not be put into effect and at most will be adopted by only a small percentage of employers. Again such inconvenience as may result must be balanced against widespread shortening of working hours and increased employment.[23]

Another general argument advanced to support proposals that all clerical workers be exempted is that compliance with the act may lead employers to change many of their employees from a weekly or monthly salary to a straight hourly pay basis with the result that the employees will earn less in slack times.[24] Without underestimating the general desirability of weekly or monthly salaries which enable employees to adjust their expenditures on the basis of an assured income (so long as they remain employed), there is little advantage in salaried employment if it serves merely as a cloak for long hours of work. Further, such salaried employment may well conceal excessively low hourly rates of pay.[25] It also does not appear why there should be a reluctance to make occasional or even frequent overtime payments to salaried workers (other than those who fall into the narrower group of specifically exempted employees). Either the penalty payments will discourage long hours of work, or the worker will receive a reasonable compensation for his additional

---

[21] For example, see statement of A. L. M. Wiggins, American Bankers' Association, record July 9 and 10 hearing, vol. I, p. 26.
[22] For example, see statement of F. G. Addison, Securities Savings and Commercial Bank of Washington, D. C., record July 9 and 10 hearing, vol. I, p. 54.
[23] One large New York bank hired 300 additional employees to reduce hours below the statutory maximum; see address of Administrator before the Iowa Bankers' Association, Des Moines, Iowa, Sept. 11, 1940; Wage and Hour Division, G-79, p. 4.
[24] See statement of A. L. M. Wiggins, op. cit., note 21, p. 10.
[25] It was stated by Hugh C. McKenny, Commercial Telegraphers' Union, that, as a result of the exemption from overtime payments accorded executives, employees in nonexecutive positions working the same number of hours and being paid at a lower rate will frequently surpass the executive in total compensation received. Record July 25-29 hearing, vol. IV, p. 546.

efforts. Extra payments by way of bonuses have long been common and are not considered inconsistent with salaried status. Although it is not suggested that under all circumstances the requirement of overtime payments to salaried workers is completely desirable and completely equitable, it is believed that under normal conditions the requirement is appropriate for salaried as well as for hourly paid workers. Finally, while it is reasonable to hold that the terms "bona fide executive, administrative * * * and professional capacity" are properly applicable in general only to salaried workers,[26] it does not necessarily follow that all salaried workers fall within these three categories. Even if such action were desirable, and it is not thought to be so, the Administrator does not have the power to exempt all salaried workers.

Another argument frequently advanced by the proponents of a blanket exemption for white collar workers is that the maximum hours provisions of the act are or should be applicable only to persons whose earnings approximate the minimum wage. "A ceiling for hours" is just as much an independent objective of the act as a "floor for wages," and surely it is a serious misreading of the act to assume that Congress meant to discourage long hours of work only where the wages paid were close to the statutory minimum. Living conditions can be improved and work spread even where wages are comparatively high.

## LOW WAGES OF SALARIED WORKERS

All the foregoing arguments have as an inarticulate major premise the assumption that all salaried white collar workers enjoy satisfactory working conditions—that they need no protection against oppressively long hours. The record shows the incorrectness of this assumption. There is evidence, some of it introduced by proponents of the blanket exemption, that, prior to the effective date of the act, a workweek of 48 or 54 hours or even longer was common.[27] This is confirmed by the results of a survey of 4,821 women office employees in 39 States and the District of Columbia which was quoted by one witness to show that the hours of work of these employees are frequently long, 30 percent of them having a workweek of 44 to 48 hours and 10 percent having one of 48 hours or more.[28] The significance of this testimony is enhanced by the fact that the 1930 Census of Population showed that 1,986,830 or 49.4 percent of the total number of clerical workers were women. Moreover, there was testimony that vacations with pay are far from universal [29] and that long hours at sedentary occupations are not conducive to health.[30] Thus, the labor conditions of this group of employees have frequently been, in fact, "detrimental to health, efficiency, and general well-being." This

---

[26] As will be seen below, a requirement that pay be on a salary basis is recommended for executive employees and on a salary or fee basis for administrative and professional employees.
[27] See, for example, statement of Joseph T. Owens, representing the Pittsburgh Plate Glass Co., record April 10–16 hearing, vol. II, p. 243; statement of Lewis Merrill, United Office and Professional Workers of America, record April 10–16 hearing, vol. II, p. 342.
[28] Women's Bureau, U. S. Department of Labor, Bulletin No. 132, Women Who Work in Offices. Quoted by Nina P. Collier, League of Women Shoppers, Inc., record April 10–16 hearing, vol. V, p. 786.
[29] Statement of Morris Zeitlin, International Federation of Architects, Engineers, Chemists, and Technicians, record July 25–29 hearing, vol. I, p. 156.
[30] Statement of Louis Merrill, United Office and Professional Workers of America, record April 10–16 hearing, vol. II, p. 340.

conclusion is corroborated by the testimony of union representatives who furnished evidence of the enhanced well-being of their members caused by the shortening of their working hours. Concretely, for example, one union representative stated that the reduction of weekly hours of work had been followed by a notable decline in per capita sick benefits.[31]

The desire to have all white-collar workers exempted under section 13 (a) (1) is probably also linked with a forgetfulness of the fact that section 13 (a) exempts workers from both section 6 and section 7 and an unawareness of the low wages that an astonishingly large percentage of these workers have been paid. It was admitted by some employer representatives that occasionally white-collar workers receive low wages,[32] but the prevalence of low wages is best shown by surveys made by governmental agencies, State and Federal. The survey of women office workers previously referred to showed that 25.4 percent of the employees covered earned less than $20.00 a week,[33] while another survey which covered both men and women office employees showed surprisingly large percentages earning less than $17.50 per week.[34]

In addition to the many statements made at the hearings by both employee and employer representatives concerning the attitude of white-collar workers toward their inclusion under the act, consideration must also be given to direct expressions from those immediately and personally affected by the proposed exemption. The Administrator has received a number of such letters. Typical among them is one from a white collar employee in North Carolina[35] who states that:

> Federal labor legislation has been responsible for reducing our hours * * * from 70 and 80 a week to around 42 * * * We and countless thousands of other so-called white-collar workers owe our leisure to the Wage-Hour Act. May I urge you again not to weaken it.

It is notable that although this employee obviously receives more than 40 cents an hour, he is deeply concerned with hours limitation. This is merely one individual statement out of many. The basic position is the same as that adopted by labor unions testifying on behalf of thousands of employees. To exempt these employees under section 13 (a) (1) would deprive them of their right to the minimum wage

---

[31] Statement of Leo Bernstein, United Wholesale and Warehouse Employees of New York, record April 10–16 hearing, vol. V, p. 810.
[32] For example, see statement of J. H. Ballew, Southern States Industrial Council, record July 25–29 hearing, vol. I, p. 20, and statements of individual employers requesting exemption for white-collar employees with salaries ranging as low as $12 and $15 a week and $52, $55, and $57.50 a month, in Southern States Industrial Council Exhibit No. 4 (hearings branch Docket No. 55).
[33] Women's Bureau, op. cit., note 28.
[34] A census of office employees conducted in Pennsylvania in 1934 showed the percentage of workers in various white-collar occupations who earned less than $17.50 a week to be as follows:

| | Percent |
|---|---|
| Office machine operators | 52.4 |
| Telephone and switchboard operators | 68.4 |
| File clerks | 46.4 |
| Order clerks | 59.8 |
| Office clerks | 38.7 |
| Shipping and receiving clerks | 40.8 |
| Stock clerks | 47.4 |
| Secretaries | 23.3 |
| Stenographers | 51.9 |
| Typists | 62.1 |
| Bank tellers | 5.4 |
| Bookkeepers | 41.3 |

Pennsylvania Emergency Relief Administration, Census of Employable Workers in Urban and Rural Non-Farm Areas, Pennsylvania, pp. 64 to 68.
[35] Letter dated August 25, 1940, from B. S. Dekle, found in hearings branch Docket No. 73.

required under section 6 and the overtime payments required by section 7. Their need for both should not be overlooked.

## Section VI. EXECUTIVE EMPLOYEES

### RECOMMENDED DEFINITION

**Section 541.1. Executive.**

The term "employee employed in a bona fide executive * * * capacity" in section 13 (a) (1) of the act shall mean any employee

(A) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

(B) who customarily and regularly directs the work of other employees therein, and

(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and,

(D) who customarily and regularly exercises discretionary powers, and

(E) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

(F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment.

Much of the criticism of the present Regulations, Part 541, has been directed at section 541.1 thereof.[36] This has arisen principally because section 541.1 tends to exclude from the exemption the type of employee previously described as being employed in an administrative capacity. Inasmuch as a separate section of the Regulations defining this type of employee is recommended,[37] no attempt will be made at this point to consider this problem. The following discussion, therefore, is concerned with employees whose responsibility is directly managerial—employees, in other words, who in addition to other responsibilities, are concerned with the supervision of other workers.

### "DEPARTMENT OR RECOGNIZED SUBDIVISION THEREOF"

There was some criticism of the requirement in the present Regulations that the employee must have as a primary duty "the management of the establishment, or a customarily recognized department thereof, in which he is employed."[38] Criticism of this section was primarily made by those who were concerned with employees who supervise miscellaneous groups of employees not constituting a customarily recognized department or subdepartment of an establishment. This criticism might be felt to have greater weight and the problem might need more careful scrutiny if it were not for the fact that, with only rare exceptions, the evidence shows that these group supervisors customarily perform a substantial amount of the same work as do the men whom they supervise. Furthermore it would require a strange interpretation of "bona fide executive" to include

---

[36] For full text of present Regulations, see Appendix A.
[37] For full text of recommended Regulations, see Appendix B.
[38] See, for example, statement of Noel Sargent, National Association of Manufacturers, record June 3-5, hearing, vol. II, p. 376.