UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHARON L. Perkins, et al., | ) | |
| Individually and on Behalf of Others Similarly Situated, | ) ) ) | No: 3:07CV967 (JCH) |
| PLAINTIFFS, | ) ) | |
| v. | ) ) | |
| SOUTHERN NEW ENGLAND TELEPHONE COMPANY, | ) ) ) | ORAL ARGUMENT REQUESTED |
| DEFENDANT. | ) | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR JUDGMENT AS A MATTER OF LAW UNDER FED. R. CIV. P. 50(b)**

Plaintiffs' Rule 50 motion is far more than a bare attempt to retry the case to the Court after being unsuccessful with the jury. Rather, when the admissible evidence is considered along with the applicable standards for liability, no reasonable trier of fact could find in SNET's favor.

*Standard*

SNET's opposition to Plaintiffs' motion begins with a blatant distortion of non-citeable case law. The stringent standard from *Scott v. Rosenthal*, 53 F. App'x 137, 140 (2d Cir. 2002) – an unciteable summary order, *see* 2d Cir. Rule 32.1.1 – applies only if the moving party failed to make a R. 50(a) motion at trial. *Id*. (citing *Pahuta v. Massey-Ferguson, Inc.,* 170 F.3d 125, 129 (2d Cir.1999)). The applicable standard is cited in Plaintiffs' initial motion and is satisfied here.[1]

*Waiver*

SNET's contention that Plaintiffs have waived their arguments has no merit. Plaintiffs' basic argument is straightforward: the evidence showed that L1 duties consisted entirely of scripted and tightly-controlled activities that were, as a matter of law, non-exempt and therefore insufficient to establish the elements of the exemption. This argument is the same one that Plaintiffs made in their Rule 50(a) motion. Tr. at 2528-34 (arguing that L1s' activities were "tightly scripted," that L1s lacked "any discretion," and thus SNET had failed to meet its burden to show that Plaintiffs' primary duty was management). Moreover, SNET construes the requirements of Rule 50(a)(2) far too narrowly: the Rule "does not require technical precision in stating the grounds of the motion." *Jordan v. City of Cleveland*, 464 F.3d 584, 595 (6th Cir. 2006) (quoting 9A Wright &. Miller, Fed. Prac. & P. § 2533, at 310 (2d ed.1994). In arguing that SNET had not met its burden with regard to the "primary duty" element of the exemptions (as well as each of the other elements), Plaintiffs gave SNET more than enough notice as to the

---

[1] SNET's footnote one is yet another reiteration of its repeatedly-rejected argument that collective and class certification is inappropriate in misclassification cases such as this one and that individualized liability proceedings and determinations are required.

1

deficiencies in its case. *See Wimmer v. Suffolk Cty. Police Dept.*, 176 F.3d 125, 136 (2d Cir. 1999) (R. 50(a)(2) waiver argument without "merit" where defendant alleged that plaintiff "had failed to satisfy the first element of a prima facie case"). "Strict identity of issues, however, is not required. So long as they are 'closely related,' such that opposing counsel and the trial court may be deemed to have notice of the deficiencies asserted by the moving party, the purposes of the rule will be satisfied." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010).

Lastly, SNET cannot claim that it was surprised Plaintiffs would allege that the L1s' work activities were non-managerial when that was a central issue in its motion for summary judgment. *See Gordon v. Cty. of Rockland,* 110 F.3d 886, 887 & n. 2 (2d Cir. 1997) (finding no merit in Rule 50 specificity objection where issue was raised in summary judgment motion); *see also Wimmer*, 176 F.3d at 136. Plaintiffs argued, and the Court agreed, that it was at least a disputed issue as to whether the L1s actually performed exempt managerial duties in the first place – even before proceeding to consider whether any such tasks formed the L1s' "primary duty." In its ruling, the Court held that even nominally managerial tasks were non-exempt under the regulations if they did not entail genuine managerial authority and control. (*See* Doc. 361)[2]

<u>Whether Particular Work Activities are Exempt is a Clear Issue of Law for the Court</u>

SNET's attempt to distinguish *Icicle Seafoods* and its progeny rings hollow. These cases directly and unambiguously state that whether a particular work activity is exempt is a question of law. In contrast, in a case such as this, the actual tasks performed by the plaintiff-employees, the amount of time spent on each one, and their relative importance under a "primary duty" analysis are issues of fact for the jury. Despite SNET's futile contortions, *Holzapfel v. Town of*

---

[2] Furthermore, the Court must take into account the fact that Plaintiffs could not precisely anticipate at the time of their motion the specific activities that SNET would, in closing argument, argue to the jury were managerial. When one of SNET's slides showed it intended to present "handling customer problems" as an exempt management task, Plaintiffs promptly objected. The Court overruled the objection, finding the question of whether customer relations qualified for the exemption to be an issue for the jury. Tr. at 2578.

*Newburgh*, 145 F.3d 516 (2d Cir. 1998), is squarely on point and fully supports Plaintiffs' argument. There, the trial court correctly determined that a canine officer's time spent grooming, training, exercising, and otherwise caring for his police dog could be compensable "work." It was left for the jury to determine whether the officer actually engaged in such "work," how much time he spent on such activities, and whether that time was spent with the employer's actual or constructive knowledge. This was a proper allocation of the decision-making functions between judge and jury. *Id*. at 521-22.[3] It is precisely what Plaintiffs are asking for here. Plaintiffs argue that certain of the "management" functions identified by SNET at trial do not qualify as exempt work under the regulations, and that any residual managerial activities performed by the L1s are legally insufficient to satisfy the "primary duty" test. When only exempt activities are considered, no reasonable finder of fact could rule in SNET's favor.

<u>The  Evidence Fails to Support a Finding that L1's "'Primary Duty' is 'Management'"</u>

### A. *<u>The L1s Perform Minimal, if Any,  Exempt Managerial Work</u>*

Much of SNET's opposition essentially amounts to little more than a tautology: that "managing" is "managerial" is "management." However, it is well established that the executive exemption analysis focuses not on labels but on what an employee actually does. *See*, *e.g*., Doc. 361 at 12-13; Doc. 418-2 at 6-7, n.12; Pltfs MOL in Supp. R. 50 Motion at 8. SNET's broad description that the L1s "manage" their team to improve its quality, productivity, and safety numbers is meaningless. SNET largely centers on work that is ancillary, or "related to," management work. Under the regulations, such tasks are irrelevant unless there are underlying genuine managerial activities to which they attach. SNET thus puts the cart before the horse.

SNET highlights the L1s' duty to spot check the techs' work. But this Court has already

---

[3] However, the district court separately erred in instructing that only the time that was "reasonably required" was compensable. *Id*. at 523-24.

3

held that the L1s' circumscribed role in performing checkbox inspections and passing along virtually pre-scripted information "cannot be appropriately considered a 'management' duty." Doc. 361 at 13-15, 17 (citing *Pressler v. FTS USA, LLC*, 2010 WL 5105135, at *2 (E.D. Ark. Dec. 9, 2010)). *See also* 29 C.F.R. § 541.703(b)(3)) (to be "directly and closely related" to exempt managerial work, spot checks must be "distinguishable from the work ordinarily performed by a non-exempt inspector."). L1s did not use their inspections to precipitate changes in techs' employment status (*see* § 541.102: "appraising employees' productivity and efficiency *for the purpose of recommending promotions or other changes in status*") or in actively directing the company's business operations (*see id*.: planning the work, directing the work, determining the techniques to be used, determining the tools or equipment to be used, training employees, setting schedules, assigning work, planning and controlling the budget, etc). Deviations were marked down, incorporated into a tech's numbers, and bore standardized consequences.[4]

SNET asserts that the L1s' customer service activities qualify as exempt. Again, SNET depends on ancillary tasks without showing they are performed in close conjunction with exempt managerial work. In responding to customer complaints, L1s do not make managerial decisions

---

[4] SNET's citations are distinguishable. In *Rainey*, plaintiffs spent most of their time on the production floor monitoring the work; this was incidental to their responsibility for "the planning and supervision" of subordinates. 314 Fed. Appx. at 695. In *Baldwin*, the court focused not on spot checks but on the following exempt activities: "the interviewing, selecting and training of employees; setting hours for and planning and directing work; evaluating and disciplining employees; and maintaining the safety of the employees and the park." 266 F.3d at 1115. The court in *Sappington* focused on the fact that each plaintiff ran an assembly line; was responsible for coordinating production and meeting production goals; had discretion over the production process; trained and evaluated employees; and recommended hiring, firing, promotions, and raises. In this context, the court noted that the plaintiffs had to monitor the work and correct mistakes to facilitate the processes over which they were in charge. *See* 2007 U.S. Dist. LEXIS 83186, at *8-15. As to "primary duty," the court determined that the plaintiffs were in charge of and ultimately responsible for their lines; frequently exercised discretion; and earned substantially more than their non-exempt subordinates. *Id*. at *18-20. Finally, *Donovan v. Burger King*, 675 F.2d 516, 517 (2d Cir. 1982) merely notes, without describing, that the plaintiffs "monitored" employee performance among other tasks. In its short-test analysis, the court focused on the fact that they oversaw and determined how to run the operation, decided how much food to prepare, maintained inventory, scheduled and assigned work, moved employees around, and could hire and fire. *Id*. at 521. This oversight of and responsibility for the entire production process set plaintiffs apart from quality and safety inspectors.

regarding the business or its employees or exercise "real authority or power."[5]

As to safety, as the Court determined at summary judgment, "*providing for* the safety and security of employees and property" (29 C.F.R. § 541.102) requires the L1s' own substantive involvement. Performing standard checkbox site inspections and passing along safety bulletins (or as SNET put it, doing "safety templates," Tr. at 2662) does not qualify. Doc. 361 at 17. In other cases, such as those cited by SNET, plaintiffs had a far more active, independent role in monitoring and maintaining the safety of subordinates and ensuring they worked safely.[6]

Finally, SNET suggests that L1s assess technician performance and provide coaching and feedback. SNET misstates the regulations, which provide that management includes "appraising employees' productivity and efficiency *for the purpose of recommending promotions or other changes in status*." 29 C.F.R. § 541.102. Viewed in the light most favorable to SNET, the facts

---

[5] *Donovan* did not discuss plaintiffs' role in customer service. In *Lloyd*, plaintiff was a store manager who performed management functions such as setting work hours, interviewing, exercising input over hiring and firing, authorizing payments, and purchasing parts and stock. He also set prices for the store and resolved related customer complaints. Such complaints would have stemmed from and related to his own decisions in managing the store and its employees. *See* 2006 Conn. Super. LEXIS 2190, at *8-9. *Jones v. Va. Oil* – an unpublished case of limited application (*see* 4th Circuit Rule 32.1) – involved an analogous situation. Similarly, in *Tahir*, plaintiff admitted that he directed and controlled the work of subordinates and made all significant decisions related to the operation; as part of this role, subordinates relied on him to resolve customer problems. 2011 U.S. Dist. LEXIS 29729, at *6-8. *Cf.* 69 Fed. Reg. 22122, 22133 ("the person responsible for handling such complaints *as the individual responsible for the functioning of the operation*… would be operating in a management capacity."). In *Jean-Louis*, plaintiff's "primary duty" was "to supervise auditors"; she "was responsible for both disciplining employees… and for identifying and training auditors who [she] thought had the potential to be team leads. She was also responsible for developing a plan for the audits, directing where and how the auditors worked, and ensuring that all necessary equipment was available." 2011 U.S. Dist. LEXIS 93424, at *36-37. The fact that she was the most senior employee at a job site and the main liaison with its customers related mainly to the "freedom from supervision" prong of the "primary duty" test. *See id*. at *36.

[6] *See Raine*y, 314 Fed. Appx. at 695 (plaintiffs spent most of their time watching the work as part of their job in planning and supervising subordinates; no indication they lacked discretion or did not direct the work); *Baldwin*, 266 F.3d at 1114-15 ("maintaining safety" as part of running a park; no indication plaintiffs lacked input or discretion); *Burson*, 661 F. Supp. 2d at 799, 801 (providing safety training and instruction); *Sappington*, 2007 U.S. Dist. LEXIS 83816, at *8-15 (running production line, overseeing work, training employees, overseeing safety and correcting and disciplining employees); *McDowell*, 2005 U.S. Dist. LEXIS 29327(plaintiff was Operations Coordinator of Emergency Medical Services, with high-level managerial responsibilities including monitoring compliance with safety regulations).

developed at trial are almost exactly those described by the Court at summary judgment – which the Court held would not constitute exempt management work. Doc. 361 at 14-15. L1s have no role in creating or modifying the company's evaluation forms or the data used to generate them. They have no involvement in setting the expectations or performance criteria for the technicians; the metrics are set from above and generated by computer. The L1s have no meaningful role in analyzing and appraising tech performance and determining the consequences to the tech. They merely convey the results dictated by the technicians' numbers and by the L1s' superiors. *Id*.[7]

### B. SNET's Admission that it Lacked Evidence of the Amount of Time L1s Spent on Managerial Tasks Cannot Be Discounted in Light of the Other Evidence at Trial

SNET is generally correct that there is no definitive threshold for the amount of time spent on management.[8] But SNET misses the point. The allocation of an employee's time between exempt and non-exempt work is a critical factor of the "primary duty" test and a key

---

[7] In *Beauchamp*, plaintiff testified that he performed numerous classic management duties. The completion of performance evaluations related to his substantive role in disciplining subordinates and directing their work. *See* 357 F. Supp.2d at 1016; *see also Petersen v. Cleveland Inst. of Art*, 2011 U.S. Dist. LEXIS 41578, at *23 (N.D. Ohio Apr. 18, 2011)(distinguishing *Beauchamp*). *Fetrow-Fix* characterized such reviews as part of plaintiff's role in "training, supervision, and evaluation of employees, as well as protecting Harrah's equipment and business relations." In order to conduct these reviews, plaintiff "needed to observe and monitor dealers on a day-to-day basis to recognize their strengths and weaknesses." 2011 U.S. Dist. LEXIS 133696, at *14-15. Similarly, in *Darosa*, plaintiff discussed performance issues with subordinates and created evaluations and reports in connection with (i) managing and delegating the daily workflow, (ii) disciplining subordinates, (iii) handing employee complaints, (iv) creating and revising procedures, (v) training employees, (vi) interviewing employees and making hiring recommendations, and (vii) handling absences, tardiness, and other issues. Furthermore, she exercised "significant discretion" in performing these management functions. 2011 U.S. Dist. LEXIS 94871, at *15-17. There is nothing in the record in this action suggesting that the L1s had the substantive, comprehensive role seen in these cases. SNET did not care about the Plaintiffs' individual assessment of the techs' strengths and weaknesses and actively sought to remove their subjective judgment from the performance management process.

[8] *In Morgan v. Family Dollar Stores*, Inc., 551 F.3d 1233, 1272-73 (11th Cir. 2008), the court found defendant's cases distinguishable because they did not entail (1) the performance of 80-90% non-exempt work; "(2) the same severe degree of restriction on store managers' discretion by corporate policy; and (3) oversight as strict and involved as district managers' in this case." Furthermore, such retail cases involved the concurrent performance of exempt and non-exempt duties -- ie. directing subordinates' work while performing beside them – entitling the employees' estimates to less weight. *See also Johnson v. Big Lots Stores, Inc*., 604 F. Supp. 2d 903, 912-13 (E.D. La. 2009) ("No circuit courts have found management was a primary duty when the employee spent 80 to 90% of his time performing nonexempt tasks.")

benchmark for the exemption. SNET admitted at trial that it had little or no evidence on this factor. In contrast, the L1s estimated that they spent 70-90% or more of their time on routine clerical and/or administrative tasks. (They did not concede that any of their remaining duties, such as spot inspections, constituted *bona fide* management). The only other evidence as to allocation of their duties was that L1s spent very little time (approximately l-5%) on discipline-related activities, only a bare fraction of which could arguably be considered managerial.

This undisputed evidence cannot be disregarded in light of the overall evidence and the remaining "primary duty" factors. As discussed above, L1s performed negligible, if any, exempt managerial work.[9] The trial evidence further demonstrated that (i) their most important duties were routine and administrative (data entry, etc.) – the company wanted its established systems and processes carried out in a uniform, pre-determined manner; (ii) they were closely monitored and controlled by the company and lacked meaningful discretion; and (iii) they had substantially less earning capacity than their non-exempt subordinates for working equivalent hours.[10] The marginal percentage of time spent on management is highly relevant, and, in combination with the other one-sided factors, compels a conclusion in Plaintiffs' favor.

---

[9] SNET's contention that tasks such as relaying scripted information and performing routine checkbox inspections are managerial, even in the absence of the L1s' substantive input or discretion (Opp. at 17-19), is belied by the Court's summary judgment order. *See* Doc. 361. SNET's citations can be distinguished on this ground, as in footnotes 4-7, supra. In order to qualify as exempt, Plaintiffs must be performing these tasks as part of their own duties in running the business and directing its employees.

[10] Plaintiffs noted at trial that they inherited a handful of tasks from General Office Assistance (GOAs), supply clerks, and other support staff. This does not mean that their remaining duties were managerial. Plaintiffs contended that they wore numerous hats and that their salaries were commensurate with their demanding hours (the equivalent of more than one job) and the company's expectations that they be available at all times. Moreover, the executive exemption centers on the relationship between a "manager" and subordinate employees. *See* 29 C.F.R. 541.100, *et seq.*. While the "primary duty" test (§ 541.700) is applicable to each of the white-collar exemptions, SNET has not cited any executive exemption case comparing an employee's salary to that of non-subordinates. An employer should not be able to cherry-pick a category of workers somewhere in the company with somewhat overlapping duties but lesser compensation. Finally, GOA compensation should have been excluded as inadmissible due to unfair surprise. *See* Pltfs' concurrent R. 59 motion. The comparative salary factor of the "primary duty" test thus either favors Plaintiffs or is, at worst, inconclusive.

### C. *Discretion is and Always Has Been Inherent to "Bona Fide" Management*

In arguing that the exemption does not require "final" decision-making authority or "unfettered" discretion and control, SNET tussles with a straw man.[11] Especially in light of the principle of narrow construction, the Court was amply justified in ruling (1) that the regulations defining management activities imply an active role on the part of the employee in question (e.g.: (i) that transferring prepackaged information is not "management" or "directing the work," (ii) that merely relaying rather than resolving a complaint is not "handling" it, (iii) that "rubber stamping" tool orders is not "controlling the flow and distribution of supplies," (iv) that informing employees of safety alerts is not "providing for" their safety); (2) that the exemption demands "real authority or power" and that a *bona fide* "executive" exercises control and discretion over the tasks performed and the activities of subordinates; and (3) that a supervisory employee who can best be characterized as an administrative assistant does not perform exempt managerial work. *See*, *e.g*., Doc. 361; *Ale v. TVA*, 269 F.3d 680, 692 (6th Cir. 2001).[12,13]

---

[11] In *Beauchamp*, the Eastern District of Michigan relied heavily on *Burger King* (*see* 357 F. Supp.2d at 1018-19), which this Court distinguished at trial. *See* Tr. at 2121-22. SNET ignores *Beauchamp's* recognition that the performance of "management" functions is "typically associated" with the exercise of "authority" as well as *Beauchamp's* reliance on the specific facts at issue in that case. 357 F. Supp.2d at 1018-19. Both *Beauchamp* and *Burger King* involved supervisory employees who worked alongside their low-level subordinates and performed a host of clearly managerial duties concurrently with non-exempt tasks; while there were some limits on the plaintiffs' discretion in both cases, neither entailed the strict degree of centralization and control imposed by SNET. *See Ale*, supra; *Morgan*, supra.

[12] SNET's attempt to distinguish Plaintiffs' citations is unavailing. For example, SNET misconstrues *Petersen*, which granted summary judgment to plaintiff. 2011 U.S. Dist. LEXIS 41578, at *24-25. The simple fact is that *Burson* does require "day-to-day discretion" and "authority" over subordinates, which is not present here. Moreover, none of these cases revolved upon the "long test" condition that a plaintiff "customarily and regularly exercise discretionary powers" but on the inherent nature of "management" and employment in an "executive capacity." *Cf*. Doc. 361 at 19-20 ("entirely consistent… to require evidence that an employee 'customarily and regularly exercise discretion' under the long test, and... to permit a court to consider the frequency of any discretion under that test's 'primary duty' requirement.").

[13] In *Darosa v. Florida Default Law Group, P.L.*, 2011 U.S. Dist. LEXIS 94871, at *12-13, (M.D. Fla. Aug. 24, 2011), cited by SNET, plaintiff claimed that she was a "glorified worker," not "respected to make any decisions." She also asserted that she had "few managerial powers, including no power to train, no power to mentor or develop employees, no power to discipline, and no power to hire and fire." The

8

While the language of the exemption may have changed over time, its basic import – the exercise of genuine managerial authority – has not.[14]

### *The Evidence Fails to Support a Finding that L1's "Directed the Work" of Techs*

SNET argues that L1s satisfy the second element of the exemptions merely by virtue of having the requisite number of employees assigned to them. This argument failed on summary judgment and should again be denied. *See* Doc. 361 at 12 n.6, 13-14. Contrary to the Court's discussion of *Burger King* (s*ee* Tr. at 2121-22), the evidence conclusively establishes that the highly-paid, experienced, self-driven, and comprehensively-regulated tech work force does not "customarily" or "regularly" need direction from the L1s' to perform its appointed rounds. *See* MOL in Supp. R. 50 Motion at 12-15. As the Court held at summary judgment, mere "supervision," without "real authority or power" is not "management." The same holds true as to "directing the work." *See* Doc. 361 at 12 n.6, 14, 17-18; R. 50 Motion at 12-13.

### *The Evidence Fails to Establish that the L1s Manage a Customarily Recognized Subunit*

SNET misconstrues Plaintiffs' motion. Plaintiffs do not contest that a work unit can be a customarily recognized subunit; however, Defendant's evidence does not establish that a crew is so recognized at the company. More importantly, SNET does not establish that the L1s are "in charge of" and "manage" such a subunit; rather the L2s and upper management run the business and are responsible for all policies, practices, and decisions regarding the techs. Numerous L1s testified that over the last several years they no longer "ran" their crews. As the Court

---

court found this testimony sufficient to raise a genuine issue of material fact on the executive exemption; it would support a conclusion that plaintiff was "a manager in 'name only.'"

[14] SNET argues that the L1s have discretion over certain tasks, including "'managing' crews," "resolving and escalating roadblocks," and "assigning and apportioning work." It is meaningless to say that "managing" is "management." Plaintiffs have discussed in their initial motion why, despite SNET's labels, the L1s' actual performance of these tasks is not managerial. Clearly relevant is SNET's position (as opposed to that of its lawyers) that assigning tech work is not considered a management task at the company but is supposed to be performed by non-exempt employees in the dispatch center. *See* Ex. A, Dep. of 30(b)(6) witness Stewart "Buddy" McElhannon at 85, 87 (discussing "load control").

9

anticipated at summary judgment, after this function was divested from them, the L1s acted as little more than "administrative assistants."  See Doc. 361 at 18.

*The Evidence Fails to Establish that the L1sMade "Change of Status" Recommendations that Were Given "Particular Weight"*

**A. The DOL's Interpretation that an Employee's Recommendation Must "Precipitate" a Change in Status is Consistent with the "Particular Weight" Requirement and is Entitled to Judicial Deference**

The DOL's considered opinion on the FLSA and the regulations promulgated thereunder is entitled to deference, even where expressed in an *amicus* brief.  *See*, *e.g.*, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007); *Auer v. Robbins*, 519 U.S. 452, 461, (1997); *Mullins v. City of New York*, 653 F.3d 104, 113-14 (2d Cir. 2011).  Here, the term "particular weight" remains somewhat ambiguous (see 29 C.F.R. §§ 541.100(a)(4), 541.105), and the DOL's 2004 Federal Register and 2007 *amicus* brief are fully consistent with these regulations.  The DOL's interpretation does not contravene the provision that the employee need not have ultimate decision-making authority or that a higher-level manager's recommendation may have greater importance.  Rather, if an employee's recommendations are frequently without consequence or effect (do not "precipitate" any change), they cannot be deemed to bear "particular weight."  If an employee makes a recommendation and *nothing* happens in response – ie. the employee's input is ignored – it can hardly be considered especially "weighty."

**B. One-Day Suspensions are Not a "Change of Status" as a Matter of Law**

The overwhelming majority of instances where SNET claims L1s influenced "changes in status" consists of one-day suspensions and cannot, as a matter of law, establish this element of the exemption.  *See* R. 50 Mot. at 15-17; R. 59 Mot. at 8-9; R. 59 Reply at 5-6.  When these are properly disregarded, the evidence is insufficient to demonstrate that L1s "precipitate" actual status changes with adequate frequency to establish the exemption.

                                                Respectfully Submitted,

Dated: January 13, 2012         /s/ Steven L. Wittels

                                              Steven Wittels, (SLW-8110)
                                              Jeremy Heisler, (JH-0145)
                                              **SANFORD WITTELS & HEISLER, LLP**
                                              1350 Avenue of the Americas, 31st Floor
                                              New York, NY10019
                                              Telephone: (646) 723-2947
                                              Facsimile: (646) 723-2948

                                              David W. Sanford
                                              **SANFORD WITTELS & HEISLER, LLP**
                                              1666 Connecticut Avenue, N.W., Suite 310
                                              Washington, D.C. 20009
                                              Telephone: (202) 742-7780
                                              Facsimile:  (202) 742-7776

                                              Edmond Clark
                                              **Law Office of Edmond Clark**
                                              83 Scotland Avenue
                                              Madison, CT06443-2501
                                              Telephone: (203) 245-4602
                                              Fax: (203) 245-9734

                                              *Attorneys for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via ECF this 13th day of January, 2012 upon the following counsel of record:

**Patrick Shea**
Paul Hastings
Park Avenue Tower
75 E. 55th Street, First Floor
New York, NY 10022
212-318-6405
Fax: 212-752-2542
Email: patrickshea@paulhastings.com

*Attorneys for Defendant*


     /s/ Steven L Wittels
            Steven L. Wittels